UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                      :

In re:                                 :         (Chapter 11)
                                        :

AMES DEPARTMENT STORES, INC., *et al*.,       :
                                        :         Case No. 01-42217 (REG)
                                        :         Jointly Administered
                     Debtors.        :
-------------------------------------------------------------x
AMES DEPARTMENT STORES, INC.,          :
                                        :         Adversary No. 06-01890 (REG)
                Plaintiff,        :
                                        :
                 v.                  :
                                        :
LUMBERMENS MUTUAL CASUALTY CO.    :
                                        :
               Defendant.      :
-------------------------------------------------------------x

REPORT AND RECOMMENDATION ON AMES'
MOTION TO CONFIRM EXCLUSIVE JURISDICTION

APPEARANCES:

STORCH AMINI & MUNVES PC
*Counsel for Plaintiffs Debtors and Debtors in Possession*
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017
By:     Bijan Amini, Esq. (argued)
         Avery Samet, Esq.
         John W. Brewer, Esq.

TORRE, LENTZ, GAMELL, GARY & RITTMASTER, LLP
*Counsel for Defendant*
100 Jericho Quadrangle, Suite 309
Jericho, New York 11753
By:     Mark S. Gamell, Esq. (argued)
         Robert Beau Leonard, Esq.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In this adversary proceeding under the umbrella of the chapter 11 cases of Ames

Department Stores, Inc. ("**Ames**") and its affiliates, the district court has directed me[1] to provide

a report and recommendation on the resolution of Ames' motion for an order confirming that the

bankruptcy court (and hence the district court) has exclusive jurisdiction to hear this adversary

proceeding against Defendant Lumbermens Mutual Casualty Company ("**Lumbermens**").[2]

Lumbermens opposes the Jurisdictional Motion, contending that all of the issues in this dispute

should instead be heard by an Illinois state court as part of Lumbermens' ongoing insolvency

proceeding.[3]

This adversary proceeding, commenced in 2006—long before the commencement of

Lumbermens' Illinois insolvency proceeding—centers on the question of ownership of

approximately $8 million currently held in a trust account.  But it involves considerably more

than that, including issues of particular importance to the bankruptcy system—most

significantly, serious allegations of interference with the Debtors' property, of two separate

types, each of which is subject to the Court's *in rem* jurisdiction and the protection of the

Bankruptcy Code's automatic stay.[4]  While the parties have addressed the merits of the

---

[1]     *See Ames Department Stores Inc., v. Lumbermens Mutual Casualty Co. (In re Ames Department Stores Inc.)*, 512 B.R. 736 (Carter, J.) (S.D.N.Y. 2014) (the "**Withdrawal Opinion**") (granting Lumbermens' motion to withdraw the reference but directing the bankruptcy court to provide a report and recommendation with respect to the Jurisdictional Motion).

[2]     ECF No. 64 (the "**Jurisdictional Motion**").

[3]     Lumbermens' Answer and Cross-Motion to Dismiss was filed by Andrew Boron, Director of Insurance of the State of Illinois, as the statutory and court-affirmed receiver of Lumbermens in Rehabilitation (the "**Rehabilitator**").  Lumbermens subsequently converted its case to a liquidation, so Mr. Boron now acts in his capacity as the Liquidator for Lumbermens (the "**Liquidator**").  As the Liquidator, he has adopted the same positions as the Rehabilitator.  *See* Supp. Opp. at 2 (ECF No. 80).

[4]     *See* Bankruptcy Code section 362, and section 362(a)(3) in particular.  *See* page 22 & n.70, *infra*, addressing the several property interests in question.

substantive issues in their briefs and oral arguments (including the assertions and denials of interference with estate property), currently at issue is solely the extent to which this Court[5] has jurisdiction over the issues Ames raised and whether that jurisdiction is exclusive—and, to the extent federal and state courts might have concurrent jurisdiction over the issues Ames raised, whether this Court must nevertheless channel issues pending here to an Illinois rehabilitation court, under the McCarran-Ferguson Act.[6]

For the reasons explained below, I determine, and recommend that the district court determine, that:

(1) this Court has jurisdiction over *all* of the remaining issues in the adversary proceeding,[7] and has *exclusive* jurisdiction over three of them—Claims #4 (for violation of the automatic stay and contempt); #6 (marshaling); and #10 (equitable subordination);

(2) the McCarran-Ferguson Act does *not* dictate that an Illinois state court resolve the Ames-Lumbermens dispute instead of this Court (but would bar this Court from ruling on the allowance and priority of Ames' claims, if any, against Lumbermens' insolvent estate); and

(3) the "First Assuming Jurisdiction Doctrine", which, if applicable, would bolster Ames' arguments in favor of determining all of the issues here, does not apply to claims

---

[5]     This proceeding originated, as is usual, in the bankruptcy court.  But as discussed below, the bankruptcy court is a unit of the district court.  Both courts have the exact same subject matter jurisdiction—that provided under 28 U.S.C. § 1334.  As used here, "**this Court**" refers to both the United States Bankruptcy Court for the Southern District of New York, with respect to any proceedings before it, and the United States District Court for the Southern District of New York, with respect to any proceedings before it—with it being remembered that district courts may, and sometimes do, sit as bankruptcy courts, as they do in instances in which they have withdrawn the reference; where shortages of bankruptcy judges require district judges to preside over bankruptcy cases and proceedings in full (as they did in Delaware in the 1990s); or where district judges' § 1334 jurisdiction otherwise has been appropriately invoked.

[6]     15 U.S.C. §§ 1011-1015.

[7]     Certain causes of action asserted by Ames in the adversary proceeding, identified later in this opinion, have been resolved by stipulation of the parties.

over which this Court has only *in personam* jurisdiction (Claims ## 1, 2, 3, and 5), and need not be applied to claims over which this Court has *in rem* jurisdiction (Claims ## 4, 6, and 10, and Lumbermens' claims against the Ames estate) because, as to the latter set of claims, this Court has exclusive jurisdiction in any event. But to the extent it matters, this Court's *in rem* jurisdiction over the latter claims causes application of the First Assuming Jurisdiction Doctrine to such claims to be proper.

My recommended Findings of Fact and Conclusions of Law in connection with this determination follow.

<u>Facts</u>[8]

*1. The Bond*

In November 2000 (before the filing of Ames' chapter 11 case), Lumbermens and Ames entered into a contract (the "**Bond Agreement**")[9] under which Lumbermens provided a surety bond for payment of up to $14.35 million (the "**Bond**") to backstop Ames' obligations to Travelers Indemnity Company ("**Travelers**"), Ames' workers' compensation insurer, under a number of insurance policies and related agreements. Among other things, the Bond Agreement required Lumbermens to pay Travelers within seven business days of a demand by Travelers for payment, unconditionally and irrespective of the merits of Travelers' demand.[10]

Lumbermens had the right to be reimbursed by Ames for any amounts Lumbermens expended under the Bond. But importantly, none of Ames' obligations to reimburse Lumbermens for amounts Lumbermens might have to pay under the Bond Agreement was

---

[8]      All facts are undisputed unless otherwise noted.

[9]      The Bond Agreement is governed by the laws of the State of Connecticut.

[10]      Bond Agreement ¶ 1 (a demand by Travelers constitutes "absolute proof of the existence and extent of the liability of [Ames] and [Lumbermens] to [Travelers]…").

secured.  Thus, while Lumbermens would have the right to reimbursement from Ames for any sums Lumbermens might have to lay out incident to its unconditional duty to pay Travelers under the Bond, Lumbermens' right to reimbursement from Ames for such sums was *unsecured*, and in the event of a future Ames bankruptcy, would be an *unsecured claim*.

*2. Events During the Ames Bankruptcy*

Ames filed a chapter 11 bankruptcy petition in this Court in August 2001.[11]  In the early stages of its chapter 11 case, Ames attempted to continue in business, and incident to that, needed to continue to provide workers compensation coverage for its workers.   Travelers continued to administer the workers compensation program.  Later that year, for that reason, Ames obtained two letters of credit (the "**Letters of Credit**") for the benefit of Travelers in the aggregate amount of $26.85 million.   The Letters of Credit, originally issued by First Union National Bank and subsequently transferred to Wachovia Corporation (**"Wachovia"**), provided additional security for Ames' obligations to Travelers.  Pursuant to Ames' secured DIP financing agreement with General Electric Capital Corporation ("**GECC**"), GECC required Ames to fully collateralize—and indeed cash collateralize— the Letters of Credit to secure Ames' reimbursement obligations to Wachovia (the "**LC Collateral**").   As a result, like Lumbermens with respect to Lumbermens' Bond, Wachovia, as beneficiary of the Letters of Credit, had the right to repayment if its Letters of Credit were drawn upon.  But unlike Lumbermens, Wachovia's reimbursement rights were *secured*.  A draw by Travelers on the Letters of Credit would result in a corresponding impact on Ames' property—its cash—the collateral Ames had posted to secure the Letters of Credit.

---

[11]     On November 13, 2013, the Court approved Ames' chapter 11 liquidation plan. *See* Order Confirming Debtors' Third Amended Chapter 11 Plan, docketed in 01-42217-REG (ECF # 4185).

In March 2002, Lumbermens filed a proof of claim (the "**Proof of Claim**") in Ames' bankruptcy case.  That Proof of Claim asserted, in relevant part, an unsecured contingent claim for $14.35 million based on Lumbermens' reimbursement right consistent with a separate indemnity agreement between Lumbermens and Ames if Lumbermen's Bond were called by Travelers.[12]  The Proof of Claim was for an *unsecured* claim, since Lumbermens' reimbursement right was unsecured.

In May 2003, Travelers made a demand on Lumbermens for payment of $14.35 million under the Bond Agreement.  But Lumbermens did not make the payment to Travelers within the contractual seven business days.  Travelers sued Lumbermens in a lawsuit in Connecticut state court (the "**Connecticut Action**") to compel payment under the Bond Agreement.

*3. The Letter Agreement*

In November 2003, Lumbermens, Travelers and The Bank of New York, as Trustee, entered into a letter agreement to settle the Connecticut Action (the "**Letter Agreement**").[13]  The essential and relevant terms of the Letter Agreement were as follows:

(i) Lumbermens would deposit $8 million into a trust account, established at The Bank of New York,[14] for the sole benefit of Travelers (the "**Trust Monies**");

(ii) Travelers would be required to draw on the Letters of Credit *before* looking to satisfy Ames' obligations from the Trust Monies;

---

[12]   *See* General Agreement of Indemnity, dated July 26, 2000 (the "**Indemnity Agreement**").  The Indemnity Agreement is governed by Connecticut law.

[13]   The Letter Agreement does not include a "Governing Law" provision.

[14]   The Bank of New York, as Trustee, was also a party to the Settlement Agreement.  But its role was solely as a stakeholder, and its role will be noted going forward only where necessary for clarity.

(iii) After both the cash collateralizing the Letters of Credit and the Trust Monies were exhausted, Travelers could then make a demand on Lumbermens for any remaining amounts owed under the Bond; and

(iv) Travelers agreed to return to Lumbermens any unused or surplus portion of the Trust Monies, with two exceptions.[15]

In essence, then, the Letter Agreement at least temporarily absolved Lumbermens for its failure to honor $6.35 million of its obligations to Travelers; reduced the potential amount that Lumbermens would have to pay Travelers under the Bond Agreement (and for which Lumbermens' reimbursement right would be only an unsecured claim); and substituted, with respect to the remaining $6.35 million Lumbermens owed Travelers under the Bond, a likely or certain draw upon Ames' cash collateral. And thereafter, Ames' cash collateral was indeed drawn upon when the Letters of Credit were tapped.

Neither Lumbermens nor Travelers sought approval from this Court of the Letter Agreement, and neither sought relief, with respect to that conduct, from the automatic stay.

*4. The Adversary Proceeding and Travelers Settlement*

In 2006, Ames commenced this adversary proceeding against both Travelers and Lumbermens. In the complaint by which it then did so,[16] Ames sought, among other things:

---

[15]     First, Travelers would not be required to calculate and adjust the amount of Trust Monies required as collateral for Ames' obligations if "(a) Travelers' claim against Ames or the availability, application, or amount of [Trust Monies] is subject to challenge of any sort or (b) Lumbermens is the subject of an insolvency, liquidation, rehabilitation, or similar proceeding." Letter Agreement, ¶ 5. Second, the Agreement provided: "Notwithstanding Travelers' agreement to return the unapplied proceeds as prescribed [] above, Travelers may return the unapplied proceeds *in accordance with the order of the Bankruptcy Court overseeing Ames' bankruptcy case (or other court or authority with competent jurisdiction) that directs a different return or other disposition of the [Trust Monies]*…" Letter Agreement, ¶ 6 (emphasis in italics added).

[16]     ECF # 1.

(i) a declaratory judgment that Ames' obligations to Travelers should be satisfied from the *Bond* before any draw on the Letters of Credit (which would result in the depletion of Ames' cash collateral);

(ii) turnover to Ames of excess collateral held by Travelers pursuant to section 542 of the Bankruptcy Code (specifically, by cancelling the Letters of Credit and releasing the LC Collateral); and

(iii) damages arising from Travelers' breach of the Bond Agreement.

In 2007, because Travelers was considerably oversecured, Ames reached an intermediate settlement with Travelers (the "**Intermediate Settlement**") and filed a motion seeking the bankruptcy court's approval of it.  The Intermediate Settlement provided that Travelers would cancel one of the Letters of Credit and reduce the amount of the second, resulting in a release in the aggregate of $26 million in excess cash collateral.  Lumbermens objected to the settlement, arguing that it interfered with its rights under the Letter Agreement.  At a hearing on November 5, 2007, I approved the terms of the Intermediate Settlement and overruled Lumbermens' objection (the "**2007 Decision**").  Lumbermens did not appeal the 2007 Decision.

The 2007 Decision included findings of fact and conclusions of law, and a determination that the "proposed stipulation [would] not materially prejudice [Lumbermens'] interests."[17]  In so finding, I explained that:

> [Lumbermens'] interest cannot possibly be considered
> prejudiced because the remaining letter of credit being held
> by Travelers will have a value equal to Ames' maximum
> liabilities under the insurance program . . . To the extent
> that [Lumbermens] believes it has a contractual right to
> have other sources of collateral drawn upon before any of
> its bond or trust monies are used, and I express no opinion

---

[17]     Tr. of Hrg. of 11/5/07 at 44:6-7 (ECF No. 23).

> on the merits of that argument, [Lumbermens] is in no way
> prejudiced by this stipulation from pursuing that claim.  I'm
> not at all sure that I would have jurisdiction over a
> Travelers/[Lumbermens] dispute in this regard but each
> side can have a reservation of rights as to that as well.…
> [Lumbermens] is of course right that Ames has no interest
> in the surety bond and that neither the bond nor the letters
> of credit are property of the Ames estate.[18]  This decision
> assumes the correctness of those assertions.[19]

The stipulation and order confirming the Court's decision was entered on November 15, 2007.[20]

Around a year later, Ames and Travelers reached a further settlement of their dispute (the "**Final Settlement**").  Under the terms of the Final Settlement, the amount of Ames' liability to Travelers was fixed and would be paid by a direct draw on one of the Letters of Credit.  In exchange, Travelers assumed all existing and future claims against the Debtors that had been covered by the insurance provided by Travelers.  As part of its motion for approval of the Final Settlement, Ames also sought a separate order from this Court directing Travelers to release to Ames the Trust Monies and the balance of the LC Collateral.

Lumbermens objected to the Final Settlement as well.  In an effort to narrow the issues raised by Lumbermens' objection, Ames, Travelers and Lumbermens jointly submitted a proposed order, approved by this Court on December 15, 2008 (the "**2008 Order**"),[21] allowing the Final Settlement to proceed but reserving decision on the portion dealing with the return of the Trust Monies.  As part of this compromise, Lumbermens agreed to provide Ames with 45

---

[18]     Lest this be misunderstood, it should be noted that while neither the Bond nor the Letters of Credit were property of the Ames estate, Ames' cash collateral was—and indeed was the paradigm of property of the Ames estate.  Steps intended to cause a draw on the cash collateral, or resulting in such an effect, would likewise be paradigms of actions with effects on property of the estate that would be prohibited in the absence of relief from the stay.

[19]     Tr. of Hrg. of 11/5/07 at 49:4-22.

[20]     ECF No. 22.  The 2007 Decision included the following:  "The Bankruptcy Court retains jurisdiction to enforce and interpret the terms [of the Decision]."  2007 Decision at ¶ 14.

[21]     *See* Order dated Dec. 15, 2008, docketed in 01-42217-REG (ECF No. 3379).

days' written notice if Lumbermens decided to try to subject the Trust Monies to any other

court's jurisdiction.  The 2008 Order provided:

> [The] portion of the Motion which sought the release and
> turnover to Ames of the Trust Monies is preserved and
> deferred, as still pending, to be determined as part of the
> Adversary Proceeding in such procedural format as this
> Court may determine, and Travelers shall continue to hold
> the Trust Monies in accordance with the Letter Agreement
> and the trust established pursuant to the Letter Agreement,
> provided, however, that Debtors and Lumbermens fully
> reserve their respective arguments, positions, claims, and
> defenses regarding the interpretation of the Letter
> Agreement and the jurisdiction of this court to hear and
> dispose of matters involving the Letter Agreement, the
> Bond or the Trust Monies . . . .[22]

The 2008 Order further provided that it was "the intention of this reservation of rights to

leave the Debtors and Lumbermens in the same position in the Adversary Proceeding or any

other proceeding now existing or in the future which may exist, as if the Approval Events had

not occurred . . . ."[23]  Similar to the 2007 Decision, the 2008 Order retained jurisdiction in the

bankruptcy court "to resolve any disputes between and/or among Debtors, Lumbermens and

Travelers regarding the interpretation of [the] Order."[24]

*5.  The Second Amended Complaint*

In March 2009, Ames filed a Second Amended Complaint to reflect the approved terms

of the Final Settlement and remove Travelers from the adversary proceeding (the "**Amended**

**Complaint**").[25]  The Amended Complaint asserts claims for relief against Lumbermens for:

---

[22]   *Id.* at 3.

[23]   *Id.* at 4.

[24]   *Id.* at 8.

[25]   ECF # 30.

(i) damages for breach of the Bond Agreement pursuant to applicable state law ("**Claim #1**");

(ii) damages for breach of the Bond Agreement's implied covenant of good faith and fair dealing pursuant to section 105 of the Bankruptcy Code and applicable state law ("**Claim #2**");

(iii) damages for unjust enrichment arising from Lumbermens' failure to comply with the Bond Agreement pursuant to section 105 of the Bankruptcy Code and applicable state law ("**Claim #3**");

(iv) damages for violation of the automatic stay and contempt pursuant to sections 105 and 362(a) of the Bankruptcy Code ("**Claim #4**");

(v) a declaratory judgment directing that the Trust Monies and proceeds of the Bond Agreement be released to Ames ("**Claim #5**");

(vi) a declaratory judgment that Ames' obligations to Travelers should have been satisfied from the amounts available under the Bond prior to a draw on the Letters of Credit pursuant to section 1107 and 105 of the Bankruptcy Code ("**Claim #6**");

(vii) a declaratory judgment that Ames has no liability for duty and fees owed to the U.S. Department of the Treasury Customs Service ("**Customs and Border Protection**")[26] and ordering the release of the Customs Bond Collateral pursuant to 28 U.S.C. § 2201 (respectively, "**Claim #7**" and "**Claim #8**");

---

[26]    In 1994, Ames obtained a bond from Lumbermens for the benefit of Customs and Border Protection in the amount of $1.2 million to secure Ames' payments in compliance with federal regulation of importing or brokering foreign goods (the "**Customs Bond**").  In connection with the Custom Bond, Ames posted collateral in favor of Lumbermens in the form of two letters of credit in the aggregate amount of approximately $2 million (the "**Customs Bond Collateral**").

(vii) an order directing Lumbermens to cancel the Customs Bond and turnover excess collateral pursuant to section 542(a) of the Bankruptcy Code ("**Claim #9**", and together with Claim #7 and Claim #8, the "**Customs Bond Claims**");[27] and

(ix) equitable subordination of Lumbermens' claims pursuant to sections 510(c) and 105(a) of the Bankruptcy Code ("**Claim #10**").

In its answer to the Amended Complaint, Lumbermens asserted a number of defenses and counterclaims against Ames.[28]  Included in the Answer were arguments that this Court lacked subject matter jurisdiction over the adversary proceeding, and that the adversary proceeding was not a "core" proceeding pursuant to 28 U.S.C. § 157.  Lumbermens also included counterclaims against Ames for damages and subrogation, setoff and contribution.  A number of Lumbermens' counterclaims asserted post-petition administrative expense priority under the Bankruptcy Code.[29]

Then, in 2010 and 2011, Lumbermens filed two administrative expense claims against the Ames estates in the amount of $7.2 million and $10.7 million, respectively.[30]  Both claims related to rights and obligations under the Bond Agreement, the Indemnity Agreement and the Customs Bond, and were asserted as counterclaims against the estates in connection with this adversary proceeding.  Ames objected to both administrative priority claims and sought to expunge or reclassify them as general unsecured claims.  In 2011, the parties agreed by stipulation to cap Lumbermens' administrative claims at $2 million.  They further agreed that the

---

[27]     The Customs Bond Claims were resolved by stipulation of the parties (ECF # 49).  Thus this Decision omits further reference to the Customs Bond Claims.

[28]     ECF # 33 (the "**Answer**").

[29]     *See* Answer, Counts Two through Six.

[30]     Claim nos. 6658 and 20039.

merits of these administrative claims would be tried together with the Adversary Proceeding.  At
that time, Lumbermens asserted that:

> It is impossible, and grossly unfair, to separate the issues
> presented by Ames' Objection [to Lumbermens'
> administrative claim] from those preserved in the [2008
> Order], that are being litigated in the Adversary
> Proceeding . . . ."[31]

### 6. Lumbermens' Illinois Rehabilitation Proceedings

By 2012, Lumbermens, like Ames, had difficulty meeting its obligations to its creditors.

On June 26, 2012, Lumbermens' board of directors voted to consent to the commencement of a

rehabilitation proceeding.  About a week later, the Circuit Court of Cook County, Illinois (the

"**Rehabilitation Court**") entered an *Agreed Order of Rehabilitation*, which, among other things,

commenced Lumbermens' rehabilitation proceeding and granted the Rehabilitator with statutory

authority over Lumbermens' liabilities and assets (the "**Rehabilitation Order**").[32]  Lumbermens

did not provide any advance notice to Ames of its decision to enter a rehabilitation proceeding.

Upon receiving notice of the Rehabilitation Order, Ames immediately sought to file with this

Court an expedited motion to confirm the court's exclusive jurisdiction over the Trust Monies.

The Rehabilitator appeared in this Court by counsel, who advised me of a desire that he

have a period of time to get up to speed as to this controversy, and he received 45 days to do so.

Ames and the Rehabilitator thus agreed to a stipulation, entered on August 1, 2012, under which

neither party would take any action with respect to the jurisdictional issues until September 14,

2012.  The Rehabilitator agreed to inform Ames in writing by that date whether he would

consent to the exclusive jurisdiction of this Court over the Trust Monies.  If the Rehabilitator did

---

[31]   *See* Lumbermens' Opposition to Debtors' Objection to Administrative Claims, at ¶ 7 (attached as Exh. H to
the Jurisdictional Motion).

[32]   Attached as Exh. M to the Jurisdictional Motion.

not consent, then Ames would have an additional 45 days to move this Court for an order confirming exclusive jurisdiction.

At the end of the standstill period, the Rehabilitator declined to consent to this Court's jurisdiction over the Trust Monies and Ames renewed its jurisdictional motion.

*7.  Motion to Withdraw the Reference*

Lumbermens thereafter moved for withdrawal of the reference.  As a result, the parties worked out a new briefing schedule, and Ames filed the Jurisdictional Motion.  On July 3, 2014, Judge Andrew Carter of the district court issued the Withdrawal Opinion—granting Lumbermens' motion to withdraw the reference, and directing me to issue a Report and Recommendation on the Jurisdictional Motion, for *de novo* review by the district court.

Incident to that, Judge Carter identified two areas as to which he particularly wished my views.  He noted that "the Bankruptcy Court will need to delve into the intricacies of whether its exercise of jurisdiction over the adversary proceeding would 'invalidate, impair, or supersede' Illinois state law within the meaning of McCarran-Ferguson . . .  It likely would also need to determine whether McCarran-Ferguson's preemptive framework extends to the first-exercising jurisdiction doctrine..."[33]

After Judge Carter issued his decision, I held a status conference to determine how then to proceed in the bankruptcy court.  The parties thereafter submitted supplemental briefing,[34] and I took oral argument.[35]

---

[33]     Withdrawal Opinion at 742-43.

[34]     *See* Tr. of Hrg. of 7/24/14 at 26:23–27:6 (ECF No. 78).  Apparently as a result of an obvious error in the transcript (which nonsensically spoke of the Court drawing inferences from "disputed," rather than "undisputed," facts), the parties' subsequent briefing also focused on what they had read in the transcript. The issue was addressed at the hearing on November 18, 2014, at which I confirmed, not surprisingly, that in the absence of an evidentiary hearing, I was speaking of drawing inferences only from *undisputed* facts. This issue now is, or should be, off the table.

<u>Discussion</u>

<u>I.</u>

<u>This Court's Jurisdiction</u>

A.    *Federal Courts' Jurisdiction Over Bankruptcy Matters*

1.    *28 U.S.C. § 1334*

District courts and bankruptcy courts exercise jurisdiction in bankruptcy-related

matters—including those in this adversary proceeding—under one of the several provisions of

the Judicial Code (title 28 of the U.S. Code) in which federal trial courts are granted subject

matter jurisdiction.

The Judicial Code's provision conferring subject matter jurisdiction for consideration of

bankruptcy-related matters, 28 U.S.C. § 1334 (which directly follows like-provisions granting

subject matter jurisdiction in federal question, diversity and admiralty cases),[36] confers original[37]

subject matter jurisdiction on district courts (and, accordingly, on bankruptcy courts, which are

units of the district court)[38] with respect to bankruptcy cases and proceedings.[39]

---

[35]    *See* Tr. of Hrg. of 6/30/15 ("**6/30 Hrg. Tr**.") (ECF No. 87).

[36]    *See* 28 U.S.C. §§ 1331 (federal question); 1332 (diversity); 1333 (admiralty).  Ames contends that this Court also has diversity jurisdiction under 28 U.S.C. § 1332, and (though I believe it means with respect to some, but not, all of its claims) federal question jurisdiction under 28 U.S.C. § 1331.  *See* Ames' Reply in Support of Jurisdictional Motion at 5-6 (ECF # 75).  For obvious reasons, I focus on § 1334 law.

[37]    In addition to their *original* jurisdiction, district courts have *appellate* jurisdiction to hear appeals from bankruptcy court orders and judgments under 28 U.S.C. § 158.  Because that district court appellate jurisdiction has no applicability here and the entirety of this discussion relates to the original jurisdiction of bankruptcy and district courts, I generally will not be inserting "original" before jurisdiction every time I discuss jurisdiction here.

[38]    *See* 28 U.S.C. § 151 ("In each judicial district, the bankruptcy judges in regular active service shall constitute a unit of the district court to be known as the bankruptcy court for that district.  Each bankruptcy judge, as a judicial officer of the district court, may exercise the authority conferred under this chapter with respect to any action, suit, or proceeding and may preside alone and hold a regular or special session of the court, except as otherwise provided by law or by rule or order of the district court.").

[39]    As I have previously noted, *see, e.g., In re Houghton Mifflin Harcourt Pub. Co*., 474 B.R. 122, 131-133 (Bankr. S.D.N.Y. 2012); *Buena Vista Television v. Adelphia Communications Corp. (In re Adelphia Communications Corp.),* 307 B.R. 404, 413 n. 22 (Bankr. S.D.N.Y. 2004) ("**Adelphia**"), "case" as used in

Subsection (a) of section 1334 provides that the district courts have original and *exclusive* jurisdiction over *cases* under title 11 (not at issue here),[40] and section 1334(e) gives district courts *exclusive* jurisdiction over property of debtors' bankruptcy estates.[41]

Then—and apart from the district courts' *exclusive* jurisdiction, just discussed— § 1334(b) grants courts sitting in bankruptcy with "original but not exclusive" jurisdiction over "civil *proceedings* arising under title 11, or arising in or related to cases under title 11"—which include, in addition to contested matters[42] in cases, adversary proceedings like this one.[43] Accordingly, there are three types of original (but not exclusive) jurisdiction that district (and hence bankruptcy) courts may exercise under § 1334.  They are colloquially referred to as "arising under," "arising in," and "related to" jurisdiction.

---

bankruptcy parlance is a word of art—referring to that which is commenced by the filing of a petition for relief under the Bankruptcy Code—and refers to the umbrella case (here, the *Ames* chapter 11 case) under which many individual proceedings (applications, motions, contested matters and adversary proceedings) are heard.  "Case" is the modern way of referring to what was commonly referred to as a "proceeding" under the former Bankruptcy Act.  Though many unfamiliar with bankruptcy practice still refer to a bankruptcy "proceeding" when they should be referring to a bankruptcy "case," it should be understood that a "proceeding" as used in the Judicial Code, 28 U.S.C., is a matter that comes up in a "case," or is a separate proceeding (like this adversary proceeding) brought in connection with a "case."  *Id.*

[40]   28 U.S.C. § 1334(a) (emphasis added).

[41]   28 U.S.C. § 1334(e)(1) ("The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction of all the property, "wherever located and by whomever held," of the debtor as of the commencement of such case, and of property of the estate.").

   With exceptions not relevant here, the bankruptcy estate is comprised of "all legal and equitable interests of the debtor "in property, "wherever located and by whomever held."  Bankruptcy Code section 541(a), 11 U.S.C. § 541(a).

[42]   A "contested matter" is a dispute requiring a bankruptcy court determination other than a contested petition or adversary proceeding.  Unless the Court orders otherwise (*see* Fed.R.Bankr.P. 9014), contested matters are typically handled by motion practice, though if material disputed issues of fact must be decided, contested matters are resolved through evidentiary hearings, much as preliminary injunction motions are.

[43]   28 U.S.C. § 1334(b) (emphasis added).

"Arising under" jurisdiction relates to federal question claims of a particular type—those arising under title 11 of the United States Code (i.e., the Bankruptcy Code).[44]  Claims of this type rest on provisions of the Bankruptcy Code, or require construction of the Bankruptcy Code for their determination.  Significantly, for purposes here, they include resolution of claims disputes in the bankruptcy case; claims for relief (or seeking a declaration of contempt) for a violation of the automatic stay under section 362; requests for payment of administrative expenses from an estate pursuant to sections 503 and 507; and requests to subordinate claims under section 510— all requests for relief involved in this case.

Cases in this district have stated that a bankruptcy court can exercise "arising in" jurisdiction over a claim if, by its very nature, the claim can only be brought in a bankruptcy case, because it has no existence outside of bankruptcy.[45]  Other decisions (including two at the court of appeals level) have stated it more broadly—that a proceeding "arises in" a bankruptcy case when it is not based on any right expressly created by title 11 but would have no practical existence but for the bankruptcy.[46]  Claims against the estate, even those based on state law,[47]

---

[44]     *See, e.g., Rednel Tower, Ltd. V. Riverside Nursing Home (In re Riverside Nursing Home),* 144 B.R. 951, 955 (S.D.N.Y. 1992) (Broderick, J.) ("***Riverside***"); *Sterling Vision, Inc. v. Sterling Optical Corp. (In re Sterling Optical Corp.),* 302 B.R. 792, 801 (Bankr. S.D.N.Y. 2003) (Gerber, J.) ("***Sterling Optical***") (citing earlier S.D.N.Y. cases).

[45]     *See Adelphia,* 307 B.R. at 413; *Riverside,* 144 B.R. at 955; *176–60 Union Turnpike v. Howard Beach Fitness Center,* 209 B.R. 307, 311 n. 2 (S.D.N.Y.1997) (Sprizzo, J.).

[46]     *Bergstrom v. Dalkon Shield Claimants' Trust (In re A.H. Robins Co., Inc.),* 86 F.3d 364, 372 (4th Cir. 1996); *see also, e.g., Grausz v. Englander,* 321 F.3d 467, 471 (4th Cir. 2003) (same, *quoting A.H. Robins*); *Poplar Run Five Ltd Partnership v. Virginia Electric & Power Co. (In re Poplar Run Five Ltd. Partnership)*, 192 B.R. 848, 857 (Bankr. E.D. Virginia 1995) ("***Poplar Run Five***") (same, and noting that a court can have arising in jurisdiction over a matter involving pre-petition claims, even when based on state law).

[47]     *See Poplar Run Five,* 192 B.R. at 857.

> A proceeding that involves state-law questions may still fall within the "core" jurisdiction of this Court if it "arises in" a case under title 11.... One example of a proceeding "arising in" a bankruptcy case is a matter involving the allowance or disallowance of claims.  In most situations,

and matters involving the enforcement or construction of a bankruptcy court order,[48] are in this category.  Many "arising under" matters litigated in bankruptcy cases also fall in the "arising in" category, and vice-versa.

Finally, "related to" jurisdiction includes those matters that are not in the first two categories that nevertheless relate to a bankruptcy case.[49]  The Second Circuit applies the broad test for "related to" jurisdiction articulated by the Third Circuit in *In re Pacor, Inc.*,[50] which has been adopted by the vast majority of other circuits.[51]  Under *Pacor*:

> [T]he test for determining whether a civil proceeding is related to bankruptcy is whether *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.* Thus, the proceeding need not necessarily be against the debtor or against the debtor's property.  An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.[52]

---

the Code requires a creditor to file a proof of claim as the first step for receiving a distribution from the estate. *See* Bankruptcy Code sections 501, 502(a).  Although the Code authorizes and for the most part requires the filing of claims, the issue of whether the claim is allowable generally turns on nonbankruptcy law, usually state law.

[48]  *See Sterling Optical*, 302 B.R. at 801.

[49]  The principles underlying "related to" subject matter jurisdiction determinations were discussed at some length in my decisions in *ML Media Partners, LP v. Century/ML Cable Venture (In re Adelphia Communications Corp.)*, 285 B.R. 127, 136-37 (Bankr. S.D.N.Y. 2002) and *Blackacre Bridge Capital, LLC v. Korff (In re River Center Holdings, LLC)*, 288 B.R. 59, 64-65 (Bankr. S.D.N.Y. 2003) and will not be repeated at length here.

[50]  *In re Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984) ("***Pacor***").

[51]  *See Publicker Industries Inc. v. U.S.A. (In re Cuyahoga Equip. Corp.)*, 980 F.2d 110, 114 (2d Cir. 1992) ("***Cuyahoga Equipment***"); *Kirschner v. Thornton, et al. (In re Refco, Inc. Sec. Litig.)*, 628 F. Supp. 2d 432, 437-38 (S.D.N.Y. 2008) (Lynch, J., then a district judge) (noting that "[t]he dominant standard for 'related to' jurisdiction is that set forth by the Third Circuit in *In re Pacor*").  *See also Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n. 6 (1995) (collecting cases).

[52]  *Pacor*, at 994 (citations omitted); *Cuyahoga Equipment*, 980 F.2d at 114.  Although the reach of the *Pacor* test is broad, it is not "limitless," *Celotex*, 514 U.S. at 308, and some courts have held that federal jurisdiction "shrinks once bankruptcy plan confirmation has occurred."  *Guccione v. Bell*, 2006 WL 2032641, *4 (S.D.N.Y. July 20, 2006) (Stein, J.); *Penthouse Media Group v. Guccione (In re General*

The existence or absence of subject matter jurisdiction is determined as of the time of the filing of the complaint.[53]

### 2. *28 U.S.C. § 157*

A second provision of the Judicial Code, 28 U.S.C. § 157, addresses the extent to which bankruptcy judges (who are appointed under Article I of the Constitution, in contradistinction to district judges, who are appointed under Article III) are empowered to "hear and determine"— *i.e.*, to issue final judgments and orders in—proceedings that fall under the subject matter jurisdiction of the district and bankruptcy courts.  There are limits to the authority of bankruptcy judges to enter final judgments and orders in the matters over which they have subject matter

---

*Media, Inc.*), 335 B.R. 66, 73 (Bankr. S.D.N.Y. 2005) (Bernstein, C.J.) ("**Penthouse**").  The rationale for diminished federal jurisdiction post-confirmation rests on the notion that a reorganized debtor is "emancipated" by confirmation and that "just like any other corporation[,] it must protect its interests in the way provided by the applicable non-bankruptcy law, without any special swaddling."  *Boston Reg'l Medical Ctr., Inc. v. Reynolds* (*In re Boston Reg'l Med. Ctr.), Inc.*, 410 F.3d 100, 106 (1st Cir. 2005) (internal quotation marks omitted); *Penthouse*, 335 B.R. at 73 ("'Since the purpose of reorganization clearly is to rehabilitate the business and start it off on a new and to-be-hoped-for more successful career, it should be the objective of courts to cast off as quickly as possible all leading strings which may limit and hamper its activities and throw doubt upon its responsibility.'").  Accordingly, numerous courts both in this and other circuits have held that "the scope of bankruptcy court jurisdiction diminishes with plan confirmation." *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 165 (3d Cir. 2004); *accord State of Montana v. Goldin (In re Pegasus Gold Corp.)*, 394 F.3d 1189, 1194 (9th Cir. 2005); *Guccione v. Bell*, 2006 WL 2032641 at *4; *Penthouse*, 335 B.R. at 73.

But courts in this district have recognized a difference between reorganization plans and liquidation plans, reasoning that "there is much less reason to depart from the general [*Pacor*] rule for related to jurisdiction" when the plan at issue is a liquidating plan because "the specter of endless bankruptcy jurisdiction and a kindred concern about unfairly advantaging reorganized debtors" does not exist.  *Kirschner v. Thornton (In re Refco, Inc. Sec. Litig.)*, 628 F. Supp. 2d at 441-42 (holding that "related to" jurisdiction over actions by the debtor is not reduced after confirmation of a liquidating plan); *see also In re Cross Media Mktg. Corp. and Media Outsourcing, Inc. v. CAB Marketing, Inc. (In re Cross Media Mktg. Corp.)*, 367 B.R. 435, 444 (Bankr. S.D.N.Y. 2007) (Glenn, J.).  The reasoning of these cases is persuasive, and the facts here support application of the *Pacor* test.  However, it is unnecessary for the resolution of this case to adopt the distinction between reorganization and liquidation plans because, even if federal jurisdiction is diminished post-confirmation, the claims in the adversary proceeding easily fall within this Court's subject matter jurisdiction under each of section 1334's three individual prongs.

[53]   *See. e.g., Rosa v. RTC*, 938 F.2d 383, 392 n. 12 (3d Cir. 1991) ("It is a firmly established rule that subject matter jurisdiction is tested as of the time of the filing of the complaint").

jurisdiction, under the Constitution[54] and by statute.  That same 28 U.S.C. § 157, addressing bankruptcy judges' statutory authority, grants authority to bankruptcy judges to hear and determine matters in "cases under title 11" (*e.g.*, the *Ames* chapter 11 case) and in "core" proceedings arising under title 11 or arising in a case under title 11—*e.g.*, this adversary proceeding.  "Core proceedings "include, but are not limited to" 16 enumerated categories of proceedings,[55] which nearly entirely relate to bankruptcy courts' historic core functions. The authority granted by statute under section 157(b) to bankruptcy judges to issue final orders is thus sometimes referred to as a bankruptcy court's "'core' jurisdiction"—though for the reasons obvious from the discussion above, it is a "jurisdiction" very different than the jurisdiction conferred under 28 U.S.C. §§ 1331-1334, and many prefer not to call it "jurisdiction" at all.

Importantly, because the constitutional and statutory limits on the authority of bankruptcy judges (appointed under Article I) do not apply to district judges, 28 U.S.C. § 157 imposes no restrictions on the district judges' power to act in matters within their 28 U.S.C. § 1334 subject matter jurisdiction.[56]  But the "core proceedings" concept is nevertheless useful for district judges to keep in mind, because core proceedings typically involve matters in which the interests of the federal bankruptcy system are most critical.

Core matters are not limited to the 16 categories enumerated in 28 U.S.C. § 157.[57]  Either by being listed under 28 U.S.C. § 157 or by caselaw, core matters include Lumbermens' claims

---

[54]   *See Stern v. Marshall*, 564 U.S. ___, 131 S.Ct. 2594 (2011) ("***Stern***").  Those limits do not require discussion here.

[55]   28 U.S.C. § 157(b).

[56]   The two sides here agree on that.  *See* 6/30 Hrg. Tr. at 51:14-25 (Ames' counsel stating that "core or non-core doesn't effect this."); 117:23-118:2 (Lumbermens counsel stating that he "agree[s] with [Ames' counsel] that distinctions of core versus non-core were removed by the withdrawal of the reference.").

[57]   *See* 28 U.S.C. § 157(b)(2) ("Core proceedings include, but are not limited to…")

against the Ames estate;[58] determinations of what is property of the Ames estate;[59] Ames' efforts to recover for violation of the automatic stay, and to enforce the automatic stay by contempt;[60] Ames' efforts to subordinate Lumbermens' claims;[61] and the Court's construction and enforcement of its earlier orders.

B.     *Application to the Claims in the Adversary Proceeding*

Here this Court has subject matter jurisdiction over all of the remaining causes of action asserted in the Amended Complaint, with each claim justiciable by this Court under one or more of the Court's "arising under"; "arising in" or "related to" jurisdictional prongs.  With respect to three of the claims, this Court's jurisdiction is exclusive.

1.     *Claim #1 (Breach of Contract for Breach of Bond Agreement Duty to Pay Travelers the $14.35 million on Demand)*

Claim #1 asserts a cause of action for damages (*i.e.*, the $14.35 million for which Lumbermens was obligated to Travelers)[62] under state law, alleging Lumbermens' failure to

---

[58]     28 U.S.C. § 157(b)(2)(B).

[59]     *Id.* § 157(b)(1) and 11 U.S.C. § 541.

[60]     *Id.* § 157(b)(2)(G) ("motions to terminate, annul, or modify the automatic stay").  The Court rejects the Liquidator's contention that because only matters to terminate, annual or modify the automatic stay are expressly listed, other matters relating to the automatic stay are not core matters.  First, of course, § 157(b)(2)'s listing is expressly stated to be non-exclusive.  Second, it is hardly surprising that § 157(b)(2) is drafted as it is; the automatic stay is supposed to be self-effectuating.  But when it is disregarded, actions for violating it are core matters.  *See, e.g. Kimber v. GMAC Mortgage, LLC (In re Residential Capital, LLC)*, 489 B.R. 489, 493 (Bankr. S.D.N.Y. 2013) (Glenn, J.) (finding that action for violation of automatic stay is a core matter); *Eastern Air Lines, Inc. v. Rolleston (In re Ionosphere Clubs Inc.)*, 124 B.R. 635, 638 (Bankr. S.D.N.Y. 1991) (Lifland, C.J.) ("***Eastern Air Lines***") (agreeing with holding in *Budget Service Co. v. Better Homes of Virginia, Inc.*, 804 F.2d 289 (4th Cir. 1986) that proceeding to prosecute a violation of the automatic stay is a core proceeding). So are proceedings for contempt.  *See, e.g. MCI Worldcom Comms., Inc. v. HSG/ATN, Inc. (In re Worldcom, Inc.)*, 361 B.R. 697, 721 (Bankr. S.D.N.Y. 2007) (bankruptcy court has authority under section 105 to hear and determine a request for contempt arising from an alleged violation of the automatic stay as a core proceeding).

[61]     But while district courts and bankruptcy courts have subject matter jurisdiction to consider Ames' efforts to recover the funds in the Trust Account, they are not core matters, and only the district court has the ability to hear them.

[62]     *See* Amended Cmplt. ¶ 92.

perform under the Bond Agreement.[63]  It is a state law claim as to which the claim is *by* the estate, not against it.  Though other Ames claims rest on the Bond Agreement being property of the Ames estate, this one does not; Ames' claim for damages for breach of contract would have equal force whether or not the contract was also Ames' property.

This Court has subject matter jurisdiction under its "related to" jurisdiction, under *Pacor* and *Cuyahoga Equipment*.  Success on this claim will plainly benefit the Ames estate and its creditors.

Also, Claim #1 is a core matter.[64]  The issues raised in Claim #1 overlap significantly with the issues raised in Lumbermens' proofs of claim (which relate to rights and obligations under the Bond Agreement).[65]  The Supreme Court has recognized that when a creditor files a claim against a bankruptcy estate that triggers the claims allowance process, it submits to the jurisdiction of the bankruptcy court, conferring core status to the resolution of both the claims themselves and the debtor's responsive claims.[66]

But this Court's jurisdiction is not exclusive.  The estate is on offense, seeking to bring additional value into the estate for the benefit of Ames and its creditors.  The claim is simply one for damages for breach of contract, which any court of competent jurisdiction can award.   At

---

[63]     *See id.* ¶ 91.

[64]     That Ames bases its claims on state law does not preclude a determination that the claims are core.  *See Ben Cooper v. Insurance Co. of State of Pennsylvania (In re Ben Cooper, Inc.)*, 896 F.2d 1394, 1399 (a "determination that a proceeding is not a core proceeding ... [cannot] be made solely on the basis that its resolution may be affected by State law.'"); *LTV Corp. v. AETNA Casualty and Surety Co (In re Chateaugay Corp.)*, 116 B.R. 887, 897 (Bankr. S.D.N.Y. 1990).

[65]     *See Sterling Optical*, 302 B.R. at 803 (holding that creditor's filed proof of claim put at issue matters that overlapped with the issues raised in the adversary proceeding, and thus the bankruptcy court had subject matter jurisdiction and adversary proceeding was core).

[66]     *Langenkamp v. Culp*, 498 U.S. 42, 111 S.Ct. 330 (1990)*; Adelphia*, 307 B.R. at 418 ("Because [n]othing is more directly at the core of bankruptcy administration ... than the quantification of all liabilities of the debtor, the bankruptcy court's determination whether to allow or disallow a claim is a core function.") (internal citations omitted).

least as a general matter, the jurisdiction to hear "related to" claims is not exclusive.  And though it doesn't matter here (because this proceeding would be heard by a district judge, after a withdrawal of the reference), it appears that Claim #1 in this proceeding would be a "Stern Claim," as that expression was used by the Supreme Court,[67] where, although core, a bankruptcy judge could not enter a final order.

Ames is plainly right as a matter of law, as asserted in the Amended Complaint,[68] that its interest in any excess cash collateral securing the Letters of Credit was and is estate property. And Ames is also plainly right as a matter of law, as also asserted in the Amended Complaint, that when Ames commenced its chapter 11 case in August 2001, Ames' rights and interests in and under the Bond Agreement became property of Ames' estate,[69] and that each of the Bond Agreement itself and the bundle of rights incident to the Bond Agreement became estate property as well.[70]  But this claim does not depend on those things.  Nor does it involve a determination of what is estate property; require the interpretation or enforcement of the Court's orders; or involve remedies for contempt.  Thus, while this Court has jurisdiction over Claim #1, there are no *in rem* or other important bankruptcy concerns to protect with respect to Claim #1, and this Court's jurisdiction over the claim need not be, nor is it, exclusive.

---

[67]   *See Executive Benefits Ins. Agency v. Arkison,* 134 S.Ct. 2165, 2170 (2014); *Wellness Intern. Network, Ltd. v. Sharif,* 135 S.Ct. 1932, 1941-42 (2015) (in each case making reference to *Stern*).

[68]   *See* Amended Cmplt. ¶¶ 56, 109, 113.

[69]   *See id.* ¶¶ 4, 55.

[70]   *See* Bankruptcy Code section 541, referenced in n.41 *supra* ("The bankruptcy estate is comprised of "all legal and equitable interests" of the debtor in property); *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204-05 (1983) (section 541 is broadly interpreted to include any legally enforceable right of the debtor).

It is important to recognize a distinction, however, which both sides blur.  The right to bond *proceeds* (and though this is more metaphysical, rights to "the bond") are not estate property.  (This was what I was saying at the hearing from which a transcript excerpt is quoted at n.19 *supra*.)  But the *bundle of contractual rights under the bond agreement* (and thus the bond agreement itself) is.  It is the latter that the Ames estate has the right to protect.

    2.    *Claim #2 (Breach of Implied Covenant of Good Faith with Respect to Bond Agreement)*

Claim #2 alleges that the Bond Agreement contained an implied covenant of good faith and fair dealing that no party disturb the rights of the other party to obtain the full benefits of the agreement,[71] and that Lumbermens violated that obligation when it failed to pay Travelers the $14.35 million when Travelers demanded it, and then entered into the Letter Agreement establishing a priority regime in favor of Lumbermens to the detriment of Ames and its estate.[72] Ames then makes the same $14.35 million claim for damages.

Here too, this Court has subject matter jurisdiction over the claim, under the "related to" prong. And the matter is core. But this Court's jurisdiction over it is not exclusive.

The analysis here is the same as with respect to Claim #1. Claim #2 provides a second basis upon which damages may be recoverable, but it does not depend on Ames' cash collateral and Bond Agreement rights being estate property. Nor does it involve a judicial determination of what is estate property; require the interpretation or enforcement of the Court's orders; or involve remedies for contempt. Once again, there are no *in rem* or other important bankruptcy concerns to protect.

    3.    *Claim #3 (Unjust Enrichment at Expense of Ames' Other Creditors)*

Claim #3 alleges that by failing to pay the Bond Agreement upon demand, Lumbermens decreased the amount of its unsecured claim against Ames in Ames' bankruptcy case by the penal sum of the Bond Agreement, and was thereby unjustly enriched at the expense of Ames' other creditors. And once again, Ames seeks damages for that, in the amount of $14.35 million.

---

[71]    *See* Amended Cmplt. ¶ 94.

[72]    *Id.* ¶ 96.

Here too the analysis is the same as with Claim #1 and Claim #2.  This Court has subject matter jurisdiction over Claim #3, under the "related to" prong.  And the matter is core.  But this Court's jurisdiction is not exclusive.

### 4.    Claim #4 (Violation of Automatic Stay and Contempt)

Ames' Claim #4, by contrast, presents classic bankruptcy issues.  Pointing out, properly, that its rights (1) under the Bond Agreement and (2) to excess cash collateral were property of the Ames estate,[73] Ames seeks a declaration that Lumbermens violated the automatic stay when, without Court approval, Lumbermens modified the terms of the Bond Agreement through the Letter Agreement, and, among other things, removed Lumbermens' obligation to pay Travelers on demand, and prohibited Travelers from drawing on the Bond issued under the Bond Agreement unless Travelers had first drawn down on Ames' cash collateral.[74]  And relying on the basic bankruptcy principle that actions taken in violation of the automatic stay are void,[75] and punishable by contempt,[76] Ames seeks a declaration from this Court that Lumbermens' actions here were void; a declaration of contempt; and remedies for contempt, including turnover of the Trust Monies to Ames and payment of the amounts remaining under the Bond Agreement.[77]

The Court has subject matter jurisdiction over all of these claims, under each of the "arising under," "arising in," and "related to" prongs of 28 U.S.C. § 1334.  Ames' rights *arise*

---

[73]    *Id.* ¶ 108.  In fact, the *entirety* of Ames cash collateral would be the property of the estate.  The portion that was *not excess* collateral would simply be subject to a more senior claim.

[74]    *Id.* ¶¶ 10, 51, 57, 109.

[75]    *See 48th St. Steakhouse, Inc. v. Rockefeller Group, Inc. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427, 431 (2d Cir. 1987), *cert. denied*, 485 U.S. 1035, 108 S. Ct. 1596 (1989); *see also Collier on Bankruptcy* § 362.12 (16th ed. 2015) ("actions taken in violation of the stay are void and without effect").

[76]    *See MCI Worldcom Comms., Inc. v. HSG/ATN, Inc.*, 361 B.R. at 721, n.60 *supra*; *see also Collier on Bankruptcy* § 362.12 (16th ed. 2015) ("violation of the stay is punishable as contempt of court.").

[77]    *See* Amended Cmplt. ¶ 114.

*under* sections 362 and 105(a) of the Code (the latter being used to enforce section 362);[78] Ames'

rights *arise in* its chapter 11 case, and rights under section 362 arise only in bankruptcy cases;

and remedies for the violation of the stay *would benefit* the Ames estate and its creditors.

This matter also is a core matter,[79] going to fundamental, and critically important,

bankruptcy policy.  Enforcement of the automatic stay is essential to "orderly and equitable

administration of the estate,"[80] for the reason, among others, that it is essential to protection of

the bankruptcy court's *in rem* jurisdiction.  A bankruptcy court has authority under section 362

of the Code to determine that there has been a violation of the automatic stay;[81] to issue

declarations of contempt for any such violations under section 105 for violations of section

362;[82] and to award appropriate remedies, even for corporate debtors, which are not

"individuals" granted express rights to sue (under Bankruptcy Code section 363(k), formerly

section 363(h)) for violations of section 362.[83]

---

[78]     Although section 105(a) cannot be used to defeat another provision of the Code, *see Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014), or to add substantive rights not provided for under the Code, *see, e.g., Solow v. Kalikow (In re Kalikow)*, 602 F.3d 82, 96-97 (2d Cir. 2010), it can be used to implement or enforce another provision of the Code.  *See id.* at 97.

[79]     *See, e.g., Eastern Air Lines,* 124 B.R. at 638 ("a proceeding to prosecute a violation of the automatic stay is a core proceeding within the meaning of 28 U.S.C. § 157."); *Glinka v. Dartmouth Banking Co. (In re Kelton Motors Inc.)*, 121 B.R. 166, 192 (Bankr. D. Vt. 1990) ("**Kelton Motors**") (same).

[80]     *Eastern Air Lines,* 124 B.R. at 638.

[81]     *See, e.g. id.* (holding that proceeding to prosecute violation of automatic stay was core proceeding within the bankruptcy court's jurisdiction and exercising authority to determine whether stay had been violated).

[82]     *See MCI Worldcom Comms., Inc. v. HSG/ATN, Inc.*, 361 B.R. at 721, nn.60 and 76 *supra.*

[83]     *See, e.g., Sosne v. Reinert & Duree, P.C. (In re Just Brakes Corporate Systems, Inc.),* 108 F.3d 881, 885 (8th Cir. 1997) ("[W]e agree that bankruptcy courts have broad equitable powers to remedy violations of the automatic stay that injure a corporate debtor's estate.").  In the Second Circuit, corporate debtors do not have a private right of action for stay violations under section 362(k) (formerly section 362(h)), and seek and obtain relief for automatic stay violations by means of contempt.  *See Maritime Asbestosis Legal Clinic v. LTV Steel Co., Inc. (In re Chateaugay Corp.),* 920 F.2d 183, 184–87 (2d Cir. 1990) (holding that only natural persons, and not corporations, may seek damages under section 362, noting that "[f]or other debtors, contempt proceedings are the proper means of compensation and punishment for willful violations of the automatic stay.").

I determine further that this Court's jurisdiction to protect estate property and to enforce, by contempt, the automatic stay against actions that are violative of the stay and that affect estate property here is *exclusive*.[84] Though I do not need to decide whether this Court's jurisdiction to consider *every* violation of the automatic stay would be exclusive (if, for example, the stay violation had no effect on estate property), here I determine, consistent with *Halas*, cases on which *Halas* relied, statutory law, and the historic importance of bankruptcy courts' *in rem* jurisdiction, that it is exclusive here. The *Halas* court reasoned, properly in my view, that allowing state courts to impose sanctions for violation of the stay, "a penalty so closely intertwined with the bankruptcy case itself, would undermine Congress' intent to have one uniform bankruptcy system."[85] And the *Halas* court continued that "[i]ndeed, '[i]t is for Congress and the federal courts, not the state courts, to decide what incentives and penalties are appropriate for use in connection with the bankruptcy process and when those incentives or penalties shall be utilized."[86] Cases cited by the *Halas* court further support that view.[87]

---

[84]     *See Halas v. Platek*, 239 B.R. 784, 788 (N.D. Ill. 1999).

[85]     *Id.* at 792.

[86]     *Id.* (quoting *Gonzales v. Parks,* 830 F.2d 1033, 1036 (9th Cir. 1987)).

[87]     *See Koffman v. Osteoimplant Technology, Inc.,* 182 B.R. 115, 124 (D. Md. 1995) ( "Remedies and sanctions for improper behavior and filings in bankruptcy court ... are matters on which the Bankruptcy Code is far from silent and on which uniform rules are particularly important."); *cf. MSR Exploration, Ltd. v. Meridian Oil,* 74 F.3d 910, 913 (9th Cir. 1996) ("Congress has expressed its intent that bankruptcy matters be handled in a federal forum."); *In re Ford,* 188 B.R. 523, 526 (Bankr. E.D.Pa. 1995) ("The resolution of certain legal issues which arise in the course of bankruptcy cases is confined to the bankruptcy courts."); *In re Raboin,* 135 B.R. 682, 684 (Bankr. D. Kan. 1991) ("[T]his court has exclusive jurisdiction to determine the extent and effect of the stay, and the state court's ruling to the contrary does not bar the debtor's present motion."); *Saunders v. Reeher (In re Saunders),* 105 B.R. 781, 784 (Bankr. E.D. Pa. 1989) ("Congress intended to establish a comprehensive enforcement mechanism for violations of the automatic stay ... within the bankruptcy code itself."); *Sermersheim v. Sermersheim (In re Sermersheim),* 97 B.R. 885, 888 (Bankr. N.D. Ohio 1989) ("It is the bankruptcy court alone that has jurisdiction to determine questions involving the automatic stay.").

The conclusion that jurisdiction is exclusive is also required by 28 U.S.C. § 1334(e) of the Code, quoted in full above,[88] providing, as relevant here, that the district court in which a bankruptcy case is commenced "shall have *exclusive* jurisdiction … of property of the estate."[89] And it is bolstered further by recognition of the bankruptcy courts' historic *in rem* jurisdiction, a critical foundation of bankruptcy law for hundreds of years.[90]  Importantly, the Supreme Court's decision in *Katz* expressly endorses ancillary orders necessary to protect a bankruptcy court's *in rem* jurisdiction.[91]

For all of these reasons, I determine that not only does this Court have jurisdiction over Ames' claims for declaratory relief and for contempt by reason of alleged violations of the automatic stay, but that jurisdiction is *exclusive*.

---

[88]     *See* n.41 *supra*.

[89]     Emphasis added.  That section, coupled with section 541 of the Code and the Supreme Court's critically important ruling in *Whiting Pools*, see n.70 *supra*, makes clear that matters relating to property of the estate, including enforcement of the automatic stay, are central to the bankruptcy court's role.

[90]     *See Central Virginia Community College v. Katz*, 546 U.S. 356, 369 (2006) ("***Katz***") ("Bankruptcy jurisdiction, as understood today and at the framing, is principally *in rem*."); *Student Assistant Corp. v. Hood*, 541 U.S. 440, 448 (2004) (A bankruptcy court's *in rem* jurisdiction permits it to "determin[e] all claims that anyone, whether named in the action or not, has to the property or thing in question. The proceeding is 'one against the world.'").

[91]     *See Katz*, 546 U.S. at 370 ("The Framers would have understood that laws "on the subject of Bankruptcies" included laws providing, in certain limited respects, for more than simple adjudications of rights in the res. … More generally, courts adjudicating disputes concerning bankrupts' estates historically have had the power to issue ancillary orders enforcing their *in rem* adjudications.").

As examples, *see Frankford Trust Co. v. Allanoff (In re Dublin Properties)*, 20 B.R. 616, 620 (Bankr. E.D. Pa. 1982) (Goldhaber, J.) ("We find it inconceivable to imagine that anyone familiar with the Bankruptcy Code could, in good faith, believe that the automatic stay provisions of the Code do not prohibit a person from taking action in another court to eliminate a property interest held by the estate."), *rev'd in part on other grounds*, 29 B.R. 407 (E.D. Pa. 1983); *In re MCEG Productions, Inc.*, 133 B.R. 232, 234-35 (Bankr. C.D. Cal. 1991) (Riblet, J.) (attempt to enjoin a sale counterparty's contract rights in the sale "necessarily implicated" the debtor's rights in the same agreement; "Moreover, § 362(a)(3) protects against such acts to exercise control over property of the estate without distinction as to the form such interference takes. Accordingly, the filing of the injunctive action was a violation of § 362(a)(3)."); *Adelphia Commun. Corp. v. The America Channel, LLC (In re Adelphia Commun. Corp.)*, 345 B.R. 69, 76 (Bankr. S.D.N.Y. 2006) (Gerber, J.) ("Bankruptcy Code section 362(a)(3) protects the *in rem* jurisdiction of the Court, and prohibits interference with the disposition of the assets that are under the Court's wing—whether or not the Debtor is named as a defendant as part of the effort.  And that is so without distinction as to the form the interference takes.").

-27-

5.    *Claim #5 (Declaratory Judgment Regarding Release of Trust Monies and Bond Agreement Proceeds)*

Claim #5, like Claim #4, presents classic bankruptcy issues.  It essentially requests a declaratory judgment determining that the Trust Monies are property of the estate under section 541.  Though the merits of Claim #5 are subject to good faith debate—with each side having more than colorable claims—there can be little doubt as to this Court's jurisdiction to hear them, or that Claim #5 is a core matter.  The only matter that is debatable is whether that jurisdiction is exclusive.

As to subject matter jurisdiction itself, it is probable that this Court has "arising under" jurisdiction (because Ames' rights arise under section 541) and this Court plainly has "arising in" jurisdiction—because determination of the ownership by the estate of asserted estate property can arise only after the filing of the chapter 11 case and exist only in bankruptcy.  Likewise, "related to" jurisdiction plainly exists, because a result favorable to Ames would benefit the Ames estate and Ames creditors, easily satisfying the *Pacor* and *Cuyahoga Equipment* tests.

Similarly, Claim #5 plainly is a core matter.[92]

Determining whether this Court's jurisdiction is *exclusive*, however, presents considerably closer questions, and on balance I conclude that this Court's jurisdiction is *not exclusive*.  The bankruptcy court's jurisdiction over Ames' unquestioned property—Ames' bundle of rights under the Bond Agreement and Ames' cash collateral—is exclusive.  But unlike that property, the Trust Monies came into being only when Lumbermens put them there, after the filing of Ames' chapter 11 case.  Ames still has the right to claim ownership over the Trust

---

[92]    *See, e.g., Velo Holdings Inc. v. Paymentech, LLC (In re Velo Holdings Inc.),* 475 B.R. 367, 386 (Bankr. S.D.N.Y. 2012) (Glenn, J.) ("The determination whether something is property of the estate is a core matter.").

Monies, under section 541. But this Court's exclusive jurisdiction to decide the issue results from a different statutory provision, 28 U.S.C. § 1334(e). And the latter speaks of property of the estate, wherever located and by whomever held, "as of the commencement of such case."[93] If the Trust Monies existed at the time Ames' chapter 11 case was filed, and Ames had at least a colorable claim to them, I would conclude that this Court's jurisdiction is exclusive. But as of that time, the Trust Monies did not yet exist. Thus, I determine that this Court does not have *exclusive* jurisdiction over the issue of their ownership.

### 6. *Claim #6 (Marshaling)*

Ames' Claim #6, which invokes sections 1107 and 105(a) of the Bankruptcy Code but which is essentially premised on the equitable doctrine of marshaling, seeks a determination that Ames' cash collateral should not have been tapped—that Travelers should have been compensated *first* by the Bond Agreement and resulting Trust Monies, and only thereafter by monies from the Letters of Credit.[94] An important element of Claim #6 is that Lumbermens elevated its unsecured claim for indemnification for amounts Lumbermens might pay as a result of the Bond Agreement into a secured claim (or no claim at all), by modifications to the Bond Agreement which had the effect of "sticking it" to Ames' other unsecured creditors.

Though "arising under" jurisdiction is debatable (as the reliance on sections 1107 and 105(a) is diffuse at best), this Court plainly has subject matter jurisdiction under the "arising in" and "related to" prongs of 28 U.S.C. § 1334(b) -- as the controversy would not have existed but for Ames' bankruptcy and the posting of cash collateral, and, even more clearly, a result to Ames would benefit Ames' estate and its creditors.

---

[93]     Bankruptcy Code section 541, 11 U.S.C. § 541.

[94]     *See* Amended Cmplt. ¶ 126.

Claim #6 is also a core matter, because it essentially operates as a counterclaim to Lumbermens' claims against the Ames estate (seeking equitable relief that would reduce Ames' obligations to Lumbermens);[95] because it requests a determination that affects Ames' legal and/or equitable rights under the Bond Agreement and with respect to its cash collateral; and because it involves a distortion of the claims allowance process, a classic core function.

And though the matter is not as obvious, I determine that this Court's jurisdiction to decide Claim #6 is *exclusive*.  Claim #6 involves two types of estate property that unquestionably belonged to the Ames estate at the time of its chapter 11 filing—its bundle of rights under the Bond Agreement and its cash collateral.  The Court has *in rem* jurisdiction over each of them.  And for reasons discussed above, that *in rem* jurisdiction extends to ancillary proceedings to protect them.  That is particularly true with respect to Ames' cash collateral, whose diversion from the Ames estate underlies Claim #6's prayer for relief.

### 7.    *Claim #10 (Equitable Subordination)*[96]

In Claim #10, Ames seeks to equitably subordinate Lumbermens' claims under section 510(c) of the Bankruptcy Code—i.e., to allow Lumbermens' claims only at a level lower than the level for Ames' general unsecured creditors.  Ames seeks that relief based on Lumbermens' alleged inequitable conduct—once again, Lumbermens' efforts to benefit itself while "sticking it" to Ames' other unsecured creditors.

This claim too presents classic bankruptcy issues, over which this Court has subject matter jurisdiction under its "arising under" prong (*i.e.*, because it arises under section 510(c)),

---

[95]     Under section 157(b)(2)(C), "counterclaims by the estate against persons filing claims against the estate," are expressly deemed "core."  In *Stern,* the Supreme Court held that a counterclaim filed by a debtor in response to a proof of claim is a core proceeding, regardless of whether the counterclaim is related to the proof of claim.  *Stern*, 131 S.Ct. at 2601, 2602, 2604–05.

[96]     Claims ## 7 through 9, having been previously resolved, need not be discussed.

and "arising in" prong—because claims allowance matters exist only after bankruptcy cases are filed and could have no existence apart from bankruptcy. It might or might not represent an appropriate invocation of "related to" jurisdiction under the *Pacor* and *Cuyahoga Equipment* tests (as it would affect Ames' other creditors, but not the Ames estate itself), but I do not need to decide this issue given the obvious jurisdiction under the first two prongs.

Claim #10 also presents a classic core matter, as it both involves the allowance of claims (expressly listed as a core proceeding under 28 U.S.C. § 157(b)(2)(B)),[97] and arises from the same transaction as do Lumbermens' filed proofs of claims.

And here too, this Court's jurisdiction is exclusive. The claims allowance process is another classic *in rem* function, appropriately handled by no court other than a bankruptcy court.

### 8.   *Lumbermens' Proofs of Claim and Counterclaims*

Finally, for the avoidance of doubt, I comment on the obvious. This Court has subject matter jurisdiction over Lumbermens' proofs of claim (and any counterclaims to those claims), under its "arising under" and "arising in" jurisdiction, and at least to the extent any counterclaims exceed the claims themselves, its "related to jurisdiction" as well. Claims are asserted against the estate in a chapter 11 case under sections 502 and 503 of the Bankruptcy Code, invoking the "arising under" jurisdiction, and because they are filed in the case itself, invoking the Court's arising under jurisdiction.

Claims allowance and disallowance is also a core proceeding, since, as noted above, it is expressly listed as such under 28 U.S.C. § 157(b)(2)(B).

---

[97]   *Aetna Life Insurance Co. v. Danbury Square Assocs., Ltd. P'ship (In re Danbury Square Assocs., Ltd. P'ship)*, 150 B.R. 544, 547 (Bankr. S.D.N.Y. 1993). It may present core matters for other reasons as well, though I need not decide that. *See Kelton Motors*, 121 B.R. at 189 (finding action for equitable subordination core as essential to the proper and complete administration of debtor's bankruptcy estate under 28 U.S.C. §§ 157(b)(2)(A); (K) (though there are no liens here) and/or (O)).

The bankruptcy court's jurisdiction to hear claims is also exclusive.  As also noted above, the claims allowance process is another classic *in rem* function, appropriately handled by no court other than the bankruptcy court in which the case is pending.[98]

## II.

### Preemption Under The McCarran-Ferguson Act

Having determined that this Court has jurisdiction over all of the causes of action in this adversary proceeding (and exclusive jurisdiction over three of Ames' claims against Lumbermens and all of Lumbermens' claims against Ames), I then must decide whether McCarran-Ferguson nevertheless dictates that an Illinois rehabilitation court should instead decide the issues now before this Court.  Under the supremacy clause and rules of statutory construction, a federal statute would ordinarily preempt a state law insofar as the state law contravened the federal statute.[99]  In passing McCarran-Ferguson, Congress created an exception to the standard preemption rules in certain instances involving state statutes regulating the insurance industry.

Specifically, McCarran-Ferguson provides in relevant part:

> "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance."[100]

For this reason, when it applies, McCarran-Ferguson is said to "reverse preempt" federal law.

---

[98]     *See, e.g., Logan v. Credit General Ins. Co. (In re PRS Ins. Group Inc.)*, 335 B.R. 77, 84 (Bankr. D. Del. 2005) ("allowance and disallowance of claims, which are core matters…fall within the exclusive jurisdiction of the bankruptcy courts.

[99]     *Stephens v. American Intern. Ins. Co.*, 66 F.3d 41, 43-44 (2d Cir. 1995) ("***Stephens***").

[100]     15 U.S.C. § 1012(b) (1994).

Many courts, including the Second Circuit, have taken a narrow reading of McCarran-Ferguson.  The Second Circuit has held that the Act did not alter the normal rules of federal preemption "so drastically as to force a federal law that clearly intends to preempt all other states laws to give way simply because the insurance industry is involved."[101]  Courts have expressed skepticism "that Congress intended, through the McCarran-Ferguson Act, to remove federal jurisdiction over every claim that might be asserted against an insurer in state insolvency proceedings."[102]

To determine whether McCarran-Ferguson applies, most courts use the same three-part analysis to determine whether a federal statute can be reverse preempted by a state law:

> (A) if the federal statute does not specifically relate to insurance;

> (B) if the state law at issue was enacted to regulate the business of insurance; and

> (C) if the federal statute at issue would invalidate, impair, or supersede the state law.[103]

I analyze each of these prongs as follows.

A.    *Does the federal statute specifically
        relate to the business of insurance?*

Turning to the first prong, I find, as other courts consistently have, that the Bankruptcy Code and relevant federal jurisdiction provisions do not specifically relate to the business of

---

[101]    *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 117 (2d Cir. 2001).

[102]    *Gross v. Weingarten*, 217 F. 3d 208, 222 (4th Cir. 2000) ("***Gross***"); *see also In re Tri-Valley Distributing, Inc.*, 350 B.R. 628, at *4 (B.A.P. 10th Cir. 2006) (quoting *Gross*); *Ochs v. Simon, et al. (In re First Cent. Fin. Corp.)*, 269 B.R. 502, 519 (Bankr. E.D.N.Y. 2001) ("***First Central Financial***") ("The McCarran-Ferguson Act does not purport to make the states supreme in regulating all the activities of insurance companies and should be construed narrowly in the face of valid federal interests.").

[103]    *In re MF Global Holdings Ltd.*, 469 B.R. 177, 194 n.17 (Bankr. S.D.N.Y. 2012) (J. Glenn); *see also Humana Inc. v. Forsyth*, 525 U.S. 299, 307 (1999) ("***Humana***").

insurance.[104]  The Supreme Court has indirectly provided its views on this question, stating that "[m]any federal statutes with potentially pre-emptive effect, such as the bankruptcy statutes, use general language that does not appear to 'specifically relate' to insurance . . . ."[105]

**B.**   *Does the state law specifically*
*relate to the business of insurance?*

The second prong of McCarran-Ferguson requires that the state law at issue specifically relate to the business of insurance.  I determine that the state statute here—the Illinois Insurance Code,[106] and in particular its section 189—specifically relates to the business of insurance.

The Supreme Court has explained that in order for a state law to have been "enacted for the purpose of regulation of the business of insurance", it must be "aimed at protecting or regulating [the] relationship [between insurer and insured], directly or indirectly."[107]  The Court has focused the inquiry on "the relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement."[108]

---

[104]   *See, e.g., Lawski v. Frontier Insurance Grp., LLC (In re Frontier Insurance Grp. LLC)*, 517 B.R. 496, 506 (Bankr. S.D.N.Y. 2014) (Morris, C.J.) ("***Lawski***") ("the Bankruptcy Code does not specifically relate to insurance" for purposes of the McCarran-Ferguson Act).

[105]   *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 42 (1996).  Under section 109 of the Bankruptcy Code, a domestic insurance company is ineligible to be a debtor in a case under chapter 7, *see* section 109(b)(2), and a foreign insurance company engaged in business in the United States is likewise ineligible.  *See* section 109(b)(3).  But that does not speak to whether the Bankruptcy Code can affect insurance company matters in other respects.  Plainly it can; *e.g.*, insurance companies frequently are creditors in cases under the Bankruptcy Code, and not infrequently are defendants in bankruptcy adversary proceedings, at least when they are not in insolvency proceedings.

Ames contends (Ames Opening Br. at 13) that the Bankruptcy Code is "in general [] a statute intended to 'clear the field' and displace contrary state-law provisions."  But I find that contention overly broad.  The two Supreme Court cases upon which Ames relies for that contention do not address the Bankruptcy Code, but rather securities laws and the Title VII prohibition against sex discrimination.  In light of caselaw specifically addressing whether the Bankruptcy Code satisfies the first prong of the test under the McCarran-Ferguson Act, I cannot extend those Supreme Court holdings to the facts here.

[106]   Article XIII, Chapter 215 of the Illinois Code.

[107]   *SEC v. National Sec., Inc.*, 393 U.S. 453, 460 (1969).

[108]   *Id.*

-34-

The parties disagree whether this Court should consider the Illinois Insurance Code as a whole or consider the specific provision relevant to the jurisdictional question in determining whether the second-prong of the McCarran-Ferguson test has been satisfied. Ames cites to the Supreme Court's decision in *U.S. Dept. of Treasury v. Fabe* that certain, but not all, provisions of the Ohio insurance law had been enacted for the purpose of regulating the insurance business[109] as an indication that a court must "parse" a state statute to determine which provisions satisfy the standards of McCarran-Ferguson. Lumbermens, however, disagrees with this reading of *Fabe*, arguing that the Second Circuit considers the statutory scheme *in its entirety* for purposes of McCarran-Ferguson analysis.[110]

Here I must disagree with Lumbermens. I think Lumbermens misreads *Stephens*. In that case, the Second Circuit expressly framed its analysis around the single provision of the Kentucky Insurers Rehabilitation and Liquidation Law at issue (in that case, the anti-arbitration provision).[111] The heart of the Second Circuit's analysis turned on the interpretation of the terms "regulation" and "protection" of policyholders with respect to *the anti-arbitration* provision of the Kentucky law, not to the entire Kentucky insolvency law.[112] Thus, in my view, whether a

---

[109]   *U.S. Dep't of Treasury v. Fabe*, 508 U.S. 491, 509-10 (1993) ("**Fabe**") ("By this decision, we rule only upon the clash of priorities as pronounced by the respective provisions of the federal statute and the Ohio Code. The effect of this decision upon the Ohio Code's remaining priority provisions—including any issue of sever ability—is a question of state law to be addressed upon remand.").

[110]   Lumbermens Reply Br. at 13 (the Second Circuit "affords preemptive power to state court insurance insolvency systems as a whole," relying on *Stephens*).

[111]   *See Stephens*, 66 F.3d at 42 ("[t]he issue presented on this appeal is whether an anti-arbitration provision in the Kentucky Insurers Rehabilitation and Liquidation Law is enacted for the purpose of regulating the business of insurance and thus preserved by the McCarran-Ferguson Act from preemption by the Federal Arbitration Act...") (internal quotation omitted).

[112]   *Id.* at 44.

state statute was "enacted for the purpose of regulating the business of insurance" comes down to the specific provision (or provisions) of the statute that a party alleges preempts federal law.[113]

Nevertheless, I determine that this distinction is not relevant here, as both Article XIII as a whole and its jurisdictional provision meet the standard for a state law that has the purpose of regulating the business of insurance.[114]

Lumbermens does not make clear in its briefs *which* provisions of Illinois insurance law it alleges preempt this Court's jurisdiction over the adversary proceeding.  In its brief, Lumbermens refers to four provisions of Article XII of the Illinois Code: sections 189, 191, 192 and 221.1 of chapter 5.[115]  At the June 30, 2015 hearing, counsel for Lumbermens referred to additional provisions not cited in the briefs, including sections 187-6, 194, and 205(g).[116]

But ultimately, I determine that the only relevant provisions of Illinois Code Article XIII for the purposes of this opinion are its sections providing the Rehabilitation Court with jurisdiction to issue injunctions against actions and proceedings against Lumbermens or its assets or property; establishing priority of claims; and requiring claimants, even those with judgments, to bring their claims to the Rehabilitation Court for allowance, in lieu of using judgment

---

[113]   *See also In re MF Global Holdings Ltd.*, 469 B.R. at 194 n.17 (analyzing section 3420(a)(1) of the New York Insurance Law for McCarran-Ferguson Act preemption).

[114]   The Court finds it beyond dispute that Article XIII as a whole was enacted for the purpose of regulating the business of insurance, and focuses its discussion below on the individual jurisdictional provisions.  For example, one of the overarching purposes of the Illinois liquidation provisions is to secure ratable distribution of an insurance company's assets.  Thus, as a whole, the statutory scheme meets the standard for McCarran-Ferguson Act purposes.

[115]   Lumbermens Opposition to Jurisdictional Motion at 16-17 (ECF # 73) ("**Lumbermens Opp.**") ("The Rehabilitation Order was entered pursuant to Illinois' comprehensive state insurance regulatory scheme (*see, e.g.,* 215 Ill. Comp. Stat. 5/189, /191, /192, as part of which all claims against the insolvent insurer's estate are to be brought in the rehabilitation court, and all claims are to be paid and distributions made in accordance with the priorities set forth in the Illinois Insurance Code.  The Rehabilitation Order requires all litigants and other claimants against Lumbermens (including Ames) to pursue collection of any claims against Lumbermens only in the Illinois State Court insolvency proceedings).").

[116]   6/30 Hrg. Tr. at 87:19-88:6, 89:22-90:17.

enforcement mechanisms to collect.  The other provisions of Illinois law cited by Lumbermens are unaffected by this Court's exercise of jurisdiction over these issues for purposes of McCarran-Ferguson.  Lumbermens presents the other Illinois provisions as potentially disrupted by the relief that Ames seeks in this Court.  But that is not the relevant inquiry here.  The question is only whether such provisions are potentially disrupted by this Court's exercise of jurisdiction or other application of federal law.

With respect to this second prong of the analysis, I find the reasoning of *Stephens* relevant here.  In that case, the state law at issue was an anti-arbitration provision in the Kentucky insurance law.  The Second Circuit noted that the Supreme Court's ruling in *Fabe* created a broad reading of this prong of the McCarran-Ferguson test by including even those state statutes that indirectly protect the relationship between the insurer and insured.[117]  The Court stated that the state statute "protects" policyholders for purposes of McCarran-Ferguson "by assuring that an insolvent insurer will be liquidated in an orderly and predictable manner and the anti-arbitration provision is simply one piece of that mechanism."[118]  Here, the jurisdictional provisions of the Illinois insurance statute achieve that same purpose, and therefore meet the standard for having the "'end, intention, or aim' of adjusting, managing or controlling the business of insurance."[119]  Although the effect of the jurisdictional provisions of the Illinois Insurance Code could accrue equally to policyholders and other non-policy holding creditors, the

---

[117]     *Stephens*, 66 F.3d at 44 (citing *Fabe*, 508 U.S. at 500).

[118]     *Stephens*, 66 F.3d at 45.

[119]     *Fabe*, 508 U.S. at 505.

effect on policyholders is clear.[120]  As a result, I find that these provisions were "enacted for the purpose of regulating the business of insurance."

C.    Would application of the federal law impair,
      invalidate, or supersede the state law?

Nevertheless, so long as this Court does not overreach in any order hereafter entered,[121] I determine that application of the Bankruptcy Code would not "impair, invalidate, or supersede" the relevant jurisdictional provision (or any other provision) of Illinois insurance law.  In *Humana Inc. v. Forsyth*, the Supreme Court defined each of these terms as follows: the term "invalidate" ordinarily means to "render ineffective, generally without providing a replacement rule or law";[122] the term "supersede" ordinarily means to "displace (and thus render ineffective) while providing a substitute rule";[123]  and the term "impair" means "to weaken, to make worse, to lessen in power, diminish, or relax, or otherwise affect in an injurious manner."[124]  The Supreme Court further held that "[w]hen federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, McCarran-Ferguson does not preclude its application."[125]

---

[120]    *See e.g. Munich American Reinsurance Co. v. Crawford*, 141 F.3d 585, 594 (5th Cir. 1998).

[121]    For example, I assume that once any of Ames' claims against Lumbermens are liquidated, Ames would then have to bring those claims to the Illinois court for allowance, subject to any priorities the Illinois Insurance Code might grant to policyholders' claims over other creditors' claims.  *See* n.133 *infra*.  But that requirement, and any liquidation priority for insureds, would involve legitimate insurance law concerns. The issues here do not.

[122]    *Humana*, 525 U.S. at 307.

[123]    *Id.* at 307.

[124]    *Id.* at 309–310.

[125]    *Id.* at 310.

Lumbermens argues that even if this Court has jurisdiction to resolve the Trust Monies ownership dispute (which this Court plainly has, though it is not exclusive), this Court must defer to the Illinois state court to resolve that question. I disagree. That property—the cash in the trust account—is no more property of the Lumbermens estate than it is property of Ames'. It is not now part of the Lumbermens insolvency estate, if it ever will be. A federal court's determination of rights to that property, without more, does not invalidate, impair or supersede state insurance law—even if the federal court later decides that the property never becomes property of the insurer's estate.[126] The property in question is not subject to the *in rem* jurisdiction of the Illinois court, and insurance law has nothing to do with the controversy.

Lumbermens nevertheless argues that this Court cannot exercise jurisdiction over the ownership dispute over the Trust Monies because Lumbermens has a "reversionary" interest in the trust holding the Trust Monies, and that only the Illinois Rehabilitation Court can issue a decision affecting that interest. But this argument ignores the fact that Ames has its own arguments with respect to the Trust Monies that may (or may not) trump Lumbermens' interest. Until ownership of the Trust Monies is resolved, adjudication of the Ames-Lumbermens dispute is no more about property of the Lumbermens estate than it is about property of the Ames estate. That property is *neither* side's property until there is a ruling determining it to be such. So while Lumbermens' alleged interest in the Trust Monies obviously will be affected by this Court's exercise of jurisdiction, such exercise is fully appropriate.

I likewise cannot agree that McCarran-Ferguson deprives this Court of the power to make a finding of contempt, or to issue a judgment for such. Like the Fourth Circuit in *Gross*, I must

---

[126]     *Lawski*, 517 B.R. at 506 ("a federal court's ordinary determination of property rights, interpretation of contracts, or interpretation of state statutes does not 'impair' state law, even when a federal court's decision has a financial impact on the insolvent insurer's estate.").

reject any argument that a statute conferring jurisdiction over the rehabilitation or liquidation of

an insurer "establishes an exclusive state court forum" for determination of claims against it.[127]

As the *Gross* court stated:

> We are skeptical that Congress intended, through the
> McCarran–Ferguson Act, to remove federal jurisdiction
> over every claim that might be asserted against an insurer
> in state insolvency proceedings.  If nothing else, the
> argument proves too much, for it would operate to divest
> exclusively federal jurisdiction as effectively as it would
> diversity jurisdiction, leaving many plaintiffs with no
> forum in which to assert their federal rights.  In any event,
> we do not believe that concurrent federal jurisdiction over
> the defendants' counterclaims threatens to "invalidate,
> impair, or supersede" (as those terms are used in the
> McCarran–Ferguson Act) Virginia's efforts to establish a
> single equitable proceeding to liquidate or rehabilitate
> insolvent insurers.[128]

Here, as in *Gross*, this Court's jurisdiction over the contempt claims is exclusive, and

taking jurisdiction away from this Court would leave Ames and its creditors, as in *Gross*, "with

no forum in which to assert their federal rights."[129]  And of course it is of dubious wisdom (if not

also absurd) to order that a state tribunal replace a federal one in deciding the federal question of

contempt, a matter of strong federal interest.[130]  But more fundamentally, once again as in *Gross*,

determining whether Lumbermens violated federal law in its dealings with Travelers does not

"invalidate, impair or supersede" Illinois' efforts to establish single equitable proceedings to

liquidate or rehabilitate its insolvent insurers.[131]

---

[127]    *Gross*, 217 F.3d at 222.

[128]    *Id.* at 222 (citations omitted).

[129]    *Id.*

[130]    *See First Central Financial,* 269 B.R. at 519 (McCarran-Ferguson "should be construed narrowly in the face of valid federal interests").

[131]    *Id.*

Absent a legitimate policy concern and substantive conflict with a federal court's exercise of jurisdiction, McCarran-Ferguson cannot *de facto* deprive such federal court of its otherwise valid jurisdiction.  Here, no such concern exists.  As courts have found, the Illinois priority scheme can coexist with federal jurisdiction over the underlying action resolving a claim.[132]  While Ames may obtain a favorable judgment in federal court, it will not be able to recover from Lumbermens other than through the rehabilitation proceeding.[133]  The claims process and priority scheme of the Illinois Insurance Code is in no way disturbed by this Court's exercise of its statutory and constitutional jurisdiction to determine the scope of Ames' rights and liabilities against Lumbermens.[134]

It is also relevant that Lumbermens has asserted its own claims against the Ames estate, and has expressly acknowledged that those claims are intertwined with Ames' claims with respect to the Bond Agreement and the Trust Monies.  There is no dispute that "Article XIII of the [Illinois] Insurance Code does not purport to confer on state courts exclusive jurisdiction to hear claims filed by the rehabilitator against third parties."[135]  As a result, any concern that the Court's adjudication of such claims will supersede, impair or invalidate Illinois state law are

---

[132]  *McRaith v. Am. Re-Ins. Co*, 2010 WL 624857, at *3 (N.D. Ill. Feb. 17, 2010) ("**McRaith**") (finding that exercise of federal jurisdiction over insurance contract dispute did not interfere with Illinois insolvency regime under McCarran-Ferguson because the proceeds of any judgment obtained in federal court would be distributed pursuant to the Illinois insolvency statute's priority regime)..

[133]  *See Gross,* 217 F.3d at 222 ("And, as we have also emphasized, the defendants would still have to present claims to the Commission in order to recover on any judgment in their favor.  The claims based on that judgment would be satisfied subject to the terms of the rehabilitation plan and the priorities established by Virginia law.  Thus, the state forum retains exclusive jurisdiction over the liquidation of Fidelity Bankers and the disposition of its assets.").

[134]  *Contrast Logan v. Credit General Insurance Co. (In re PRS Ins. Group, Inc.)*, 294 B.R. 609, 613 (Bankr. D. Del. 2003) (finding reverse preemption under McCarran-Ferguson Act appropriate because determination by the bankruptcy court of preference and fraudulent transfer claims would disturb the priority scheme set forth in the Ohio insurance insolvency law).

[135]  Illinois Insurance Code, 215 ILCS 5/192(3) and Rehabilitation Order, p. 4; *McRaith*, 2010 WL 624857, at *3.

minimal.  Because Ames' claims are interconnected with Lumbermens, as discussed above, the resolution of Ames' claims by this Court is also appropriate and does not run afoul of McCarran-Ferguson.

Finally, I believe, contrary to Lumbermens' argument, that by exercising jurisdiction over the adversary proceeding, this Court would not "take control of any part of Lumbermens' nearly $1 billion rehabilitation proceeding."[136]  This Court's exercise of jurisdiction will not interfere with the Rehabilitation Court's enforcement of the priority scheme in that proceeding.  This Court will simply determine ownership of the property now in the trust account, and the existence and amount of claims that Ames has against Lumbermens and Lumbermens has against Ames.  When courts have concurrent jurisdiction, as is the case here, the court with the greater expertise should decide the issues.  In this case, this Court is more qualified to decide the issues of bankruptcy law, and is equally qualified to interpret non-Illinois state law.[137]

For these reasons, I determine that the Illinois insolvency statutes will not be impaired, invalidated or superseded by this Court's exercise of jurisdiction in the adversary proceeding.[138]

---

[136]  Lumbermens Opp., at 18.

[137]  Other than in the Illinois claims allowance stage (a matter I assume would be handled by the Illinois court), it will be recalled that the relevant law is non-Illinois law—the law of Connecticut, which Ames and Lumbermens agreed would govern the Bond Agreement.  *See* n.9 *supra*.

[138]  While discretionary abstention might still be permissible, *see Gross*, 217 F.3d at 222, 223, I would not recommend it.  Here even those claims involving the interpretation of state law significantly overlap with issues requiring knowledge of bankruptcy law.  The majority of the claims in the adversary proceeding arise from the Bankruptcy Code, and it is of dubious wisdom to leave for a nonbankruptcy court matters that call for a bankruptcy court's knowledge of bankruptcy law.  Similarly, I do not believe that this Court should leave for a nonbankruptcy court matters that require interpretation and enforcement of this Court's prior orders in the Ames' bankruptcy case.

III.

First Assuming Jurisdiction Doctrine

Finally, having determined that McCarran-Ferguson does not require this Court to defer to the Illinois state court for resolution of the issues raised in the adversary proceeding, I then turn to whether the "First Assuming Jurisdiction Doctrine", as first articulated by the Supreme Court in *Princess Lida of Thurn and Taxis v. Thompson*,[139] applies to any of the claims in the Amended Complaint.  That doctrine states that although the general rule is that "state and federal courts would not interfere with or try to restrain each other's proceedings . . . [a]n exception has been made in cases where a court has custody of property, that is, proceedings in rem or quasi in rem."[140]

Because the First Assuming Jurisdiction Doctrine applies only to claims that are *in rem* or *quasi in rem*, it does not apply to *in personam* actions.  Thus it does not apply to Ames' causes of action for breach of contract, breach of good faith and fair dealing, and unjust enrichment,[141] each of which seeks money or property not yet in the *in rem* jurisdiction of the Court, if it ever will be.

As to the remaining claims (for violation of the automatic stay and contempt, marshaling and equitable subordination[142]) and Lumbermens' claims against Ames in the Ames chapter 11 case, the First Assuming Jurisdiction Doctrine at least seemingly has no relevance, because this Court has exclusive jurisdiction over those claims in any event.[143]  But to the extent it is

---

[139]    305 U.S. 456, 466 (1939).

[140]    *Donovan v. City of Dallas*, 377 U.S. 408, 412 (1964).

[141]    Claims ## 1, 2, 3, and 5.

[142]    Claims ## 4, 6 and 10.

[143]    *See* page 26 *et. seq., supra*.

desirable to make a recommendation on the doctrine's applicability anyway, I determine that the doctrine *does apply* to the claims for violation of the automatic stay and contempt; marshaling; equitable subordination; and Lumbermens' claims against Ames.

What makes these latter claims distinct from the *in personam* claims in the first category is the latter's relation, in whole or in meaningful part, to the bankruptcy court's *in rem* jurisdiction. Claim #4 (for contempt) rests on section 362(a)(3) of the Bankruptcy Code, which proscribes interference with—or the destruction of—property of the estate (as alleged here, rights under the Bond Agreement, and cash collateral) which is subject to the *in rem* jurisdiction of the bankruptcy court, and which is to be used by a debtor to reorganize, to satisfy creditors' claims, or both.[144] Claim #6 involves two types of estate property that unquestionably belonged to the Ames estate at the time of its chapter 11 filing—its bundle of rights under the Bond Agreement and its cash collateral. The Court has *in rem* jurisdiction over each of them. And for reasons discussed above, that *in rem* jurisdiction extends to ancillary proceedings to protect them. That is particularly true with respect to Ames' cash collateral, whose diversion from the Ames estate underlies Claim #6's prayer for relief. And Claim #10 (for equitable subordination), and Lumbermens' claims against the Ames estate likewise relate to the bankruptcy court's *in rem* jurisdiction—though there they relate to a different side of the court's *in rem* jurisdiction, the claims allowance process, in which claims to be satisfied by estate assets are allowed and disallowed, and the bankruptcy court determines creditors' competing priorities in realizing on the value of estate assets when necessary.

---

[144]     To be sure, in this case (as in many 362(a)(3) contempt situations), the estate property that was subject to the court's *in rem* jurisdiction has been removed from the estate—and thus could be said to have exited from this Court's *in rem* jurisdiction. But to countenance such a way of looking at it would defeat the purpose of section 362(a)(3), which is to protect the assets subject to the bankruptcy court's *in rem* jurisdiction, Thus I am unwilling to hold that the *in rem* jurisdiction of the bankruptcy court no longer exists after a violation of section 362(a)(3) has caused estate assets to leave the estate.

Of course, the claims in this latter category represent aspects of the bankruptcy court's *in rem* jurisdiction of a somewhat different character than simply administering assets remaining under the supervision of the court.  But their *in rem* character remains the same, and respect for all of the ways in which the bankruptcy court's *in rem* jurisdiction is applied is important to the bankruptcy system.[145]

Thus I conclude that the First Assuming Jurisdiction Doctrine does not apply to Claims ## 1, 2, 3, and 5, and that it does not need to be applied to Claims ## 4, 6 and 10, and to Lumbermens' claims against the Ames estate, because as to the latter, this Court's jurisdiction is exclusive anyway.  But to the extent my views on the latter claims nevertheless are desired, I conclude that the *in rem* aspects of the latter matters cause application of the First Assuming Jurisdiction Doctrine to be proper.

---

[145]     By contrast, Ames argues that this Court also exercised *in rem* jurisdiction over the Trust Monies, and that I recognized such jurisdiction at the November 5, 2007 hearing.  *See* Motion at 23 (citing Tr. of 11/5/07 Hrg. at 50:2-5) ("[t]his Court has already held that it has *in rem* jurisdiction over the 'effort by the estate to avoid a continuing hold on its assets, collateral as posted, as to which [the bankruptcy court has] *in rem* jurisdiction . . . .'").  But Ames misunderstands what I then said.  The focus was on the distinction between bond and letter of credit proceeds (which at least generally are not property of the estate), and the collateral posted for the benefit of the obligors on those bonds or letters of credit, which most definitely was estate property, subject to this Court's *in rem* jurisdiction.  I was not speaking of the funds Lumbermens placed in the Trust Account, which at this juncture are in the *in rem* jurisdiction of neither estate.

That should be apparent from the entire relevant portion of  the transcript of that hearing:

> Kemper is of course right that Ames has no interest in the surety bond and that neither the bond nor the letters of credit are property of the Ames estate.  This decision assumes the correctness of those assertions.  But this controversy does not involve an effort by the estate to block a payment on a letter of credit or on a surety bond, areas where most of the law concerning whether letters of credit and bonds are or are not property of the estate can be found.  It instead arises from an effort by the estate to avoid a continuing hold on its assets, collateral as posted, as to which I have in rem jurisdiction, where the circumstances do not permit a continued hold on those assets.  While neither the LCs nor the bond are property of the estate, cash posted as collateral to secure Wachovia's obligations under the letters of credit is property of the estate and it is that property that both the debtors and the Court have a legitimate interest in protecting.

Tr. of 11/5/07 Hrg. at 49:19-50:9.

-45-

<u>Conclusion</u>

For the reasons explained above, I recommend that the district court determine that:

(1) this Court has subject matter jurisdiction over *all* of the claims at issue in this adversary proceeding, and that it has *exclusive* jurisdiction over Claims ## 4, 6, and 10 and Lumbermens' claims against the Ames estate;

(2) McCarran-Ferguson *does not* require this Court to defer to an Illinois state court for resolution of the issues raised in the adversary proceeding (but McCarran-Ferguson does require that if this Court grants Ames any monetary judgment, Ames must take that judgment to the Illinois' insolvency court for allowance and determination of the judgment claim's priority); and

(3) the First Assuming Jurisdiction Doctrine does not apply to Claims ## 1, 2, 3, and 5, and does not need to be applied to Claims ## 4, 6 and 10, or to Lumbermens' claims against the Ames estate (because as to the latter, this Court's jurisdiction is exclusive anyway). But to the extent it matters, the *in rem* aspects of the latter matters cause application of the First Assuming Jurisdiction Doctrine to be proper.


Dated: New York, New York                    __*s/Robert E. Gerber*___
          December 7, 2015                          United States Bankruptcy Judge


-46-