**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------- X

In re:

AMES DEPARTMENT STORES, INC., *et al.*,

*Debtors*.

--------------------------------------------------------------------- X

AMES DEPARTMENT STORES, INC.,

*Plaintiff*.

LUMBERMENS MUTUAL CASUALTY COMPANY,

*Defendant.*

--------------------------------------------------------------------- X

District Court Docket No.:
12-cv-08365 (ALC)

Chapter 11
Case No. 01-42217 (CGM)
(Jointly Administered)

Adversary Proceeding
No. 06-01890 (CGM)


**DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION**
**OF THE BANKRUPTCY COURT CONCERNING JURISDICTION MOTIONS**

**(ORAL ARGUMENT REQUESTED)**


**TORRE, LENTZ, GAMELL, GARY**
**& RITTMASTER, LLP**
*Attorneys for Defendant*
100 Jericho Quadrangle, Suite 309
Jericho, New York  11753
Tel.:  (516) 240-8900
Email: MGamell@TLGGR.com
Mark S. Gamell, Esq.
Robert Beau Leonard, Esq.

2234391_1

**TABLE OF CONTENTS**

DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION OF THE
BANKRUPTCY COURT CONCERNING JURISDICTION MOTIONS ......................................1

PRELIMINARY STATEMENT ...........................................................................................................2

Section I The Liquidator's Objections to the Introduction and "Facts" Sections of the Report........7

      The Bond and the "Bond Agreement" ...................................................................9

      Events During Ames' Bankruptcy ......................................................................14

      "Cash Collateral" Allegedly Supporting The Letters Of Credit ...........................15

      Lumbermens' Proofs of Claim.............................................................................19

      Travelers' Demand...............................................................................................19

      The Letter Agreement ..........................................................................................20

      The Adversary Proceeding and the Travelers Settlement....................................26

      The December 2008 "Final Settlement" ..............................................................28

      The Second Amended Complaint .........................................................................30

      Lumbermens' Illinois Rehabilitation Proceedings..............................................33

      The Motion To Withdraw The Reference, etc. ....................................................37

Section II The Liquidator's Objections to the Report's Discussion of "The Court's Jurisdiction" ..39

      The Report Failed to Acknowledge that the Liquidator Made Both A "Facial" and a
      "Factual" Challenge to Jurisdiction ......................................................................40

      Claim No. 5 – Declaratory Judgment Re: Trust Monies ......................................44

      The Liquidator's Property Rights In The Trust Monies .......................................45

      Insurance Regulatory Issues Involving The Trust ................................................46

      Claim # 4 - Civil Contempt under 11 U.S.C. 105(1) For Automatic Stay Violation ...........48

      Lumbermens' Right Of Equitable Subrogation ...................................................51

      Claim # 6 - Marshalling .......................................................................................54

      Claim # 10 – Equitable Subordination of Lumbermens' Claim ...........................55

Section III The Liquidator's Objections to the Report's Discussion  of Preemption Under The
      McCarran Ferguson Act.........................................................................................56

      The Report's "Narrow Construction" Cases..........................................................57

      The Report's Erroneous Application of the Three-Pronged Fabe Test .................60

         a.     The Report Misconstrues the Second Circuit's Decision in Stephens...........61

         b.     The Third Prong of the Fabe Test Is Satisfied In This Case.........................63

                 Impaired Illinois Statutory Provisions ................................................64

Cases Supporting Preemption On Parallel Facts ...............................66

c.       Cases Relied Upon By The Report Are Distinguishable.................................73

Section IV Liquidator's Objections To Report's Recommendations  As To "First Assuming Jurisdiction Doctrine" ......................................................................................77

The Liquidator Objects To The Report's Rejection of  Discretionary/Permissive Abstention As An Alternative Remedy ...............................................................80

## TABLE OF AUTHORITIES

### CASES

*APWU v. Potter*
343 F.3d 619 (2d Cir. 2003)...............................................................................44

*Ashcroft v. Iqbal*
556 U.S. 662 (2009)................................................................................3, 43, 57

*Autry v. Northwest Premium Serv., Inc.*
144 F.3d 1037 (7th Cir. 1998) .........................................................................75

*Biro v. Condé Nast*
2012 U.S. Dist. LEXIS 112466 (S.D.N.Y. Aug. 9, 2012)...............................31

*Connecticut National Bank v. Douglas*
221 Conn. 530 (1992) .......................................................................................51

*Davister Corp. v. United Republic Life Ins. Co.*
152 F.3d 1277 (10th Cir. 1998)....................................................................72–73

*Dep't of Treasury v. Fabe*
508 U.S. 491 (1993)........................................7, 56, 57, 59, 60, 61, 62, 63, 64, 65, 77

*Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc.*
*(In re Metromedia Fiber Network, Inc.)*
416 F.3d 136 (2d Cir. 2005)..............................................................................55

*Enron Power Mktg v. Calif. Power Exchange Corp.*
*(In re Enron Corp.)*
2007 U.S. Dist. LEXIS 73638
(S.D.N.Y. September 21, 2007)(McMahon, J.) ...............................................50

*Galey & Lord Inc. v. Arley Corp. (In re Arlco, Inc.)*
239 B.R. 261, 274 (S.D.N.Y. 1999)..................................................................55

*Gaynor v. Payne*
261 Conn. 585 (Conn. 2002)............................................................................45

*Gross v. Weingarten*
217 F3d 208 (4th Cir. 2000)...........................................................46, 59, 60, 73

*Gucci Am. v. Bank of China*
768 F.3d 122, 144 (2d Cir. 2014)......................................................................79

*Hassett BancOhio Nat'l. Bank, (In re CIS Corp.)*
172 B.R. 748, 757 (S.D.N.Y. 1994) ..........................................................................45

*Humana v. Forsythe*
525 U.S. 299, 309-310 (1999) .............................................................57, 60, 63, 65, 74

*In re Advanced Cellular Systems*
235 B.R. 713 (Bankr. P.R. 1999) ......................................................................62, 67, 68

In re A*mes Dept. Stores, Inc.*
306 B.R. 43 (Bankr. S.D.N.Y. 2004) ..................................................................55

*In re Aquatic Dev. Group, Inc.*
352 F.3d 671 (2d Cir. 2003)..................................................................................55

*In re Borges*
184 B.R. 874 (Bankr. D. Conn. 1995) ................................................................54, 55

*In re Liquidation of Security Casualty Co.*
127 Ill.2d 434, 130 Ill.Dec. 446, 537 N.E.2d 775 (1989) .........................................6, 65

*In re Lyondell Chem. Co.*
402 B.R. 596 (Bankr. S.D.N.Y. 2009) (Gerber, J.)......................................................54

*In re MF Global Holdings, Ltd.*
469 B.R. 177, 194 n.17 (Bankr. S.D.N.Y. 2012) ..........................................................60

*In re M.J. Sales & Distrib. Co.*
25 B.R. 608 (Bankr. S.D.N.Y. 1982).....................................................................50

*International Diamond Importers, Inc. v. Oriental Gemco (NY), Inc.*
2014 U. S. Dist. Lexis 164567 (S.D.N.Y. November 24, 2014) ...................................41

*Jordan v. Verizon Corp.*
391 Fed. App'x 10, 12 (2d Cir. 2010) ..............................................................42, 44

*J.S. ex rel. N.S. v. Attica Cent. Sch.*
386 F.3d 107, 110 (2d Cir. 2004).......................................................................43

*Keene Corp. v. Acstar Ins. Co. (In re Keene Corp.)*
162 B.R. 935, 942 (Bankr. S.D.N.Y. 1994) ..........................................................50

*Lander v. Hartford Life & Annuity Ins. Co.*
251 F.3d 101 (2d Cir. 2001)..............................................................................58, 59

*Lawski v. Frontier Ins. Group*
517 B.R. 496 (Bankr. S.D.N.Y. 2014) ..................................................................76, 77

*Logan v. Credit Gen. Ins. Co.*
*(In re PRS Ins. Group, Inc.)*
294 B.R. 609 (Bankr. D. Del. 2003)
aff'd 2005 U.S. Dist. Lexis 22611 (D.Del. 2005)...............................................68, 69, 70

*McNutt v. General Motors Acc. Corp.*
298 U.S. 178 (1936)........................................................................................................41

*McRaith v. Am. Re-Ins. Co.*
2010 U.S. Dist. LEXIS 14021 (N.D. Ill. Feb. 17, 2010) ...................................74, 75, 76

*In re Medical Care Management Co.*
361 B.R. 863 (Bankr. M. D. Tenn. 2003) ...................................................................71, 72

*Meyer v. United States*
375 U.S. 233 (1963)........................................................................................................55

*Munich American Reinsurance Company v. Crawford*
141 F.3d 585 (5th Cir. 1998)
*cert den.* 142 L.Ed.2d 448, 199 S.Ct. 539 (1998)....................................................62, 75

*New Eng. Dairies, Inc. v. Dairy Mart Convenience Stores, Inc.*
*(In re Dairy Mart Convenience Stores, Inc.)*
351 F.3d 86 (2d Cir. 2003) .........................................................................................49, 55

*Ochs v. Simon (In re First Cent. Financial Corp.)*
269 B.R. 502 (Bankr. E.D.N.Y. 2001) .....................................................................58, 59,

*O'Neil v. Fleet National Bank (In re Britton)*
300 B.R. 155 (Bankr. D. Conn. 2003) ......................................................................45, 46

*Peoples State Bank v. GE Capital Corp. (In re Ark-La-Tex Timber Co.)*
482 F.3d 319 (5th Cir. 2007) ..........................................................................................55

*Roth v. Jennings*
489 F.3d 499 (2d Cir. 2007)............................................................................................31

*In re Rubin*
160 B.R. 269 (Bankr. S.D.N.Y. 1993) ...........................................................................59

*Rushton v. Bank of Utah (In re C.W. Mining Co.)*
477 B.R. 176 (B.A.P. 10th Cir. 2012)..............................................................................54

*Sigmon v. Goldman Sachs Mortg. Co.*
539 B.R. 221 (S.D.N.Y. 2015)..........................................................................31

*Smart World Techs., LLC v. Juno Online Servs.*
*(In re Smart World Techs., LLC)*
423 F.3d 166 (2d Cir. 2005)............................................................................55

*Spirit v. Teachers Ins. And Annuity Ass'n*
691 F.1054 (2d Cir. 1982) ...............................................................................59

*Standard Investment Chartered, Inc. v. N.A.S.D.*
621 F.Supp. 2d 55 (S.D.N.Y. 2007)................................................................41

*State of New York Ins. Dept.*
*OGC Opinion No. 08-10-09* (October 27, 2008) ...........................................47

*Stephens v. American International Ins. Co.*
66 F.3d 41 (2d Cir. 1995)..........................................................................61, 63

*TD Bank, N.A. v ARS Partners Poplar Plains, LLC*
2010 Conn. Super. LEXIS 232 (Fairfield Superior Court, February 2, 2010) ...........................51

*The Majestic Star Casino, LLC v. Barden Development, Inc.*
*(The Majestic Star Casino, LLC)*
716 F.3d 736 (3d Cir. 2013)............................................................................42

*Transmontaigne Prod. Servs. v. MIV Wilbur R. Clark*
2010 U.S. Dist. LEXIS 30 (S.D. Ala. Mar. 29 2010) ....................................55

*Tri- Valley Distributing Fin. Corp.*
350 B.R. 628 (B.A.P. 10th Cir. 2006)(Unpublished) .................................59, 60

*Vt. Toy Works, Inc. v. Sebert Lumber Co. (In re Vt. Toy Works, Inc.)*
135 B.R. 762 (D. Vt. 1991)..............................................................................55

*Wagner v. Amwest  Ins. Group*
285 B.R. 447 (Bankr. C.D. Cal. 2002) ............................................................70

## Statutes

*McCarran-Ferguson Act*
(15 U.S.C. §§ 1011-1015)................................................1–5, 33, 37, 39, 40, 46, 48, 56,
................................................................................60, 61, 63, 64, 67, 68, 69,
................................................................................70–78, 80

11 U.S.C. §105(a) ...............................................................................5, 48, 56, 79

11 U.S.C. §362(a) ...................................................................................................79

11 U.S.C. §362(a)(3) ................................................................................................5

11 U.S.C. § 541 ..............................................................................................45, 60

11 U.S.C. § 542 ..............................................................................................67, 68

11 U.S.C. § 543 ..............................................................................................67, 68

15 U.S.C. § 1012 .....................................................................................................57

28 U.S.C. § 157(d) ...................................................................................................2

F.R.E. 201 ..............................................................................................................31

11 NYCRR § 126 (NY Regulation 114) ...............................................................47

11 NYCRR § 126.3(d) ...........................................................................................47

215 ILCS 5/187 .................................................................................................1, 34

215 ILCS 5/187(6) .................................................................................................65

215 ILCS 5/189 ........................................................................................35, 64, 66

215 ILCS 5/191 ......................................................................................................65

215 ILCS 5/192 ......................................................................................................76

215 ILCS 5/194 ........................................................................................36, 65, 66,

215 ILCS 5/205 ................................................................................................56, 65

215 ILCS 5/205(1) ...................................................................................................6

215 ILCS 5/209(8) ...........................................................................................65, 66

215 ILCS 5/210 ........................................................................................................7

**Other**:

*Restatement 3d of Suretyship & Guaranty,* §37 (1996) ...................................................51

**DEFENDANT'S OBJECTIONS TO REPORT AND RECOMMENDATION
OF THE BANKRUPTCY COURT CONCERNING JURISDICTION MOTIONS**

1.  Defendant Lumbermens Mutual Casualty Company ("**Lumbermens**"), acting through the Director of Insurance of the State of Illinois as statutory Liquidator of Lumbermens (the "**Liquidator**"), submits these Objections to the "Report and Recommendation on Ames' Motion to Confirm Exclusive Jurisdiction" (the "**Report**") of the Bankruptcy Court filed in this Court on December 10, 2015 [*ECF #18*].[1]

2.  The Report sets forth the findings of fact and conclusions of law that the Bankruptcy Court recommends this District Court issue in determining the cross-motions of the parties as to jurisdiction (comprised of (i) plaintiff's motion for a declaration of exclusive jurisdiction over this adversary proceeding and certain Trust Monies, and (ii) the Liquidator's cross-motion to dismiss or stay the adversary proceeding based upon the McCarran-Ferguson Act).

3.  Defendant Lumbermens is an Illinois insurance company that was placed in Rehabilitation on July 2, 2012, under Article XIII of the Illinois Insurance Code, *Rehabilitation, Liquidation, Conservation and Dissolution of Companies,* Section 215 ILCS 5/187 et seq., and subsequently placed in Liquidation under that same Illinois statute effective on May 10, 2013. Plaintiff Ames Department Stores, Inc. ("**Ames**") is a post-confirmation Chapter 11 Debtor, having filed for bankruptcy protection in August, 2001, and whose Chapter 11 liquidating plan was approved by the U.S. Bankruptcy Court on November 13, 2013.

---

[1] The briefing below was conducted in the name of Andrew Boron, who as Director of Insurance of Illinois was first appointed Rehabilitator, and later Liquidator, of Lumbermens.  Mr. Boron has since been succeeded by Acting Director Anne Melissa Dowling.

4.      The Report was issued pursuant to this Court's Opinion & Order dated July 3, 2014 [_ECF #15_] ("**Withdrawal Opinion**"), reported at 512 B.R. 736, which ruled that 28 U.S.C. § 157(d) required mandatory withdrawal of the reference to the Bankruptcy Court as to this Adversary Proceeding, due to the substantial issues presented requiring consideration of interstate commerce and the McCarran-Ferguson Act (15 U.S.C. §§ 1011-1015).

5.      Filed with these Objections is an Appendix (cited herein as "**Appx.**") containing the motion papers and other submissions filed on Ames' motion and Lumbermens' cross-motion (the "**Jurisdiction Motions**" or "**Motions**"), and the transcripts of the conferences and oral argument held in in the Bankruptcy Court concerning the Motions.  The Appendix contents have been numbered sequentially, and a table of contents to the Appendix is filed with it.

6.      Also, additional evidentiary materials are provided as exhibits to these Objections.

## PRELIMINARY STATEMENT

7.      This Court's review of the Motions (and the Report) is _de novo_.

8.      The Liquidator objects to a great many of the Report's recommended findings of "fact," as well as many of the Report's conclusions of law.  Of great concern are the pervasive errors in the Report's statement of "facts," which the Report states are "undisputed" unless noted otherwise [Report p.3, n.8].  In many instances, these supposed "undisputed facts" were simply adopted from Ames' pleadings, without regard to whether Lumbermens' pleadings or papers deny, dispute, or disprove the allegations.  Lumbermens submitted substantial evidence on the Motions that contradicts many of these "facts."  With respect to some of the other "facts" there is no factual support whatever in the record.  The adoption of allegations from Ames' pleadings as "undisputed facts" is especially troubling, as the Liquidator presented factual support demonstrating the failure of Ames' Second Amended Complaint to survive scrutiny under

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009), and Ames' failure to meet its burden of establishing the jurisdictional facts with competent proof as further described in these Objections.

9.      The Liquidator's counsel had expressed concern at the last conference prior to the oral argument that the Bankruptcy Court might erroneously conclude that facts alleged by Ames were "undisputed" because the Jurisdictional Motions were, of necessity, not being decided on a full and complete record, and much of the voluminous discovery record in the case had not been placed before the court by either party.  To satisfy this concern, the Bankruptcy Court announced a procedure for permitting Lumbermens or Ames to supplement the record following oral argument.[2]  However, the procedure did not occur, and thus the parties were not afforded an opportunity to supplement the record prior to the issuance of the Report.

10.     In addition, the Report overlooks, ignores or misinterprets the plain language of many of the key, operative documents and agreements among the three key parties – Lumbermens, Ames and Travelers.  For example, in construing the surety bond at the heart of this matter, the Report overlooked and gave no effect to the express waiver by Ames, in the body of the bond itself, of any property interests or other rights in the surety bond or its proceeds. When Travelers made a claim under the surety bond, Lumbermens settled the claim, in part, by funding an $8 million Trust with its own assets for the exclusive benefit of Travelers at the Bank of New York, under an express Trust Agreement requiring that the funds be used for restricted purposes only.  All operative documents provide that if Travelers does not use the funds to pay defaulted obligations of Ames, then the funds shall be returned to Lumbermens (in this case, to Lumbermens' insolvent liquidation estate). Despite Ames' express waiver of any rights in the surety bond or its proceeds, the Report permits Ames to continue to pursue a strategy of seeking

---

[2] See Transcript of 11/18/14 conference (Tr. 19:23 – 22:10; Tr. 24:20 – 25:16); Defendants' Letter Brief dated December 1, 2014, Appx. pp. 959-961 at 961.

to convert Lumbermens' Trust Monies into a source from which Ames can recover upon a hoped-for damage award against Lumbermens to benefit of Ames' own liquidation estate.  Such a result would frustrate the Illinois insurance insolvency statute, which dictates that all funds of Lumbermens are to be used to pay the claims of "policyholders" in preference to "creditors."

11.     As to the Report's conclusions of law, the Liquidator objects to the Report's recommendations regarding the viability and justiciability of Ames' claims against Lumbermens, its views of the jurisdictional bases for several of Ames' claims, and the application of the McCarran-Ferguson Act to preempt federal bankruptcy jurisdiction over Ames' claims.

12.     The Liquidator particularly objects to the analysis employed in the Report's rejection of the reverse preemptive protection that should be granted under the McCarran-Ferguson Act to the State of Illinois' comprehensive system concerning insolvent insurers under Article XIII of its Insurance Code.  The view expressed in the Report as to federal bankruptcy concerns and powers appears overbroad; the view of the scope of the McCarran-Ferguson Act's reach appears overly narrow; and the Report contains little serious consideration of the legitimate and important state law and national concerns at issue in insurance insolvency statutes in general, and in the provisions of the Illinois insurance insolvency statute in this particular case.  The Report relies upon caselaw that takes a narrow view of McCarran-Ferguson, but in factual contexts wholly dissimilar to that presented in this adversary proceeding.  The Report does not adequately weigh and consider the paramount interest of Illinois in protecting its system for insurer insolvency, which is centralized, orderly and efficient in order to maximize the recovery for policyholders – a goal that the U.S. Supreme Court and the Second Circuit, as well as several other circuit, district and bankruptcy court decisions, have found worthy of preemptive protection under McCarran-Ferguson.

13.     In addition to upholding all of Ames' claims, the Report identifies three "claims" asserted by Ames that the Report concludes are within the "exclusive" bankruptcy jurisdiction of the federal court, and which the Report recommends be retained in the federal court and permitted to proceed.  Those three claims are for (i) civil contempt sanctions under 11 U.S.C. §105(a) for alleged violation of the automatic stay (11 U.S.C. §362(a)(3)); (ii) "marshalling"; and (iii) equitable subordination of Lumbermens claims in the Ames bankruptcy case.  Even though the Liquidator demonstrated the lack of merit of these claims, both factually and legally, the Report goes no further than a facial review of the allegations regarding these claims contained in Ames' 2009 Second Amended Complaint.  The Liquidator submits that prior to determining that Illinois' insurance insolvency statute was not entitled to preempt the federal court's exercise of jurisdiction over such claims, the Bankruptcy Court should have engaged in more than a "facial" review of Ames' allegations since the Liquidator's jurisdictional challenge was both facial and factual.

14.     Furthermore, the Report proposes that claims pending before a federal court that the court finds to be "important," or of which the court's jurisdiction is "exclusive," should be retained and permitted even if McCarran-Ferguson would, on its face, dictate preemption or abstention.  The Report does cite some caselaw suggesting that McCarran-Ferguson should be narrowly construed where important federal interests are concerned, but those cases arise from inapposite situations (*i.e.*, SLUSA concerns), and do not support the broad rejection of McCarran-Ferguson embodied in the Report's recommendations. McCarran-Ferguson does not present a "balancing" test to be applied by the Bankruptcy Court; it preempts the court's legislatively granted jurisdiction where the court's exercise of that jurisdiction would "invalidate, impair or supersede" state law regulating the business of insurance, and state insurer insolvency

statutes have been repeatedly held to constitute such protected statutes.  The Report's suggestion that the federal court only determine and liquidate Ames' claims, while determining the ownership of Lumbermens' $9 million in Trust Monies, does little to avoid the head-on conflict between the continued exercise of this Court's jurisdiction and key provisions of Article XIII of the Illinois Insurance Code.

15.    The Report largely ignores the actual language employed in the relevant agreements, even failing to acknowledge the broad waiver of rights by Ames of any interest in Lumbermens' $14.35 million surety bond issued on Ames behalf, which was set forth in the body of the Bond itself.[3]  Similarly, the Report fails to acknowledge the Liquidator's demonstration that Ames' claims ignore long-standing principles of fundamental law, including suretyship, equitable subrogation and the "independence principle" governing letters of credit.

16.    The Illinois Insurance Insolvency Act was designed to provide a comprehensive, orderly and efficient procedure for liquidating insurance companies while protecting the rights of interested parties.  *In re Liquidation of Security Casualty Co.,* 127 Ill.2d 434, 447, 130 Ill.Dec. 446, 537 N.E.2d 775 (1989).  The Illinois Supreme Court has held that the schedule of priorities set forth in Section 205(1) of that Act, 215 ILCS 5/205(1), constitutes a "rule of absolute priority." *Id.* That court has further held that, "[b]ecause the legislature has provided a comprehensive statutory scheme governing the distribution of assets from a liquidated insurer's estate, equitable relief different from that provided by statute [is] not available…" *Id.*  The Report having confirmed that the Trust Monies are *not* assets of Ames, and the Liquidator having a residuary interest in the Trust Monies that is cognizable and protectable under Connecticut law, this Court cannot award Ames an interest in those Trust Monies (any putative award of damages

---

[3] The Bond states: "The Principal [*i.e.*, Ames] shall not at any time have any rights or property interests in this Bond, the Bond Collateral or other proceeds of this Bond."  (Appx. p. 321, ¶ 2, last sentence).

in favor of Ames constituting a claim against Lumbermens' general assets which are subject to distribution only by entry of an order by the Illinois state receivership court. 215 ILCS 5/210). A contrary award by this Court would contravene Illinois' comprehensive and absolute statutory rule of distribution by elevating Ames to a "dollar for dollar" or super-priority claimant above the priority interest granted to, among others, administrative expenses and policyholder interests – priorities that were upheld and granted preemptive power over even the federal priority statute by the U.S. Supreme Court in *Dep't of Treasury v. Fabe*, 508 U.S. 491 (1993).

### <u>Section I[4]</u>
### <u>The Liquidator's Objections to the Introduction and "Facts" Sections of the Report</u>

17.    At the very outset, the Report's description of the Liquidator's essential contention on its cross-motion [*Report,* p. 1] is incorrect, as it overlooks the alternative relief requested by Lumbermens, which is to have the adversary proceeding stayed on abstention grounds. In addition, the Report's statement in note 3 that Lumbermens "converted its case to a liquidation" is incorrect; unlike the preceding Agreed Order of Rehabilitation, the Order of Liquidation is not an agreed order. The Director of Insurance determined that Lumbermens' rehabilitation proceedings should be converted to a Liquidation proceeding under applicable law, the Illinois Attorney General filed a Verified Complaint for Liquidation, and the insolvency court agreed and issued an appropriate order.[5]

18.    As for the Report's description of the automatic stay violation alleged in Ames' adversary complaint as "serious allegations of interference with the Debtor's property of two separate types" [*Report, p.* 1], the Liquidator disagrees entirely. The *allegations* made by Ames may be viewed as "serious," but the facts show that there was no stay violation, and that no

---

[4] These Objections comment on the Report in the sequence in which matters were presented in the Report.

[5] See Liquidation Order dated May 8, 2013 (Exhibit "A" to these Objections).

property of the Debtor was adversely affected by the November 4, 2003 agreement between Lumbermens and Travelers ("**Letter Agreement**") on which Ames' automatic stay claim is based.

19.     As discussed below, one of the two types of bankruptcy estate property that the Report suggests was interfered with were the supposed rights of Ames in the Bond issued by Lumbermens.  Incredibly, the Report ignores the critical passage in the Bond concerning this issue – highlighted multiple times in Lumbermens' motion papers: the Bond's statement on its face that "The Principal [*i.e.*, Ames] shall not at any time have any rights or property interests in this Bond, the Bond Collateral or other proceeds of this Bond."[6]

20.     The second type of property – cash collateral allegedly posted by Ames to support letters of credit held by Travelers – has not been shown to have existed as of the date of the alleged automatic stay violation, and Ames has judicially admitted that there was no such cash collateral until subsequent to June 3, 2005.[7]  In any event, the evidentiary facts show that no such cash collateral was adversely affected by the Letter Agreement between Lumbermens and Travelers since (a) the Letter Agreement dealt only with the letters of credit and their proceeds, which are not property of the estate and a draw on which is not barred by the automatic stay even if the letters of credit were cash collateralized, and (b) the result to the Ames estate would have been the same in the absence of the Letter Agreement in light of two basic principles of suretyship law: (i) Lumbermens' right to be equitably subrogated to Travelers' rights to the letters of credit had Lumbermens' funds been applied to pay Ames' debt, and (ii) Travelers' obligation, as obligee of the Bond, to Lumbermens, as surety, not to dissipate or release the letters of credit in a manner detrimental to Lumbermens.

---

[6] Bond, ¶ "2," last sentence (Appx. p. 321).

[7] Complaint, ¶ 22 (Appx. p. 511).

**The Bond and the "Bond Agreement"**

21.     The Liquidator objects to the Report's "undisputed" facts regarding the Bond at issue in the case.  The Report ignores the actual language of the Bond, and blends certain incorrect "interpretations" of the Bond into its factual statement.

22.     In addition, the Report discusses a "Bond Agreement" (adopting a defined term used in Ames' Second Amended Complaint, without adopting Ames' definition).  The Report does not make clear what the difference is between the two documents ("Bond" and "Bond Agreement"), and conflates the two terms confusingly and sometimes inconsistently.  At oral argument, that the Bankruptcy Court indicated the term "Bond Agreement" referred to the "General Indemnity Agreement" executed by Ames in favor of Lumbermens several months before the Bond was issued.[8]  However, in the Report the meaning of "Bond Agreement" is frequently confused and unclear.  In Ames' Second Amended Complaint, the term "Bond Agreement" is used to refer to the "Bond" (which it attached as an exhibit).[9]  The Liquidator objects to the use of the term "Bond Agreement" as ambiguous and confusing when it is being used as a substitute for the accurate and correct term, "Bond."

23.     The first sentence of the Report's section entitled "The Bond" (p. 3), states that in November 2000, Lumbermens and Ames entered into a "contract" ("Bond Agreement") under which Lumbermens provided a surety Bond for payment of up to $14.35 million (the "Bond") to "backstop" Ames' obligations to Travelers (Ames' workers' compensation insurer), under a number of insurance policies and related agreements.  To the extent that the term "Bond Agreement" as used by Bankruptcy Court in this instance refers to the General Indemnity

---

[8]   Transcript of June 30, 2015 Oral Argument, Appx. p. 972, l. 9-14; Appx. p. 1060, l. 17-21; General Indemnity Agreement, Appx. pp. 326-331.

[9] Second Amended Complaint, Appx. p. 550, p. 7, ¶ 26.

Agreement, it was not entered into in November 2000, but prior to that date (because Lumbermens had earlier issued other surety bonds on behalf of Ames). Furthermore, to the extent that the characterization of the surety bond as a "contract" or "agreement" is intended to suggest that the Bond is not a surety bond governed by the applicable laws of suretyship, that characterization is rejected as incorrect.

24.    The General Indemnity Agreement was a document under which Ames made a series of promises in favor of Lumbermens and granted Lumbermens a series of rights. Among the most significant of these rights was the grant to Lumbermens of the exclusive right to determine how claims against its Bonds should be "compromised, resisted, defended, tried or appealed," and the surety's decision was agreed to be "final and binding upon the Indemnitors" (General Indemnity Agreement, Appx. p. 327, ¶ "5", "Surety's Rights Re: Claims"). In addition, Lumbermens was granted the right to consent to changes in the Bond or in the underlying bonded contract (*i.e.*, the agreement between Ames and Travelers), and Ames waived any right to receive notice from Lumbermens [Appx. pp. 327-28, ¶"2" ("Surety's Consent To Changes"), and ¶ "10" ("Indemnitors' Waiver Of Notice")].

25.    The Report incorrectly asserts that the $14.35 million Bond was issued by Lumbermens "to backstop Ames' obligations to Travelers Indemnity Company ("Travelers") under a number of insurance policies and related agreements . . ." [Report p. 3]. In fact, Lumbermens submitted undisputed evidence obtained in discovery in this adversary proceeding that the "agreements" between Ames and Travelers referred to in the Bond did not exist at the time the Bond was procured from Lumbermens, which would have provided Lumbermens with a significant defense under the Bond if it had been discovered earlier (and which may be relevant to any current claim regarding the Bond).

26.     The Report's description of the Bond as a "backstop" to Ames' obligations is a colloquial expression, and certainly cannot take the place of a careful review of the Bond's own terms, conditions and limitations.  In describing the Bond, the Report omitted the significant undisputed fact that the Bond was not drafted by Lumbermens (and therefore is not to be construed against Lumbermens), but rather was drafted by Travelers, the obligee (and thus any ambiguity must be construed against Travelers as the drafter).

27.     The second sentence of this section of the Report (now referring to the "Bond Agreement" rather than the "Bond" [*Report,* p. *3*]), incorrectly interprets the Bond as requiring Lumbermens to pay Travelers within seven business days of a demand by Travelers for payment, unconditionally and irrespective of the sufficiency of Travelers' demand (citing the first paragraph of the Bond [Report, n. 10]).  This interpretation of the Bond is entirely erroneous.  In fact, there were conditions expressed in the Bond which Travelers did not satisfy when it made its demand in 2003.

28.     Paragraph 1 of the Bond required, by its clear terms, that a demand under the Bond specify "the amount due, either as security or for payment or for reimbursement pursuant to the Agreements," to fix the liability of both the Principal (Ames), and the Surety (Lumbermens), to make payment under the Bond, as follows:

> 1)     Within seven (7) business days of Surety's receipt of a demand for payment under this Bond ("Demand"), Surety shall pay to the Obligee the amount of such Demand.  <u>The Obligee's Demand to the Surety of the amount due, either as security or for payment or for reimbursement pursuant to the Agreement(s), shall be absolute proof of the existence and extent of the liability of the Principal and the Surety to the Obligee hereunder</u>. The Obligee may present one or more Demands at any time in its sole discretion, provided however, Surety shall not be obligated to pay an aggregate amount in excess of the penal sum of the bond. [emphasis added].[10]

---

[10] See Bond, Appx. pp. 321-325

29.     Paragraph 2 of the Bond stated that Travelers could demand the full penal sum (*i.e.,* $14.35 million) if Travelers' demand was "for security," in which event the Bond further provided that Travelers was to hold the proceeds as "collateral" (defined in the Bond as "Bond Collateral"), to be applied from time to time to Ames' "Obligations" (as defined in the then non-existent supposed "agreements" between Travelers and Ames) in Travelers' discretion, provided further that any unapplied portion of such Bond proceeds received by Travelers *must be returned to Lumbermens*, as follows:

> 2)      In the event that Obligee shall demand the entire penal sum of the Bond under a Demand (less any previous amounts paid to Obligee under the Bond), Obligee shall hold all funds ("Bond Collateral") received as security for the Obligations and shall apply such funds to the Obligations from time to time in its sole discretion. At such time as Obligee determines in its sole discretion that all of the Obligations are fully and finally paid and such payment is not subject to avoidance or other turnover Obligee shall return to the *Surety* the unapplied portion of the Bond Collateral. * * * The Principal shall not at any time have any rights or property interests in this Bond, the Bond Collateral or other proceeds of the Bond.[11][*emphasis added*]

30.     As can be seen from the Bond's actual language, the Report improperly elevates the importance of the first sentence of paragraph "1" out of context, and treats it as the central and governing term of the Bond.  In fact, that sentence was a "time of payment" term only for a *proper* demand made under the Bond.  Paragraph "1" required that a Demand contain certain information as to the purpose of the demand (security, payment or reimbursement) in order to bind the principal and the surety.  The Travelers demand, which was for the full penal sum, failed to state the purpose of its "Demand," as required by Bond paragraph 1.  It also demanded the full penal sum, but without confirming that the demand was solely for the purpose of security, as required by paragraph 2 of the Bond.[12] Accordingly, Travelers' demand did not

---

[11] See Bond, Appx. pp. 321-325.

[12] Demand, Appx. p. 332.

comply with the Bond's terms.  The Report does not mention any of this language, or any of these facts regarding Travelers' demand, and instead simply accepts the proposition alleged by Ames that Lumbermens "breached" the Bond by not promptly and immediately paying Travelers.

31.     The third and fourth sentences of this section of the Report acknowledge that Lumbermens had the right to reimbursement from Ames for any amounts expended under the Bond (once again confusing "Bond" and "Bond Agreement," since Lumbermens had the right to reimbursement under both (under the Bond at common law, and under the General Indemnity Agreement by express agreement)).  The Report then incorrectly posits that Lumbermens' reimbursement right was not secured, and that in the event of a future Ames bankruptcy, Lumbermens would have only an unsecured claim [Report, pp. 3-4].

32.     The fallacy in this conclusion is that it does not acknowledge that from the outset of its involvement, Lumbermens, as a surety, would become equitably subrogated to the rights of Travelers, the obligee under the Bond, upon Lumbermens making a payment under the Bond. Among the rights to which Lumbermens would be subrogated was Travelers' right to draw upon a letter of credit, originally provided to Travelers by Ames pre-petition, which stood as collateral for the same obligations that were collateralized by the Bond.  Accordingly, whether Lumbermens itself was secured is not the end of the inquiry; since Lumbermens' obligee held security, Lumbermens would "step into the shoes" of Travelers, including its rights to draw on that letter of credit, were Lumbermens to be called upon to perform under its Bond.[13]

---

[13] It later developed that Travelers received an additional letter of credit as collateral for a post-petition insurance agreement with Ames, for which both Travelers and Ames contended the Bond also stood as collateral.

**Events During Ames' Bankruptcy**

33.     The Report presents as Section "2" what it erroneously presents as undisputed facts regarding the Ames bankruptcy estate, its letters of credit and the collateral backing those letters of credit. The Liquidator objects to this section as almost entirely incorrect with respect to the letters of credit, the timing of their issuance, whether they were "cash collateralized" at the time of the Letter Agreement, and at what point in time they ever did become cash collateralized. These facts are, at a minimum, in dispute.

34.     The Report (p. 4) erroneously states that post-petition, Travelers continued to "administer" the workers compensation program of Ames, and later that year (2001), for that reason, Ames obtained two letters of credit for the benefit of Travelers in the aggregate amount of $26.85 million.  These statements are not only incorrect, but omit the critical fact that Travelers and Ames entered into their post-petition insurance agreement (Lumbermens Deposition Ex. 19, 2001-2002 Program Agreement; Exhibit "B" to these Objections), which has been ignored in the Report.  Under this agreement, Travelers did not merely continue to administer the prior insurance program; Travelers agreed to provide another year of insurance policies, products and services to Ames' bankruptcy estate, and required that Ames provide an *additional* letter of credit as collateral security to support that post-petition year of insurance obligations.  Accordingly, rather than posting two post-petition letters of credit for Travelers' continuing administration of the pre-petition insurance program, as the Report asserts, Ames post-petition posted *one* additional letter of credit to support an entirely post-petition insurance program; separately, Ames issued another letter of credit from its DIP facility to *replace* the expiring original $12,500,000 letter of credit that Travelers had held since February 2000 from Ames' pre-petition bank as collateral (together with the Bond) for the prior insurance obligations

of Ames through November 2001.

**"Cash Collateral" Allegedly Supporting The Letters Of Credit**

35.     The Report concludes, without factual support, that it is "undisputed" that all letters of credit issued on behalf of Ames in favor of Travelers were supported by "cash collateral" provided by Ames.  The implication that the letters of credit provided to Travelers were cash collateralized is without support in the record of this proceeding, and there is significant evidence contradicting that conclusion.

36.     The agreement eventually signed between Ames and Travelers for the insurance year November 1, 2000 to November 1, 2001 required collateral to be posted by Ames of two kinds: the Bond in the sum of $14,350,000, and a "step up" Letter of Credit in the initial sum of $7,000,000 to be increased to $12,250,000.[14]  This letter of credit was issued by Bank of America ("**BOA**"), LOC No. 3022836, in February 2000 in favor of Travelers, as beneficiary.[15]

37.     The BOA Letter of Credit issued to Travelers was not collateralized by cash, but was supported by the "asset based" lending formulas Ames had with BOA.[16]  In 2001, before Ames filed for bankruptcy, Ames switched lenders to GECC.  Travelers was concerned about potential "indirect preference" liability were it to simply accept a new letter of credit from GECC and release the BOA Letter of Credit, so Travelers refused to accept a new letter of credit from GECC until 91 days after GECC had filed its UCC financing statements.[17]  In the interim, the BOA letter of credit continued in force, backed by a $32 million letter of credit in favor of Bank

---

[14] November 1, 2000 Agreement, Appx. pp. 375 – 410 at 382.

[15] Letter of Credit, Exhibit "C" to these Objections.

[16] Deposition testimony of Ames' Treasurer Linda Cote, pp. 167:18 – 168:8 (Exhibit "D" to these Objections).

[17] Lumbermens Deposition Ex. 26, June 12, 2001 email with attached letter from Travelers to Ames (Exhibit "E" to these Objections).

of America issued by GECC, pre-petition.[18] Meanwhile, BOA issued a non-renewal notice for its letter of credit to Travelers, by which the BOA letter of credit would expire on October 31, 2001.[19]

38.    Accordingly, from approximately July 19, 2001 onwards, the BOA letter of credit held by Travelers was supported *not* by collateral of Ames posted with the issuer, or by "cash" of Ames, but by a letter of credit issued by GECC in favor of the BOA.  As of the date when Ames filed for bankruptcy protection on August 20, 2001, the BOA letter of credit held by Travelers still had not been replaced by another Letter of Credit.

39.    On August 20, 2001, Ames filed its bankruptcy petition commencing its Bankruptcy Case under Chapter 11, and subsequently the Bankruptcy Court issued various "first day" orders, including one which authorized the continuation, post-petition, of Ames' insurance programs and agreements with Travelers and various other insurers [ECF#17, Case No. 01-42217-cgm, filed 8/20/01].  On October 11, 2001, the Bankruptcy Court issued an Order approving an October 5, 2001 Stipulation between Ames and Travelers for the replacement of the BOA letter of credit still held by Travelers, with a substitute letter of credit to be issued as part of Ames' post-petition DIP lending facility with GECC.[20]  The Order and Stipulation both state that it is in the Debtor's "ordinary course of business" to "arrange for and maintain insurance programs, including the provision of replacement letters of credit to back those programs."  The stipulation recited that for insurance obligations of Ames commencing in 1998, Travelers held a letter of credit issued by BOA in the sum of $12,500,000.  It also stated that the

---

[18] Lumbermens Deposition Ex. 27, letter from Ames' David Lissy to Travelers' Mary Duffy with attached letter of credit from GECC to BOA (Exhibit "F" to these Objections).

[19] Lumbermens Deposition Ex. 39, letter from Travelers to Ames dated September 13, 2001 (Exhibit "G" to these Objections).

[20] Exhibit "H" to these Objections, [ECF 372 and 372-1 in Ames' main bankruptcy case, 01-42217-cgm].

new letter of credit in the sum of $12,500,000 issued by GECC was issued "in replacement" for the existing BOA letter of credit, and that Travelers had agreed to surrender the BOA letter of credit only in exchange for the new, "replacement" letter of credit.  Accordingly, the Report is in error in stating that it is undisputed that Ames secured the issuance of two "additional" post-petition letters of credit in favor of Travelers for its continuation of the "administration" of the pre-petition insurance program.  The Stipulation And Order makes clear that the October, 2001 letter of credit in the amount of $12,500,000 "replaced" the pre-petition letter of credit that had been held by Travelers for some time, and which was not collateralized by cash.

40.     Under the GECC DIP lending agreement, letters of credit were not required to be supported by cash collateral.  Rather, it was discretionary with the lender, GECC, as to whether cash collateral would be required.  Ames' treasurer testified that up until at least June 2002, GECC did not require that *any* cash collateral be posted for letters of credit issued under its DIP facility for Ames.[21]

41.     In the summer of 2002, Ames determined to cease operations and convert to a liquidating Chapter 11 bankruptcy.  Ames then negotiated a Sixth Amendment to its post-petition DIP lending agreement with GECC, and moved for its approval by the Bankruptcy Court.[22]  The motion did not mention in its text that any change was being made in the requirements of the DIP facility for letters of credit.  However, the Amendment itself (attached to the motion) provided that after certain other higher-priority debts were fully satisfied, the GECC collateral account would be funded with "cash" that resulted from the liquidation of inventory and assets from

---

[21] Deposition testimony of Linda Cote, p. 175:4-9 (Exhibit "I" to these Objections).

[22] Motion for Approval of Amendment, Lumbermens Deposition Ex. 34, (Exhibit "J" to these Objections).

certain of Ames store closings to occur over a period of time.[23]   Accordingly, cash sufficient to collateralize the outstanding letters of credit was not placed all at one time into such an account, but would be placed in the account from the proceeds of only certain of the assets being liquidated, and then only after higher priority debts listed in the amendment had been fully funded.

42.     No evidence was produced in this adversary proceeding establishing what cash, if any, had been placed in the letter of credit collateral account, or whether any such cash existed, as of November 4, 2003 – the date of the Letter Agreement between Travelers and Lumbermens (whose effect on the supposed "cash collateral" is the basis for Ames' "automatic stay violation" and several other claims against Lumbermens).

43.     However, Ames' original Complaint in this adversary proceeding, filed November 3, 2006, at paragraph 22, alleges that it was pursuant to a June 3, 2005 letter agreement between Ames and GECC that Ames was "required" to set aside cash to collateralize the letters of credit issued under the GECC facility. [Appx. p. 511].  Accordingly, Ames has judicially admitted that the letters of credit were not cash collateralized at the time the November 4, 2003 Letter Agreement was signed.  It was apparently  not until nineteen months later that Ames was required to provide cash collateral pursuant to the June 3, 2005 letter agreement between Ames and GECC.  That date is more than nine months after Ames' bankruptcy counsel, Weil Gotshal, had been provided with a copy of the Letter Agreement by Travelers.[24]

44.     Therefore, it appears that it was an act of Ames itself in 2005, rather than any act of Lumbermens and Travelers in 2003, that placed Ames' cash collateral at risk from the terms

---

[23] Deposition testimony of Linda Cote, p. 169:8 – 175:19 (Exhibit "K" to these Objections); Amendment, ¶ 3.1(b), (Exhibit "J" to these Objections).

[24] Lumbermens Moving Brief, Appx. p. 704.

of the Letter Agreement or a potential draw by Travelers on the letters of credit Travelers held.

**Lumbermens' Proofs of Claim**

45.     The statements in this same section of the Report regarding Lumbermens first proof of claim in the Ames bankruptcy, filed in March 2002, while technically accurate in describing Lumbermens' claim as "unsecured," should have mentioned that Lumbermens need not have had, or filed, a "secured" claim in order to assert the rights of Travelers, including the right to draw upon the letters of credit Travelers held.   Counsel for Ames admitted as much at the oral argument upon questioning from the Bankruptcy Court[25]

46.     At that time Lumbermens' original proof of claim was filed, no claim or demand had been made on the Bond by Travelers.   The Report also omits that after Ames served its Second Amended Complaint and prior to the deadline for amending proofs of claim, Lumbermens filed an Amended Proof of Claim (Exhibit "L" to these Objections).   The Amendment spelled out very clearly all of the rights of Travelers to which Lumbermens had become subrogated, including Travelers' rights as a creditor of Ames and as beneficiary of the letters of credit.

**Travelers' Demand**

47.     Finally, the Report's description of the "undisputed facts" regarding Travelers' May 3, 2003 demand on the Bond omits the undisputed facts that were presented by Lumbermens regarding the non-conforming demand sent by Travelers, and the failure of Travelers to respond to Lumbermens' valid inquiries regarding the information omitted from the demand but required by the Bond.[26] Also omitted is the undisputed fact presented by

---

[25]   June 30, 2015 Oral Argument, Appx. pp. 1103-1104, Tr. 138:22–139:18.

[26] Lumbermens Moving Brief, Appx. pp. 698–702.

Lumbermens that Ames and its outside counsel were aware of Travelers' suit against Lumbermens almost immediately after it was filed and took no action to intervene or become involved in the action, or assert that any rights of Ames might be affected.[27]

**The Letter Agreement**

48.     In section "3" of the Report (p. 5), subtitled "The Letter Agreement," the Liquidator objects to numerous erroneous fact statements and interpretations of the Letter Agreement.  The Liquidator also objects to the Report's erroneous and slanted summary of the "essence" of the Letter Agreement and its effect, which ignores the fact that Lumbermens, as surety, was entitled to be equitably subrogated to Travelers' rights (including its rights in the letters of credit), and that Travelers was obligated to hold, and not release or dissipate, any other collateral it held for Ames' obligation (such as the letters of credit) for which the Bond might respond to avoid "impairing the suretyship" of Lumbermens (which would result in Lumbermens' release).  These suretyship law concepts, which are long-established elements of the surety-obligee relationship, were erroneously ignored in the Report, with the result that the Report misconstrues the letter and is recommending that Ames be, in effect, granted "new rights."

49.     Contrary to the Report's statement (p. 5), the Bank of New York, as Trustee, was not a party to the Letter Agreement.[28]

50.     The Report also erroneously suggests that the concept of exhausting Ames' "cash collateral" for the letters of credit held by Travelers was discussed in the Letter Agreement; it was not.  *[Report, p. 6, subp.3(iii)]*.  The actual Letter Agreement does not indicate whether either of the parties knew at that time whether any "cash collateral" was supporting those letters

---

[27] Lumbermens Moving Brief, Appx. pp. 701-706.

[28] Letter Agreement, Appx. pp. 339-342.

Case 1:12-cv-08365-ALC   Document 29   Filed 02/01/16   Page 29 of 88

of credit (or whether, as discussed above, any such cash collateral was even in existence as of that date).

51.     Subparagraph (i) of this section of the Report, describing the establishment by Lumbermens of the $8 million Trust at the Bank of New York, omits a critical element of that portion of the Letter Agreement: the funds in the Trust were agreed to be held as "proceeds of Collateral" backing the "Obligations" of Ames owed to Travelers under the Insurance Program ("Obligations").  This meant that the monies were not to be immediately applied to any outstanding obligation of Ames; they would not "pay down" any debt of Ames to Travelers, but would be held against the eventuality of an Ames default in payment.  Under the terms of the Bond itself, this made the Trust Monies "Bond Collateral," as defined in paragraph "2" of the Bond – funds in which the Bond expressly stated that Ames had no property rights or interest. [See Bond, Appx. p. 321].  In addition, that language made it clear that the Trust Monies were proceeds of collateral which, under the 2000 Program Agreement between Ames and Travelers, had to be returned to Lumbermens if not eventually applied to obligations of Ames. [November 1, 2000 Agreement, ¶3(a); Appx. pp. 399-400].  Under that Agreement, those proceeds could not be applied unless Ames defaulted on its obligations to Travelers, which Ames never did.

52.     Subparagraph (ii) of this section of the Report is basically correct in stating that Travelers would be required to draw upon the Letters of Credit before looking to the Trust Monies.  Paragraph "2" of the Letter Agreement actually provides that Travelers would not draw upon the Trust Monies unless it has first drawn upon the two letters of credit it held and the proceeds thereof were insufficient to satisfy Ames' obligations at that time; at that point, Travelers could draw upon the Trust Monies "in an amount sufficient to satisfy the Obligations" (*i.e.,* not the entirety of the Trust Monies but only that part necessary to satisfy any deficiency

after the letters of credit had been drawn upon).

53.     Subparagraph (iii) of this section of the Report (p. 6) is in error in suggesting that the Letter Agreement included the concept of exhausting the "cash collateralizing the Letters of Credit"; that concept appears nowhere in the Letter Agreement.  It is correct that the Letter Agreement provided that Travelers would not make further demand upon the Bond unless and until Travelers had applied the proceeds of both the letters of credit and the Trust to Ames' Obligations and the Obligations still remained unsatisfied (Letter Agreement, paragraph "3").

54.     Subparagraph (iv) of this section (p. 6) is inaccurate, in that the footnoted description of two scenarios in which Travelers allegedly would *not* have to return the Trust Monies to Lumbermens is incorrect, and confuses the various paragraphs of the Letter Agreement and their effect.  Note 15 to the Report completely misinterprets the second full paragraph of paragraph "5" of the Letter Agreement.  That paragraph deals only with Travelers' agreement to calculate Ames' Obligations for the purpose of periodically adjusting the amount of collateral needed to support the Ames/Travelers insurance programs, to determine if any interim return of surplus in accordance with the Letter Agreement was appropriate.  It was *this* obligation of Travelers under the Letter Agreement – the obligation to make an interim calculation of Ames' Obligations and adjustment of collateral – of which Travelers would be relieved under the Letter Agreement if either of the events described in subsections "(a)" or "(b)" of the second paragraph of paragraph "5" occurred (*i.e.,* Travelers' claim against Ames, etc. was subject to challenge of any sort, or Lumbermens was subject of an insolvency, liquidation, rehabilitation or similar proceeding).

55.     The second full sentence of note 15 of the Report correctly quotes from a portion of paragraph "6" of the Letter Agreement, which refers to and modifies the first paragraph of

paragraph "5."  However, that portion of paragraph "5," as well as paragraph 6, deals with how

Travelers will return any unapplied proceeds (if any) of the Bond or the Letters of Credit.

Paragraph "5" of the Letter Agreement, in its entirety, states:

> Return of Proceeds.  Under the Insurance Program, Travelers may return proceeds of Collateral to the providers of the Collateral.  If, under the Insurance Program, Travelers will return proceeds of the LOCs and the Bond to the issuers of the LOCs and to Lumbermens as surety, then Travelers agrees that it will return those unapplied proceeds first to Lumbermens (up to the amount of the Trust Monies paid to Travelers as prescribed in paragraph 1 above and additional amounts, if any, subsequently paid to Travelers under the Bond) before returning any unapplied proceeds to the LOCs' issuers.

56.    Accordingly, what the first paragraph of paragraph "5" of the Letter Agreement

actually effectuates in Lumbermen's right to equitable subrogation to Travelers rights under the

letters of credit.  It provides that once Ames' obligations are terminated or satisfied, Travelers

will *first* return to Lumbermens all remaining proceeds of both the Bond (meaning remaining

Trust Monies and any other Bond proceeds in Travelers' hands) *and* the letters of credit until

Lumbermens has been fully reimbursed, and only then will Travelers return the balance of any

letter of credit proceeds it holds to the letter of credit issuers.  This is nothing more than

memorializing the manner in which equitable subrogation would traditionally operate where a

surety paid a loss to an obligee that held letter of credit (or other) collateral for the obligations.

Nothing set forth in paragraph "5" affects, or deals with, the provisions of the Trust Agreement,

the Ames/Travelers insurance agreement or the Bond, all of which require that any unused

monies located in the *trust account* (*i.e.*, Bond Collateral) be returned to Lumbermens.

Accordingly, the only *change* made by paragraph "5" to the already effective collateral return

provisions is that the letter of credit proceeds will *first* be used, if necessary, to reimburse

Lumbermens.

57.    The provisions of paragraph 6 are clearly intended to give Travelers the ability to

act pursuant to an order of any Court of competent jurisdiction that were to direct a return of the letter of credit proceeds in a different manner than that set forth in paragraph "5," but it must be recalled that paragraph "5" deals with the return of excess proceeds of letters of credit, not the return of the Trust Monies (which all the agreements dictate were always to go to Lumbermens to the extent that they had not been drawn upon). Accordingly, by operation of paragraphs "5" and "6," were a court to order, for example, that excess proceeds of the letters of credit in Travelers' hands should not be paid to Lumbermens to reimburse it for its loss under the Bond, but should be turned over to another party, Travelers would not be placed in the position of either breaching the Letter Agreement or placing itself in contempt of a court order. Nothing in paragraph 5 or paragraph 6 changes the disposition of the undrawn Trust Monies ("Bond Collateral"), nor does paragraph "6" provide the Bankruptcy Court (or any court) with power to broadly or generally rewrite the entire system of agreements made by the parties for the equitable benefit of Ames or its creditors.

58.     The Report's description of what the Bankruptcy Court found to be the "essence" of the Letter Agreement (Report, p. 6, first full paragraph) is inaccurate, and fails to reflect the rights that Travelers and Lumbermens respectively had already been granted by Ames under the operative documents, and under common law. As noted above, in the General Indemnity Agreement, Ames granted Lumbermens the unfettered right to resolve, in Lumbermens' discretion, any claims made against the Bond, including the compromise and settlement of those claims, as well as to consent to modifications of the Bond or to the contracts underlying the Bond, all without notice to Ames. Travelers had been granted the right, in the insurance agreement for the year 2000 (and for the year 2001 post-petition agreement as well) to choose the order and priority in which Travelers would look to its two separate types of collateral:

surety bond collateral in the sum of $14,350,000 and letter of credit collateral in the sum of $12,250,000. In this respect, Ames had *not* negotiated into its agreement with Travelers any infringement upon Travelers' right to exercise its sole discretion to choose which collateral to access first. This was acknowledged by the attorney for the Ames creditors committee at the November 5, 2007 hearing before the Bankruptcy Court.[29] Rather than an agreement in which Lumbermens was "temporarily absolved … for its failure to honor $6.3 million of its obligations to Travelers," as the Report suggests, the Letter Agreement was thoroughly satisfactory to Travelers, the only party entitled to receive performance under the Bond, and whose counsel told the Bankruptcy Court that in Travelers' view the settlement was a "good result."[30]

59.     A fair description of the "essence" of the Letter Agreement would be that two non-debtors, a surety and its obligee, settled a dispute between them by (a) making an agreement regarding the Bond, Bond proceeds and Bond collateral, none of which were property of the principal or its estate; (b) making an agreement regarding the Letters of Credit held as collateral by the obligee and their proceeds, none of which were property of the principal's estate, that memorialized the surety's right of equitable subrogation and the obligee's duty not to impair any collateral to which the surety might become equitably subrogated.

60.     The final sentence of the Report's "In essence …" paragraph at page 6 is also inaccurate and misleading. In stating that "Ames' cash collateral was indeed drawn upon when the letters of credit were tapped," the Report creates the misleading impression that the letters of credit were "tapped" either against Ames' will, or by action of Lumbermens or Travelers under the Letter Agreement. In fact, Ames continually paid out of its operating funds all of its

---

[29] Committee counsel Hazan at 11/5/07 Tr. 18:18-20, Appx. p. 470 ("Travelers has a right to call upon whichever pot it needed to address the responsibilities it had whether it was the letters of credit or the surety bonds.")

[30] 11/5/07 transcript, Tr. 31:17 – 32:1, Appx. pp. 483-484.

obligations to Travelers in full. The only time that any of the Letters of Credit were drawn upon was pursuant to the December 2008 "Final Settlement" order, which was initiated by Ames itself.

61.     The final sentence of this subsection of the Report accurately states that neither Lumbermens nor Travelers sought approval from the Bankruptcy Court of the Letter Agreement nor sought "relief, with respect to that conduct" from the automatic stay. As discussed further below, Lumbermens maintains that no relief from the automatic stay or Bankruptcy Court approval was required, as the agreement was between two non-debtors dealing with property that was not property of the estate (*i.e.,* the Bond and its proceeds, and the letters of credit and their proceeds). However, the Report neglects to mention that Ames was fully aware that Travelers had sued Lumbermens, and was aware of the Letter Agreement by no later than August 18, 2004.[31]   Nevertheless, this adversary proceeding did not include any claim based on the "automatic stay" until nearly five years later, in 2009.

**The Adversary Proceeding and the Travelers Settlement**

62.     Ames' original Complaint in this adversary proceeding is summarily described by the Report in the first portion of its section 4 [*Report, p. 6*]. The Report's summary of the relief sought by Ames in the original Complaint is inaccurate, in that contrary to the Report's description in subparagraph "(iii)" (Report, p. 7), no damages arising from an alleged breach by Travelers of the "Bond Agreement" were sought; the Complaint sought damages against Travelers for its alleged breach of the insurance policies [Complaint, ¶77, Appx. p. 523]. In fact, the term "Bond Agreement" never appears in Ames' original adversary Complaint. Notably, the initial adversary Complaint, filed two years after Ames' counsel received a copy of the Letter

---

[31] Lumbermens Moving Brief, Appx. pp. 704-705.

Agreement, also does not contain any allegations or claim that a violation of the automatic stay had occurred.

63.     In the Report's partial quotation from the Bankruptcy Court's ruling at the conclusion of the Intermediate Settlement hearing in 2007, the Report seeks to draw a distinction (Report, p. 8, n. 18) between the Bond and the Letters of Credit, which were not property of the Ames estate, and Ames' cash collateral that was.  In its footnote, the Report says "steps intended to cause a draw on the cash collateral, or resulting in such an effect, would likewise be paradigms of actions with effects on property of the estate that would be prohibited in the absence of relief from the stay."  However, as noted above, there is no evidence whatever that the letters of credit held by Travelers were "cash collateralized" at the time the Letter Agreement was entered into by Travelers and Lumbermens, and the record contains no evidence of any "steps taken by Lumbermens subsequent to the Letter Agreement to cause a draw on the cash collateral or resulting in such an effect."  Furthermore, if paragraph 22 of Ames' original adversary Complaint is correct, cash collateral for the letters of credit was not provided until after June 3, 2005.

64.     The Report notes (Report, p. 7, first full paragraph, last sentence) that "Lumbermens did not appeal the 2007 Decision."  While this statement is correct, it is of no import.  Lumbermens did not appeal the 2007 Decision because, as the Report further explains, that 2007 Decision did "not materially prejudice" Lumbermens' interests (Report, pp. 7-8).  In this regard, as the Report reflects, the Bankruptcy Court ruled, in part,

> I'm not at all sure that I have jurisdiction over a Travelers/[Lumbermens] dispute
> in this regard but each side can have a reservation of rights as to that as well …
> [Lumbermens] is of course right that Ames has no interest in the surety Bond and
> neither the Bond nor the letters of credit are property of the Ames estate.  This
> decision assumes the correctness of those assertions.

(Report, pp. 7-8.)

**The December 2008 "Final Settlement"**

65.     There are several oversights and errors in the Report's discussion of the

December 2008 order and so called "Final Settlement" as between Travelers and Ames.  The

Report (p. 8) states that under the terms of the "Final Settlement" "the amount of Ames' liability

to Travelers was fixed and would be paid by a direct draw on one of the letters of credit."  It is

not correct that the "amount of Ames' liability" to Travelers was "fixed." Instead, after five years

of negotiations, Ames agreed to pay a lump sum amount of $6,511,508 to Travelers in exchange

for Travelers accepting sole responsibility for all remaining exposures, claims and claim

development under the entirety of the insurance program Travelers had issued and administered

on behalf of Ames (an agreement referred to by Ames and Travelers' witnesses as a "Loss

Portfolio Transfer").  Accordingly, the amount agreed upon did not represent the calculation of

the "amount due."  The distinction is important, as the 2008 Order expressly reserved all of

Lumbermens' defenses and positions, including the ability to challenge the sum negotiated

between Travelers and Ames, to challenge whether the amount represented Obligations that were

covered under the Bond, etc.  Also, part of the Final Settlement, but not mentioned by the

Report, was the settlement of Travelers' proof of claim in the Ames bankruptcy, which included

assertions by Travelers of administrative priority with respect to the insurance program.

66.     The Report asserts that Lumbermens objected to the Final Settlement, but that is

not entirely accurate.  The portion of the proposed settlement to which Lumbermens objected

was the portion of the motion that sought an order requiring that Travelers reimburse Ames *out

of the Trust Monies* for the $6.5 million Ames was proposing to pay Travelers through draw

upon the remaining letter of credit.

67.     These points are important to understand the full import of the portion of the 2008

Order that reserves the rights of all parties as if the "Approval Events" had not occurred (Report,

p. 9 at n. 23).  This means that for purposes of this adversary proceeding, the status of the parties is treated as if Ames and Travelers have agreed to a "loss portfolio transfer" for approximately $6.5 million but it has not been paid; Travelers still holds one letter of credit in the amount of $13, 350,000;[32] Travelers still has its administrative claim, priority and other creditors' rights against Ames' estate intact; the Letter Agreement and Trust are still in full force and effect; and Lumbermens still has all of its arguments based upon the rights of Travelers to which Lumbermens will become subrogated if it is required to sustain a loss, including Travelers' rights to draw upon the remaining letter of credit.

68.     It should also be noted that to the extent that the Travelers' insurance program was a post-petition agreement, then Travelers' right to be reimbursed from the estate did not rely entirely upon the letters of credit.  All costs of the program became post-petition administrative expenses required to be paid in full under bankruptcy law.  There is substantial evidence that it was, including the 2001 "first day" order permitting the continuation of the insurance programs, the post-petition insurance program agreement that recited all prior program years and agreements, and the position of both Travelers and Ames that under the post-petition insurance agreement Travelers had the right to look to all collateral, including all pre- and post-petition letters of credit and bonds.[33]  In that case, and upon any payment under the Bond, Lumbermens would become subrogated to Travelers' administrative claim rights to full reimbursement directly from the estate as a post-petition administrative creditor (or potentially Lumbermens could recover 100% of its loss as an administrative priority claimant on its own).  Accordingly, all rights that Travelers possessed immediately prior to the approval of the 2008 Final Settlement

---

[32] See ¶ "M" of "Stipulation Regarding The Allowance, etc.", November 25, 2008 [Appx. pp. 172-187 at p. 176, ¶M.].

[33] Second Amended Complaint, ¶29, n.6, Appx. p. 550; testimony of LaLiberte, 76:14-81:23 (esp. at 80:19-81:23) (Exhibit "M" to these Objections).

remain of relevance in determining whether, in fact, the Letter Agreement caused any impact whatever to the Ames estate.

**The Second Amended Complaint**

69.     While the Report's summary description of the 10 claims originally set forth in Ames' Second Amended Complaint filed in March 2009 are, for the most part, not inaccurate, those summary descriptions should not be relied upon in place of reviewing Ames' actual pleading allegations.

70.     For example, in the Second Amended Complaint, p. 7, n. 6, Ames alleged that the Bond covers past, present and future "obligations" under the Ames/Travelers insurance program, and is not limited to any policy year.  In essence, this is an allegation that the Bond (which was issued pre-petition in connection with the insurance year commencing November 1, 2000) must also stand as collateral for the post-petition insurance agreement between Travelers and Ames for the insurance year commencing November 1, 2001.  While Lumbermens does not agree that the Bond contains language susceptible to Ames' allegation, the allegation is there all the same and Ames has steadfastly refused to withdraw it.  This important allegation, which provides the basis for the dispute regarding the administrative claim filed by Lumbermens that is referred to in the Report, is not referred to anywhere in the Report.

71.     It must also be noted that in the Second Amended Complaint, Ames introduced for the first time the concept of the "Bond Agreement," and it uses that term to refer to the "Bond."[34] This was an apparent attempt to litigate by "label," and to emphasize Ames' baseless argument that it somehow had rights under the Bond despite its express waiver of any and all rights in the Bond itself.

---

[34] See Second Amended Complaint, ¶¶ "3" and 26 (Appx. pp. 545-550).

72.     To the extent that the Second Amended Complaint uses the term "Bond Agreement" to refer to the "Bond," and to the extent that the Report uses those terms to describe two different agreements (the Bond and the General Indemnity Agreement) but when quoting from Ames' pleading adopts Ames' misleading and confusing "litigation by label" terms, this Court is not bound by the mischaracterizations contained in Ames' Second Amended Complaint or in the Report, since this Court can always consider the actual content of the documents upon which the pleadings are based, (all of which were placed in the record below by Lumbermens), and facts of which this Court may take judicial notice under F.R.E. 201. *Sigmon v. Goldman Sachs Mortg. Co.,* 539 B.R. 221, 224 (S.D.N.Y. 2015 (Carter, J.); *See also Roth v. Jennings,* 489 F.3d 499, 509-510 (2d Cir. 2007); *Biro v. Condé Nast,* 2012 U.S. Dist. LEXIS 112466 (S.D.N.Y. Aug. 9, 2012).

73.     The Report (p. 11) correctly indicates that Lumbermens' Answer to the Second Amended Complaint asserted "a number of defenses and counterclaims against Ames," including objections to jurisdiction and to the alleged "core" nature of the proceedings.  However, the Court's description of Lumbermens' counterclaims leaves the misimpression that Lumbermens sought to independently invoke the jurisdiction of the Bankruptcy Court with respect to its counterclaims to effectuate affirmative recovery.  In fact, Lumbermens' counterclaims were asserted by way of defense, including subrogation, setoff, recoupment, contribution and similar theories, from the same set of circumstances alleged in Ames' Second Amended Complaint.[35] Similarly, the Court's reference to Lumbermens' counterclaims asserting post-petition administrative expense priority fails to note the allegation of the Second Amended Complaint that the Bond stood as collateral for Ames' post-petition insurance agreements and post-petition

---

[35] Amended Answer, Appx. pp. 605-613.

obligations to Travelers, which would obviously entitle the surety to claim equitable subrogation to administrative expense treatment, if not administrative expense treatment on its own, to the extent that it were called upon to make any payment and to the extent that premiums were due and unpaid for the continuation of the Bond (which they were).  Once again, Lumbermens disputes Ames' contention that the Bond served as collateral for post-petition operations of the debtor (without notice, consent and an opportunity to be heard on the part of Lumbermens, none of which occurred).  However, given Ames' allegations that the Bond provided post-petition credit support for the Ames estate, the responsive pleadings of Lumbermens are appropriate and defensive in nature.

74.     The Report is correct that Lumbermens filed two administrative expense claims against the Ames estates.  The Report is in error in describing those administrative expense claims as relating to "rights and obligations under the Bond Agreement, the Indemnity Agreement and the Customs Bond."  The Customs Bond matters were settled and removed from the litigation [Adv. Pro. 06-01890 ECF # 49 filed 7/7/11].  As explained to the Bankruptcy Court at the September 13, 2011 hearing of Ames' motion to expunge or reclassify Lumbermens' administrative priority claims, they arose from the same allegation set forth in Ames' Second Amended Complaint regarding the Bond providing credit support and being liable for Ames' post-petition insurance obligations to Travelers under the post-petition insurance agreement commencing November 1, 2001.  Accordingly, neither the administrative priority claims asserted by Lumbermens, nor the agreement to limit them to a maximum recovery of $2 million, constitutes litigation or claims by Lumbermens that are outside the scope of the allegations that were originally made against Lumbermens by Ames in the Second Amended Complaint.  It was against this background that counsel for Lumbermens made the statement quoted at the top of p.

12 of the Report regarding the manner in which the administrative priority claims and the allegations against Lumbermens asserted in the adversary proceeding were difficult, if not impossible, to separate, and the unfairness of separating those issues.

75.    The Report also errs in failing to recite that in Lumbermens' Reply Brief on the Motions, and again at oral argument of the Motions, Lumbermens offered that to the extent its administrative priority claims against the Ames' estate were the impediment to the McCarran-Ferguson reverse preemption, stay or other relief sought by Lumbermens in its cross-motion, Lumbermens would withdraw its administrative priority claims (reserving them only defensively to establish set-off, recoupment, rights to equitable subrogation, etc.)[36]

**Lumbermens' Illinois Rehabilitation Proceedings**

76.    The Report's description of the evolution of the financial difficulties of Lumbermens, as well as the entry of the "Rehabilitation Order," are inaccurate.  [Report, pp. 12-13]  Moreover, they fail to provide any sense of the legitimate state interests involved in the rehabilitation (and eventual liquidation) of Lumbermens as reflected in the Rehabilitation Order, including its historical narrative sections and the powers the Order granted to the Liquidator.

77.    Lumbermens' financial difficulties and involvement with Illinois insurance regulations did not first arise in 2012, as the Report suggests.  As narrated in the Agreed Order of Rehabilitation,[37] a series of "agreed corrective orders" was entered into beginning February 10, 2003 (prior to Travelers' demand on the Bond in May, 2003) between the Illinois Department of Insurance and Lumbermens.  Pursuant to the terms of the Corrective Orders, Lumbermens commenced a voluntary run-off in 2003.[38]  From 2004 onwards, Lumbermens operated under a

---

[36] Lumbermens Reply Brief, Appx. p. 800; June 30, 2015 Oral Argument, Appx. p. 1089:7-13.

[37] Appx. pp. 620-637, at pp. 626-629, ¶¶ "G" through "R".

[38] Agreed Order of Rehabilitation, p. 5, ¶ G, Appx. p. 626

Run-Off plan filed with the Department of Insurance on March 19, 2004 and approved on June 9,

2004, together with annual updates to the Run-Off Plan, under which Lumbermens was

continuously operated under the oversight of the Department of Insurance.  The scope of the

Department's oversight was described in the Agreed Order of Rehabilitation in paragraphs I

through Q, and included the retention by the Department of outside public accounting, tax and

consulting firms, as well as the involvement of the National Association of Insurance

Commissioners ("NAIC") Lumbermens' Working Group, composed of representatives from

State Insurance Departments of Illinois, California, New York, Texas, Pennsylvania, Florida,

Massachusetts and New Jersey, which were described in the Agreed Order of Rehabilitation as

states comprising a large majority of the business previously written by Lumbermens and its

affiliated insurance companies.

   78. The Agreed Order of Rehabilitation proceeded to name Andrew Boron, Director

of Insurance of the State of Illinois, and his successors in office, as statutory Rehabilitator of

Lumbermens and its affiliates, and to provide broad and sweeping powers to the Rehabilitator in

his efforts to commence the rehabilitation of Lumbermens.  Among those powers were many that

are key elements of the Illinois statutory system for the rehabilitation and liquidation of insolvent

insurers under Article XIII of the Illinois Insurance Code (215 ILCS 5/187, et seq.).  Among

them were the following:

   (1) to take immediate possession and control of the property, accounts and other assets of Lumbermens, and to marshal and liquidate the assets pursuant to the provisions of Article XIII of the Code;

   (2) to both sue and defend on behalf of Lumbermens, or for the benefit of the policyholders, claimants and other creditors of Lumbermens, in the Courts either in his name as Rehabilitator of Lumbermens or in the name of Lumbermens;

   (3) restraining and enjoining all reinsurance companies involved with Lumbermens from making any settlements with any claimant or policyholder of Lumbermens, or any other person, other than the Director, as Rehabilitator, except with

the written consent of the Director (except for when the reinsurance contract expressly provides for direct payment by the reinsurer to the claimant).

79.     The Rehabilitation Order further issued a broad array of both mandatory and negative injunctive relief set forth in paragraph 14 of the Rehabilitation Order, based upon the authority provided in 215 ILCS 5/189 ("Injunction") within Chapter 215/Article XIII of the Illinois Insurance Code, including the following:

> B.      Lumbermens, its directors, etc. "and all other persons and entities," shall give immediate possession and control to the Rehabilitator of all property, business, books, records and accounts of Lumbermens …;
>
> C.      Lumbermens, its officers, etc. "and all other persons and entities having knowledge of this Order are restrained and enjoined from transacting any business of Lumbermens" or disposing of any company property or assets without the express written consent of the Rehabilitator;
>
> D.      … All persons and entities having knowledge of this Order are restrained and enjoined from bringing or further prosecuting any claim, action or proceeding at law or in equity or otherwise, whether in this State or elsewhere, against Lumbermens … or their property or assets, or the Director or Rehabilitator, except insofar as those claims, actions or proceedings arise in or are brought in the rehabilitation proceedings prayed for herein; or from obtaining, asserting or enforcing preferences, judgments, attachments or other liens, including common law retaining liens, or encumbrances or the making of any levy against Lumbermens, or their property or assets while in the possession and control of the Rehabilitator, or from interfering in any way with the Rehabilitator in his possession or control of the property, business, books, records, accounts, premises and all other assets of Lumbermens and American Manufacturers, until the further order of this Court; and
>
> E.      Any and all banks, brokerage houses, financial institutions and any and all of the companies, persons or entities having knowledge of this order having in its possession accounts and any other assets which are, or may be, the property of Lumbermens, are restrained and enjoined from disbursing or disposing of said accounts and assets unless otherwise authorized or approved by the Rehabilitator …;

80.     In the Ames v. Lumbermens adversary proceeding, counsel for Lumbermens filed the Agreed Order of Rehabilitation, under cover of a "Notice of Entry," on July 6, 2012, placing Ames and the Court on notice of the entry of the Order.  To meet suggestions by Ames that the Agreed Order of Rehabilitation was "collusively procured" in order to adversely affect Ames'

dispute with Lumbermens, the Director of Insurance and Rehabilitator, Andrew Boron, provided a Reply Affidavit describing the evaluation he performed in order to determine that Lumbermens should be placed in rehabilitation pursuant to the provisions of Article XIII of the Illinois Insurance Code, and attesting to the fact that Lumbermens' litigation with Ames was not a factor in his determination that the LMC Group Company (*i.e,* Lumbermens) should be placed into rehabilitation.[39]

81.     In 2013, the Lumbermens' Rehabilitation was terminated and Lumbermens was placed in Liquidation, effective May 10, 2013.  The Illinois Court's "Order of Liquidation With A Finding Of Insolvency" contains provisions regarding the powers of the Liquidator and injunctions that are very similar to those set forth in the Rehabilitation Order, but adds, among other things, a date for the "fixing" of the rights of all persons against the Lumbermens estate as the effective date of the Order (i.e., May 10, 2013), pursuant to 215 ILCS 5/194.[40]

82.     Accordingly, it can be seen that the Report comes up short in capturing the scope of the interests of the State of Illinois in the rehabilitation (and subsequent liquidation) of Lumbermens, or the scope of the powers and injunctions granted under the Insurance Code of the State of Illinois to the Director of Insurance in his capacity as Rehabilitator (and subsequently liquidator) in order to carry out the provisions and goals of the Illinois Insurance Insolvency Act with respect to Lumbermens and its policyholders.

83.     The Report's narrative of the events occurring after the Rehabilitator appeared in the Bankruptcy Court by counsel [Report, 12-13], gives a misimpression that the Rehabilitator simply issued a refusal to the Court's invitation that the Rehabilitator consent to the Bankruptcy Court's jurisdiction over the Trust Monies.  In fact, the Liquidator's position rejecting Ames'

---

[39] Appx. pp. 778-79.

[40] See Order of Liquidation With A Finding Of Insolvency, Exhibit "A" to these Objections, at p. 5, ¶D.

proposed grant of "exclusive jurisdiction" over the Trust Monies to the Bankruptcy Court, and the impact of the McCarran-Ferguson Act, was set forth in a detailed 12-page position letter sent to Debtor's counsel.[41]

**The Motion To Withdraw The Reference, etc.**

84.      Section 7 of the Report (Report, p. 13), omits reference to a second conference held by the Bankruptcy Court on November 18, 2014, at which, as noted in the preliminary statement, the Bankruptcy Court confirmed it would afford the parties the opportunity to correct erroneous assumptions as to what facts were "undisputed" and to supplement the record with respect to jurisdictional facts.  At the hearing, the Bankruptcy Judge stated that he intended to rely solely upon "undisputed facts" in carrying out the jurisdictional inquiry that had been referred to him by the District Court, and if he viewed disputed facts as relevant to that inquiry, disputed facts would only be evaluated by evidentiary hearing.[42]  Counsel for the Liquidator raised a concern regarding how the Bankruptcy Court would determine what facts were "undisputed" based on the necessarily incomplete record that had been placed before the Court on the cross-motions,[43] suggesting it might be necessary to revisit whether there are additional facts that should be added to the record to assure that the Bankruptcy Court did not mistakenly view something as "undisputed" simply because Ames had alleged it and it had not been directly responded to in Lumbermens' factual submissions.  In response, Ames' counsel suggested that oral argument on the cross-motions proceed and that if from that discussion it appeared that there were facts not addressed in the papers, they could be addressed thereafter.[44]

---

[41] Appx. pp. 643-654.

[42] 11/18/14 Transcript, p. 11:17-25

[43] 11/18/14 Transcript, p. 20:2-22:6

[44] 11/18/14 Transcript, p. 23:5-24: 2

85.     The Bankruptcy Court resolved the issue by first confirming that it would, indeed, take oral argument on the cross-motions.[45] The Bankruptcy Court then proceeded to set forth the following procedure:

> And if it turns out that there is a material fact that is either more disputed than it might have been thought to be or alternately becomes important and you haven't had a chance to develop the record as you might want in that regard, then we could ascertain that at the time of oral argument. And then if it looks like I gotta do that in order to get a just result from both sides, provide you then with the opportunity that you're looking for now. So in essence we're talking about a stop, look, and listen at the time of oral argument or after I have heard what you folks have had to say on oral argument. And then is there is a material area where the record needs to be developed, I'll give you and your opponent that opportunity.
>
> So not foreclose you from doing it now, but not stop the train now. Let's at least see what we can ascertain at the – by your respective efforts in oral argument.[46]

86.     Neither at nor following the oral argument held on June 30, 2015,[47] did the Bankruptcy Court advise counsel that it intended to treat the allegations of Ames' complaints in the adversary proceeding as if the allegations were the "undisputed facts," or that it would ignore Lumbermens' extensive evidentiary submission which had "disputed" many of those allegations. As the discussion above reveals, the source of many of the "undisputed facts" set forth in the Report is, indeed, allegations of Ames' pleadings that are wholly inconsistent with Lumbermens' responsive pleadings and with other evidence in the record. If the procedure outlined by the Bankruptcy Court at the November 18, 2014 hearing had been followed, perhaps these objections would not have had to challenge so many of the factual underpinnings of the Report's erroneous recitals, recommendations and conclusions.

---

[45] 11/18/14 Transcript, p. 24:20-24

[46] Transcript, p. 24:25-25:16. The Court's ruling was also confirmed by letter brief shortly after the conference. See Liquidator's December 1, 2014 Letter Brief, Appx. p. 961.

[47] Appx. pp. 966-1125.

**Section II**

**The Liquidator's Objections to the Report's Discussion of "The Court's Jurisdiction"**

87.     The Report's lengthy discussion (pp. 14-20) of the various types of federal bankruptcy jurisdiction is, in part, a consequence of the bankruptcy court having directed that the jurisdictional motions and cross-motions be briefed prior to the determination by this Court of the Liquidator's motion for withdrawal of the reference under Section 157(d).  However, when the Report was written, the Bankruptcy Court was aware of the Withdrawal Opinion, and that distinctions such as core or non-core jurisdiction of the bankruptcy court should no longer be relevant.

88.     To the extent that McCarran-Ferguson preemption is determined to be applicable to Ames' claims, then whether they originally invoked "core" or "non-core" bankruptcy jurisdiction, or "exclusive" or "non-exclusive" jurisdiction, should be of no consequence.  If any of Ames' claims has sufficient merit to avoid dismissal (and the Liquidator argues that they do not), and so long as any such claim can be interposed as a "claim" in the Illinois liquidation court, then it should be preempted by the McCarran-Ferguson Act and be either dismissed or stayed on that basis, regardless of which federal bankruptcy statutory enactment originally may have provided jurisdiction; the result of McCarran-Ferguson preemption is the divestiture of federal subject matter jurisdiction.

89.     As discussed further below, McCarran-Ferguson "reverse preempts" federal laws and courts, stating at 15 U.S.C. § 1012:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance [except certain anti-trust laws].

90.     As the Report concedes (p.33-34), the Bankruptcy Code is not an Act which

"specifically relates to the business of insurance."  Accordingly, even claims over which the

Report asserts that this Court has "exclusive" bankruptcy jurisdiction should be subject to the

reverse preemption of McCarran-Ferguson unless Ames can demonstrate that the continued

exercise of such federal jurisdiction would not "invalidate, impair, or supersede" the provisions

of the Illinois insurance insolvency statute.  However, the threshold question is not the *type* of

federal bankruptcy jurisdiction applicable to each of Ames' claims; it is whether the exercise of

that jurisdiction would "invalidate, impair, or supersede" the provisions of Article XIII of the

Illinois Insurance Code.

91.     This section of the Report suggests that "strong" federal interests should be

exempted from the preemptive effect of McCarran-Ferguson, even if the three-part test for

McCarran-Ferguson preemption is met.  However, nothing in McCarran-Ferguson permits the

federal Court to elevate the "importance" of bankruptcy jurisdiction above the Congressional

mandate of McCarran-Ferguson reverse preemption, since as the Report concedes, the

Bankruptcy Code is *not* a statute that contains the express statement of Congressional intent

required to escape the reach of McCarran-Ferguson preemption.

**The Report Failed to Acknowledge that the Liquidator**
**Made Both A "Facial" and a "Factual" Challenge to Jurisdiction**

92.     The Report failed to inquire into the factual underpinnings for Ames' claims set

forth in the Second Amended Complaint.  In letter briefs submitted to the Bankruptcy Court

regarding how the Bankruptcy Court should proceed in light of this Court's Withdrawal Order,

the role that should be played by "undisputed facts," "disputed facts" and inferences in the

Bankruptcy Court's jurisdictional review were discussed.  The Liquidator's Sur-Reply letter on

this subject made plain that the Court was required to conduct the necessary inquiries to

determine both a "facial" and a "factual" challenge to jurisdiction, and so inferences favorable to

the pleader were not to be drawn from the complaint, and materials beyond the pleadings were to

be considered:

> We note that here, there is both a "facial" and a "factual" challenge to subject
> matter jurisdiction.  A court resolving a "facial" challenge to jurisdiction "must
> accept the *factual* allegations of the complaint as true, but should refrain from
> drawing inferences favorable to the party asserting jurisdiction." *Standard
> Investment Chartered, Inc. v. N.A.S.D.,* 621 F.Supp. 2d 55, 65 (S.D.N.Y. 2007)
> *(internal citations omitted, emphasis added)*.  Regarding "factual challenges" to
> jurisdiction, the applicable rules were recently summarized in *International
> Diamond Importers, Inc. v. Oriental Gemco (NY), Inc.,* 2014 U. S. Dist. Lexis
> 164567 at *9-10 (S.D.N.Y. November 24, 2014), as follows:
>
> "When . . . the defendant challenges the factual basis for the plaintiff's assertion of
> jurisdiction, '[j]urisdiction must be shown affirmatively, and that showing is not
> made by drawing from the pleadings inferences favorable to the party asserting
> it.'"48  "In deciding the motion, the court 'may consider affidavits and other
> materials beyond the pleadings to resolve the jurisdictional issue, but [it] may not
> rely on conclusory or hearsay statements contained in the affidavits.'"49
>
> [48   *Jordan v. Verizon Corp.*, 391 Fed. App'x 10, 12 (2d Cir. 2010) (quoting
> *APWU v. Potter,* 343 F.3d 619, 623 (2d Cir. 2003)).]
>
> [49   *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills,* 701 F. Supp. 2d 568,
> 580-81 (S.D.N.Y. 2010) (alteration in original) (quoting *J.S. ex rel. N.S. v. Attica
> Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004)).]
>
> See*, also, McNutt v. General Motors Acc. Corp.,* 298 U.S. 178, 189 (1936), "If his
> allegations of jurisdictional facts are challenged by his adversary in any
> appropriate manner, he must support them by competent proof."  [*See also ECF
> #80, p. 6*].

Liquidator's December 1, 2014 Letter Brief [Appx. pp. 960-61]

93.     Despite this submission by Lumbermens, Section I(B) of the Report conducts

only a "facial" analysis of Ames' claims, taking Ames' Second Amended Complaint at face

value. Thus, the report disregarded the detailed factual presentations by Lumbermens in its initial

Memorandum of Law and accompanying documentary submission (Appx. pp. 688-740; Appx.

pp. 314-687), which presented the operative facts that were relevant based on Ames'

jurisdictional motion.  The Liquidator presented a step-by-step deconstruction of each of Ames'

claims, showing the claims' lack of merit and pleading deficiencies [Appx. pp. 734-738 (Point IV)], which was ignored in the Report.  The Liquidator respectfully requests that this Court review the arguments set forth in the Liquidators three major briefs, its letter briefs and their accompanying documentary support provided by affidavit in connection with the Motions, as part of this Court's *de novo* review of the cross-motions and the Report.  The Liquidator reaffirms and incorporates by reference into these Objections to the Report, those briefs and factual submissions.

94.     As a further example of the lopsided manner in which the pleadings were evaluated by the Report, Lumbermens' Answer to the Second Amended Complaint, which contained detailed allegations of fact and quotes from the documents that were largely mis-characterized in the Second Amended Complaint, was not referred to in the Report other than to observe that Lumbermens' Answer contained counterclaims and affirmative defenses that included subrogation, setoff, contribution, and post-petition administrative expense priority under the Bankruptcy Code.  [*Report, p. 11*].[48]  As was quoted above, the Second Circuit stated in *Jordan v. Verizon Corp.*, 391 Fed. App'x 10, 12 (2d Cir. 2010) (quoting *APWU v. Potter,* 343 F.3d 619, 623 (2d Cir. 2003), "[w]hen . . . the defendant challenges the factual basis for the plaintiff's assertion of jurisdiction, '[j]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'"

95.     As in *The Majestic Star Casino, LLC v. Barden Development, Inc. (The Majestic Star Casino, LLC)*, 716 F.3d 736, 747 (3d Cir. 2013), as a "threshold matter of justiciability" this Court must consider whether Ames has standing to assert the "causes of action" alleged in its pleading.  As one example, Ames' first "claim," for "breach of contract" damages for

---

[48] See Lumbermens' Amended Answer, Appx. pp. 573-616.

Lumbermens alleged "failure" to pay to Travelers the full amount demanded by Travelers in

May, 2003, is treated as jurisdictionally sound by the Report despite the undisputed fact the

Bond itself, in plain language, waived any rights on the part of Ames in the Bond or its proceeds.

The Report contains no discussion of how Ames can sue for breach of a contract when under the

Bond itself, the only performance owed by Lumbermens was to Travelers (which is not asserting

that the contract is in breach and was fully satisfied with the settlement it negotiated in the Letter

Agreement of November, 2003).  Finally, there is no discussion of how the law of suretyship can

be turned on its head to permit the principal of a surety bond (Ames) to sue its own surety

(Lumbermens) based upon the surety's successful limitation, mitigation and reduction of the

surety's loss under the Bond, when the principal had expressly given the surety the right to do so

in the General Indemnity Agreement.  Nevertheless, the first claim – and all the rest of them –

were sustained in the Report.

96.     Accordingly, this Court's *de novo* review of the Motions should consider the

inadequacy of Ames' pleadings, which fail to meet the specificity and plausibility guidelines of

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009). [49]

97.     With respect to the actual underlying facts and the legal deficiencies of Ames'

claims identified in the report as Claims ##  1, 2 & 3, we refer this Court to the Liquidator's

original briefs and submissions referenced in paragraph 94 above.  The Report did not identify

any of those claims as falling under "exclusive" bankruptcy jurisdiction, or presenting a "strong"

federal interest; nor did the Report strongly suggest that those claims could not be just as

effectively tried in the Illinois liquidation court.

98.     Of a different character in this dispute are Ames' Claim # 5, seeking a declaratory

---

[49] See Lumbermens Moving Brief, Appx. pp. 734-738; Lumbermens Reply Brief, Appx. pp. 789-792.

judgment that the Trust Monies are property of the Ames estate; Claim # 4 (for violation of the automatic stay of 11 U.S.C. §362(a)(3) and contempt relief under 11 U.S.C. §105(a) in connection therewith); Claim #6 ("Marshaling"); and Claim #10 (subordination of Lumbermens claims against the estate of Ames due to alleged bad conduct of Lumbermens).  As to the treatment of these Claims in the Report, the Liquidator sets forth specific objections below.

### Claim No. 5 – Declaratory Judgment Re: Trust Monies

99.     The Report describes Ames Claim # 5 as "essentially" requesting "a declaratory judgment determining that the Trust Monies are property of the estate under section 541" of the Bankruptcy Code [Report p.28].  The Second Amended Complaint actually does not mention §541 in connection with this claim.  Nor did it allege that the Trust Monies were property of Ames' estate.  Rather, its demand for relief seeks a judgment directing that the Trust Monies be released to Ames [Appx. p. 566; ¶ 118].

100.     Although the Report correctly concludes there is no "exclusive" federal bankruptcy jurisdiction over Ames' Claim # 5, the Report should have gone further and recommended dismissal of this claim, since the Report elsewhere concludes that the Trust Monies *are not* property of the estate (Report p. 39).  Given the importance to the McCarran-Ferguson analysis of the ownership dispute between the Ames estate and the Liquidator's estate, there is no apparently valid explanation for the inconsistency in the Report's treatment of Claim #5 as cognizable, while later rejecting Ames' claim to a present ownership interest in the Trust Monies.

101.     If the Trust Monies are not property of the Ames estate, as the Report concludes at p. 39, then federal bankruptcy jurisdiction under §541 is not appropriate for this Court to entertain; §541 is not the appropriate vehicle to bring property into the estate where the claim is

in fact a state law claim to determine disputed ownership in property.  *Hassett BancOhio Nat'l. Bank, (In re CIS Corp.),* 172 B.R. 748, 757 (S.D.N.Y. 1994).  What the Report is improperly recommending is that this Court allow a state law claim to fly under the false colors of §541 for jurisdictional purposes, while the Report acknowledges that there is no foundation in law or in fact, or in Ames' pleading, for the §541 label.  As the Report states, the Trust Monies did not exist at the time of the filing of Ames' bankruptcy petition and Ames does not even have a "colorable" claim to them.  (Report p. 29).

**The Liquidator's Property Rights In The Trust Monies**

102.    In stark contrast, the Liquidator has a presently protectable and legally cognizable residuary interest in the Trust Monies.  Under the terms of all the agreements involved in the transactions – the Bond,[50] the Trust Agreement[51] the Travelers/Ames Year 2000 Insurance Program Agreement,[52] and the Letter Agreement,[53] any Trust Monies not applied by Travelers to unpaid obligations of Ames under the insurance program revert to Lumbermens upon the termination of the Trust.  Under Connecticut law, which governs the Bond, the Trust and Ames' agreements with Travelers [Trust, Appx. p. 352, ¶ 11; Bond, Appx. p. 322, ¶ 6], interests such as that of the Liquidator are termed "vested remainders subject to complete defeasance," or "contingent remainders," rather than an unenforceable mere "expectancies," and are legally cognizable.  *Gaynor v. Payne,* 261 Conn. 585 (Conn. 2002); *O'Neil v. Fleet National Bank (In re Britton),* 300 B.R. 155 (Bankr. D. Conn. 2003).

103.    Therefore, while (as the Report concedes) the Ames estate has no present property

---

[50] Bond, Appx. p. 321, ¶ 2.

[51] Trust Agreement, Appx. p. 351, ¶ 9(c).

[52] November 1, 2000 Agreement, Appx. pp. 399-400 at ¶ 3(a).

[53] Letter Agreement, Appx. p. 341 at ¶ 5.

interest in the Trust Monies, the Liquidator's estate *has* a property interest that must be recognized and protected.  Under those circumstances, this Report's recommendation that this Court exercise jurisdiction to consider "declaring and directing that the Trust Monies and Bond Agreement Proceeds be  released to Ames" would constitute the exercise of direct control over property of the Liquidator's estate by this Court contrary to McCarran-Ferguson – a result that not even the Court in *Gross v. Weingarten* would permit (discussed *infra,* p. 73), and one which is expressly disavowed elsewhere in the Report (p. 38, n. 121).

104.    The foregoing analysis also demonstrates that the Report is in error in stating (p.39) that the Trust Monies are "not subject to the *in rem* jurisdiction of the Illinois court . . .." To the contrary, Lumbermens' legally cognizable contingent remainder/vested remainder interest in the Trust Monies is clearly property of the Liquidator's Estate under the jurisdiction of the Illinois court.  See *O'Neil v. Fleet National Bank (In re Britton), supra,* 300 B.R. 155, 159 (Bankr. D. Conn. 2003) (contingent remainder interest of debtor was cognizable property right that became property of debtor's bankruptcy estate).

**Insurance Regulatory Issues Involving The Trust**

105.    Furthermore, in concluding that with regard to the dispute over ownership of the Trust Monies "insurance law has nothing to do with the controversy, and thus no expertise beyond that of the Bankruptcy Court was required, the Report once again erred.  The Trust was established between two insurance companies, Travelers and Lumbermens, domiciled in different states (Connecticut and Illinois), but both regulated by, among other states, New York as "admitted" insurers.  The Letter Agreement pursuant to which the Trust was established required, in the introductory sentence to "paragraph "1," that:

> Lumbermens will pay into *a "New York Regulation 114" or similar trust ("Trust")* the sum of $8,000,000 ("Trust Monies") to

be held pursuant to a trust agreement that is, in form, trustee, and substance, acceptable to Travelers.

(Letter Agreement, Appx. p. 339, ¶ 1) (emphasis added).

106.    The reference in the Letter Agreement to "New York Regulation 114" (11 NYCRR § 126) injects a serious question of insurance regulatory law into Ames' continued attempts to secure an interest in the Trust Monies governed by this Trust, which would be impinged upon by any judgment that does not uphold the Trust.  "Regulation 114 is intended to protect domestic insurers that have ceded business to unauthorized reinsurers by affording to cedants unfettered access to readily liquidatable collateral.  For this reason, the regulation prohibits any trust features that could possibly impair the use of the proceeds of an investment by the ceding company. *See, e.g.*, 11 NYCRR § 126.3(d) (requiring the trust agreement be clean and unconditional, and not subject to any conditions or qualifications outside of the trust agreement itself.") [*State of New York Ins. Dept., OGC Opinion No. 08-10-09* (October 27, 2008)].[54]

107.    As a result of compliance with Regulation 114 in the establishment of collateral security for a ceded risk to a company acting as, in effect, a reinsurer, the ceding company need not post a reserve for the risk (to the extent of the Regulation 114 assets), while the grantor depositing the funds may retain them on its books as an encumbered asset.  However, the form of trust has strict requirements, in order to assure the availability of funding for payment of the reinsured claims to the ceding company.  Here, two sophisticated insurers established what they intended to be a Regulation 114 trust, in which Travelers would stand in the position of the ceding company and Lumbermens would stand in the position of the reinsurer.  The issues of whether such a trust qualifies for treatment under Regulation 114 (given Lumbermens' run-off status as of the date of the Letter Agreement), and, in consequence, whether the Regulation 114

---

[54] Appx. pp. 933-935.

trust corpus may be applied for any purpose other those set forth in the Trust Agreement and whether the funds are subject to any other attack or lien by any other party, raise significant insurance regulatory questions that not only fall within the scope of McCarran-Ferguson, but which also demonstrate that the state insurance liquidation court's expertise would be better suited to the issues.

### Claim # 4 - Civil Contempt under 11 U.S.C. 105(1) For Automatic Stay Violation

108.    Ames' Claim # 4 seeking civil contempt under 11 U.S.C. 105(a) against Lumbermens for an alleged violation of the automatic stay is described in the Report as being based upon interference with property of the Ames estate resulting from the November 4, 2003 Letter Agreement between Lumbermens and Travelers.  The claim rests entirely on the proposition that the Letter Agreement improperly and adversely affected two types of property of the Ames estate: Ames supposed "bundle of rights" in the "Bond Agreement," and the cash collateral of Ames pledged to secure the letters of credit held by Travelers.  The claim fails for many reasons, but most simply because (a) Ames had waived pre-petition any rights in the Bond or its proceeds; (b) the letters of credit were apparently not cash collateralized at the time of the November 4, 2003 Letter Agreement, and perhaps not until after June, 2005; (c) Lumbermens and Travelers were both exercising rights that were granted to them in the prepetition agreements signed by Ames and under common law; and (d) in any event, the Letter Agreement had no adverse effect on the estate's property because the same results would have obtained in the absence of the Letter Agreement due to the operation of Lumbermens' right, as surety, to be equitably subrogated to Travelers rights in the letters of credit, and accordingly the Ames estate suffered no harm.

109.    There was no "bundle of rights" that the Ames estate possessed in the Bond, or in

the "Bond Agreement" (whether it refers to the Bond, or to the Bond and the General Indemnity Agreement).  Again, when Ames signed the Bond, it agreed to a broad waiver of any potential rights in the Bond, as follows:

> The Principal shall not at any time have any rights or property interests in this Bond, the Bond Collateral or other proceeds of the Bond.

The Report does not mention this waiver, and does not even attempt to identify what rights of any nature were, or could have been, reserved by Ames in the face of such an express waiver. Merely referring to the "Bond" as a "Bond Agreement" does not affect its terms, or modify Ames' express waiver. The Bankruptcy Code is not a vehicle for the creation of rights in the debtor that did not exist upon the petition filing date.[55]  To the extent the "Bond Agreement" is intended to include the General Agreement of Indemnity, that agreement provides Ames with no rights, and only obligations.[56]  In short, there is nothing in the Report supporting the existence of a "bundle of rights" of Ames in the Bond, and the Bond itself expressly negates it.

110.    It must also be remembered that in the General Indemnity Agreement, Ames granted rights and powers to Lumbermens, including the right to settle or compromise claims under its Bonds in its sole discretion, and the right to modify the Bond or the bonded contracts, all without notice to Ames.  Neither Ames nor the Bankruptcy Court can now urge that a "bundle of rights" existed that rendered illusory these express grants of rights to Lumbermens in the General Indemnity Agreement.

111.    As for the other property allegedly interfered with - "cash collateral" - as explained above (*supra*, pp. 15–18), there is no proof that there was any cash collateral

---

[55] *New Eng. Dairies, Inc. v. Dairy Mart Convenience Stores, Inc.* (*In re Dairy Mart Convenience Stores, Inc.*), 351 F.3d 86, 91-92 (2d Cir. 2003)

[56] General Indemnity Agreement, Appx. pp. 326-331

supporting the letters of credit as of the date of the Letter Agreement, and Ames appears to have judicially admitted that there was no cash collateral supporting the letters of credit prior to June 3, 2005.  But even if there were, the Letter Agreement only concerned the letters of credit themselves and their proceeds, neither of which are property of the Ames estate.

112.    The letters of credit represented the independent obligation to Travelers of the issuing bank, and neither the letters of credit nor their proceeds are property of Ames bankruptcy estate.  *Enron Power Mktg v. Calif. Power Exchange Corp. (In re Enron Corp.),* 2007 U.S. Dist. LEXIS 73638 at *12-13 (S.D.N.Y. September 21, 2007)(McMahon, J.) (proposition that letters of credit and their proceeds are not property of the debtors' estates on whose behalf they were issued is "too well settled to warrant extended discussion"); *In re M.J. Sales & Distrib. Co.,* 25 B.R. 608, 613-615 (Bankr. S.D.N.Y. 1982).  And the automatic stay did not bar a draw upon the letters of credit by Travelers, even if they were collateralized with debtor's property.  *Keene Corp. v. Acstar Ins. Co. (In re Keene Corp.),* 162 B.R. 935, 942 (Bankr. S.D.N.Y. 1994)(letter of credit is an independent third party obligation, and the proceeds are not the debtor's property even if the letter of credit is secured by the debtor's property).

113.    Regarding the actual terms of the Letter Agreement, see the detailed discussion, *supra,* at pp. 20-26.  Those agreements should be reviewed in the context of Travelers' insurance program agreements with Ames, which gave Travelers' unfettered discretion as to the sequence in which it could draw upon its two pools of collateral: bond collateral and letter of credit collateral.  In the Letter Agreement, Travelers merely agreed with Lumbermens as to how it would exercise that discretion.  Ames cannot now use the Bankruptcy Code to retract the discretion it granted Travelers in the numerous insurance agreements between those companies, both pre-and post-petition.

114.    Regarding the provision of the Letter Agreement for the use by Travelers of any unapplied proceeds of the letters of credit to repay any loss of Lumbermens under the Bond once Ames' obligations had been retired or reduced, that is merely the memorialization of Lumbermens' rights of equitable subrogation.  And Travelers' agreement not to release or reduce the letters of credit without Lumbermens' consent is the embodiment of Travelers' common law duty, as obligee under the Bond, not to dissipate, diminish or release its other collateral to the detriment of the surety's equitable subrogation rights: the doctrine of "impairment of suretyship" acknowledged under Connecticut law and throughout the country.  *See*, *Connecticut National Bank v. Douglas,* 221 Conn. 530 (1992); *TD Bank, N.A. v ARS Partners Poplar Plains, LLC,* 2010 Conn. Super. LEXIS 232 (Fairfield Superior Court, February 2, 2010); *Restatement 3d of Suretyship & Guaranty,* §37 (1996).

**Lumbermens' Right Of Equitable Subrogation**

115.    Finally, there was no adverse impact to the Ames estate because Lumbermens' right of equitable subrogation to Travelers' rights under the letters of credit dictates that the same economic result to the Ames estate occurs in this matter whether Lumbermens had paid Travelers' demand or not.  The importance of Lumbermens' equitable subrogation rights in this matter was emphasized in Lumbermens' main brief on the Motions,[57] and again at oral argument,[58] and yet there is no mention of it in the Report.  For that reason, some discussion is in order.

116.    Had Lumbermens paid the entirety of the "full penal sum" demand made by Travelers in May 2003, the funds would have still been held by Travelers as "Bond Collateral"

---

[57] Appx. pp. 731-734 (Memorandum, pp. 36-39; Cite to equitable subrogation discussion in Lumbermens' briefs below.

[58] Appx. pp. 1061-1066 at Tr. 97:24-101:9

pursuant to paragraph "2" of the Bond (*i.e.,* not immediately applied to Ames' obligations unless Ames defaulted, and then only applied if Travelers, in its discretion, chose to do so).  At the time of Travelers' demand, Ames was not in default of any payment or obligation, and so there was nothing to which Travelers could have lawfully applied the Bond proceeds at that time – they would have been held as collateral (just as they were in the Trust account).  Lumbermens, however, would have become entitled to exercise Travelers' rights in the letters of credit held by Travelers up to the amount paid on the Lumbermen's bond (*i.e.,* $14.35).  While those rights would not have ripened until the entire debt from Ames to Travelers had been paid, the significant over-collateralization of Travelers assured that there would be letter of credit proceeds remaining to make Lumbermens whole.  For example, Ames and Travelers agreed in 2007 that Travelers was *grossly* over-secured for its obligations, with Travelers holding over $28 million in letter of credit collateral and $14.35 million in surety bond collateral against obligations that Travelers agreed did *not exceed* $13.5 million.  Had Lumbermens paid Travelers the $14.35 million demand in 2003, then no "excess" collateral release would have been possible in 2007, or until Lumbermens had been made whole, as the surety's rights of equitable subrogation is entitled to contingent protection[59].  Accordingly, due to equitable subrogation, a surety whose obligee has security is actually, albeit indirectly, secured to the same extent.

117.    This is an important concept when evaluating Ames' claims that the agreement between Lumbermens and Travelers entered into in November, 2003 violated the automatic stay and damaged its estate.  In fact, what the Letter Agreement did was no more than recite Lumbermen's equitable subrogation position when Travelers agreed (a) to look first to the letters of credit if there were an Ames default before drawing upon the bond or Trust Monies, and (b)

---

[59] Lumbermens moving brief, Appx. p. 733

that any remaining proceeds of letters of credit in Travelers hands when all obligations of Ames had been satisfied would be first paid to Lumbermens to the extent needed to reimburse Lumbermens for any loss under the Bond.  This is equitable subrogation memorialized, and nothing more.

118.    This same "feedback loop" caused by equitable subrogation applies equally to the current, fictionally created circumstances in the adversary proceeding by reason of the reservation of rights set forth in the December 2008 order approving the "Final Settlement." Under that order, Ames and Lumbermens are conducting the adversary proceeding as if (a) Travelers has agreed to accept $6.5 million to release Ames from all obligations; (b) Travelers is holding a letter of credit in the sum of $13.5 million; (c) Lumbermens has funded $8 million of "Bond Collateral" which remains in the trust account; and (d) Travelers has an active proof of claim in the Ames bankruptcy which includes administrative claims for all workers compensation and other insurance payments that Travelers has, or will be, making post-petition under Ames' insurance programs.

119.    By operation of equitable subrogation (as expressly recognized and preserved in the 2008 Order), if the court were to direct that the trust funds be used to pay the $6.5 million to Travelers, thus terminating the remainder of Ames' obligations to Travelers, then Lumbermens would *immediately* become entitled to exercise Travelers' right to draw upon the remaining $13.5 million letter of credit to reimburse Lumbermens for its $6.5 million loss.  Only by ignoring the surety's long-established right of equitable subrogation can any arguments be made by Ames under which a payment under the Bond by Lumbermens would not be repaid by Lumbermens from the letters of credit held by the over-secured creditor Travelers.

120.    This same analysis also demonstrates that there has been no damage to the Ames

estate by reason the Letter Agreement.  Accordingly, even if the Letter Agreement had constituted a technical violation of the automatic stay, since there is no demonstrable damage to the estate that resulted from it, there is no basis for an award of civil contempt damages; the rule of "no harm, no foul" can be applied.  *Rushton v. Bank of Utah (In re C.W. Mining Co.),* 477 B.R. 176 (B.A.P. 10th Cir. 2012).  What the Letter Agreement did was essentially preserve the "status quo" of Travelers' and Lumbermens' rights as against each other under the operative agreements and surety law, and acts which merely preserve the status quo do not constitute actionable stay violations.  *See, In re Lyondell Chem. Co.,* 402 B.R. 596, 606-607 (Bankr. S.D.N.Y. 2009) (Gerber, J.).

### Claim # 6 - Marshalling

121.    The Report's discussion of Ames' "Claim #6" seeking "marshaling" [*Report, pp. 29-30*] failed to consider that the requisite elements of "marshaling" could not be established in this adversary proceeding, and that the doctrine is therefore simply inapplicable.  [See Lumbermens' Moving Brief, *Appx. p. 738* (*Adv. Pro. ECF #73, p. 43*)].  Furthermore, the Report's identification of this claim as one within the bankruptcy court's "exclusive" jurisdiction is difficult to understand, as it is a common law equitable doctrine as cause of action, not mentioned in the Bankruptcy Code.  "Marshaling" applies only where there are, in essence, (1) two secured creditors of a common debtor; (2) two funds belonging to the debtor; and (3) a senior creditor entitled to satisfy its demand from both funds, in competition with a junior creditor entitled to resort to only a single fund.  *In re Borges*, 184 B.R. 874, 879 (Bankr. D. Conn. 1995).  This dispute does not involve "two secured creditors" of a "common debtor", nor two funds that are property of the debtor, nor a junior creditor trying to compel application of such a fund by a senior creditor entitled to satisfy its demand from both funds.  [*Id.*].  It was held

in *In re Borges, supra*, that the "common debtor" requirement renders marshaling unavailable in cases in which the two funds consist of an interest in estate property and an interest in property of a non-debtor. *Id.* at 184 B.R. 879 n.3 (Bankr. D. Conn. 1995).  Ames has never demonstrated how its claim for "marshaling" meets any of the established requirements for applying that concept.  *See also Meyer v. United States,* 375 U.S. 233, 236-37 (1963); *Peoples State Bank v. GE Capital Corp. (In re Ark-La-Tex Timber Co.),* 482 F.3d 319,331 (5th Cir. 2007); *Galey & Lord Inc. v. Arley Corp. (In re Arlco, Inc.),* 239 B.R. 261, 274 (S.D.N.Y. 1999); *Vt. Toy Works, Inc. v. Sebert Lumber Co. (In re Vt. Toy Works, Inc.),* 135 B.R. 762 (D. Vt. 1991); *Transmontaigne Prod. Servs. v. MIV Wilbur R. Clark,* 2010 U.S. Dist. LEXIS 30, 33-34 (S.D. Ala. Mar. 29 2010).

122.    To the extent the Report may have accepted Ames' assertion that the term "marshaling" should be expanded for use in a broader context not meeting the long-established elements of the cause of action (*i.e.*, "Targeted Use Of Assets"), the Report is inviting this Court to improperly invoke § 105 to create new rights, power and remedies for the debtor in direct contravention of the Second Circuit's rulings in *Smart World*, *Metromedia* and *Dairy Mart*.[60]

### Claim # 10 – Equitable Subordination of Lumbermens' Claim

123.    Ames' contention that Lumbermens' claims against the Ames estate should be equitably subordinated to the claims of other creditors due to Lumbermens' alleged "inequitable conduct" simply "piggybacks" on the allegations of Ames' earlier claims.  As the discussion above has shown, there was no inequitable conduct by Lumbermens, so this claim should fall if

---

[60] *Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC)*, 423 F.3d 166, 184 (2d Cir. 2005); *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d Cir. 2005); *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart Convenience Stores, Inc.)*, 351 F.3d 86, 92 (2d Cir. 2003). See also *In re Aquatic Dev. Group, Inc.*, 352 F.3d 671, 680 (2d Cir. 2003) (Straub, J., concurring); and *In re Ames Dept. Stores, Inc.*, 306 B.R. 43, 58 n.49 (Bankr. S.D.N.Y. 2004) (Gerber, J.) (discussing and applying those cases).

the merits of Ames' allegations are fairly reviewed under the standard announced in *Ashcroft v. Iqbal.*

### Section III

### The Liquidator's Objections to the Report's Discussion of Preemption Under The McCarran Ferguson Act

124.     The Liquidator objects to the entire analysis set forth in the Report regarding the scope of reverse preemption provided under the McCarran-Ferguson Act, and the Report's application of the three-part test for determining the application of reverse preemption to the continued exercise of federal jurisdiction over this adversary proceeding.  The Bankruptcy Court took an overly narrow view of the application of McCarran-Ferguson, ignored precedent supporting the invocation of McCarran-Ferguson preemption where there is a dispute over property ownership between a bankruptcy estate and an insolvent insurer's estate, and did not give sufficient consideration to the Illinois insurance insolvency statute, either as a whole or as separate components of an integrated system in which injunctions against the continuance of actions such as this adversary proceeding figure prominently.

125.     Moreover, the Report failed to give sufficient consideration to the very critical heart of the state insolvency statute – the priority of distribution statute, 215 ILCS 5/205 – which like that granted preemptive power in *Dep't of Treasury v. Fabe,* 508 U.S. 491 (1993), dictates that policyholder claims be granted priority over the claims of "creditors."  That  priority would be overturned were this Court  to proceed to grant Ames any part of the Trust Monies, since as the Report acknowledged, and as discussed supra, Ames has no current ownership interest in the Trust Monies, but only *claims* against Lumbermens for which Ames asks this court to make the Trust Monies respond.  Thus, Ames seeks to have its non-policyholder "claims," which would be Priority "g" "creditor claims" in the Lumbermens liquidation proceedings, treated as super-priority claims

and paid in preference to claims of policyholders or the costs of administration of the insolvent

Lumbermens estate – two priorities of distribution which the U.S. Supreme Court acknowledged in

*Fabe* were so critical to policyholder interests that they preempted the conflicting federal priority

statute.

126.    As explained in *Humana v. Forsyth*, 525 U.S. 299 (1999), the McCarran-Ferguson

Act (15 U.S.C. §§ 1011–1015) was prompted by the Supreme Court's holding in 1944 that

insurance companies doing business across state lines were engaged in interstate commerce.  In

response, Congress passed the McCarran-Ferguson Act to secure to the States the regulation of the

business of insurance.  Section 2(b) of the McCarran-Ferguson Act "precludes application of a

federal statute in face of state law 'enacted . . . for the purpose of regulating the business of

insurance,' if the federal measure does not 'specifically relate to the business of insurance' and

would 'invalidate, impair, or supersede' the State's law." *Id.* at 306-307.

> The McCarran-Ferguson Act states, in part, as follows, at 15 U.S.C. § 1012:
>
> No Act of Congress shall be construed to invalidate, impair, or supersede any law
> enacted by any State for the purpose of regulating the business of insurance, or
> which imposes a fee or tax upon such business, unless such Act specifically relates
> to the business of insurance [except certain anti-trust laws].

127.    As was held in *Dep't of Treasury v. Fabe*, 508 U.S. 491, 505–06 (1993), "[t]he

primary purpose of a statute that distributes the insolvent insurer's assets to policyholders in

preference to other creditors is identical to the primary purpose of the insurance company itself:  the

payment of claims made against policies."

**The Report's "Narrow Construction" Cases**

128.    This jurisdictional dispute deals with the very type of state insurance regulatory

statute granted preemptive power over the federal priority statute by the U.S. Supreme Court in

*Fabe.*  This must be contrasted with the cases relied upon by the Report (p. 33, and n.101 and 102)

in urging that a "narrow reading" of McCarran-Ferguson guide this Court's analysis.  Those cases
are inapposite and distinguishable, or in any event should be limited to their own peculiar facts
which are not parallel to those presented here.

129.    For example, *Lander v. Hartford Life & Annuity Ins. Co.,* 251 F.3d 101 (2d Cir.
2001) has already been distinguished by this Court in its "Withdrawal Opinion" as a case in which
the federal statute in question (SLUSA) was explicit in preempting state regulatory schemes. 512
B.R. 736 at 742, n3.  As the Report concedes, the same cannot be said of the U.S. Bankruptcy Code
or those related provisions of the U.S. Code that create its jurisdictional basis [*Report, p.33- 34; n.
105*].

130.    In *Ochs v. Simon (In re First Cent. Financial Corp.),* 269 B.R. 502 (Bankr.
E.D.N.Y. 2001), the holding company parent of an insurer filed for bankruptcy protection and its
insurance-company subsidiary was placed in rehabilitation by New York State.  The Trustee in
bankruptcy sued the former officers and directors of the holding company for various breaches of
duty in the bankruptcy court, while the Superintendent of Insurance, as Rehabilitator, brought his
own state court action against the officers and directors of the insurance company subsidiary in
rehabilitation.  As the holding company and its insurance company subsidiary had several directors
and officers in common, the Superintendent was concerned that the Trustee of the parent holding
company/debtor would secure a judgment (and access to the insurance policy available) before him.
In an effort to have the Trustee's action stayed or dismissed, the Superintendent argued, among
other things, that the Trustee's suits were in fact "derivative" actions being brought on behalf of the
insurance subsidiary, which claims belonged to the Superintendent, and that therefore McCarran-
Ferguson provided a basis for staying or dismissing the Trustee's actions.  The *Ochs* court rejected
the Superintendent's contention that the Trustee's proceeding should be stayed pursuant to

McCarran-Ferguson, but in doing so the Court relied upon a "four-part," more restrictive test for the application of McCarran-Ferguson that had been formulated by the U.S. Bankruptcy Court for the Southern District of New York in an earlier case, *In re Rubin,* 160 B.R. 269 (Bankr. S.D.N.Y. 1993). The *Rubin* test that has been superseded by the three-part test enunciated in *Fabe* and *Humana*. *Rubin* also relied upon cases such as *Spirit v. Teachers Ins. And Annuity Ass'n,* 691 F.1054 (2d Cir. 1982), a pre-*Fabe* case involving the preemptive effect of Title VII, a decision which this Court has also already deemed inapplicable to the issues presented in this matter. [See Withdrawal Opinion, 512 B.R. 736 at 742, n3].

131.    As for the other two cases cited in note 102 of the Report, *Gross v. Weingarten,* 217 F.3d 208 (4th Cir. 2000) and *Tri-Valley Distributing Fin. Corp.,* 350 B.R. 628 (B.A.P. 10th Cir. 2006)(Unpublished), discussed further below, both involved situations where state appointed receivers of insolvent insurers voluntarily elected to avail their insolvency estates of federal jurisdiction and then attempted to avoid that same jurisdiction on McCarran-Ferguson grounds (in *Gross,* diversity jurisdiction for an affirmative recovery action and in *Tri-Valley,* stipulated bankruptcy court jurisdiction to determine ownership of certain proceeds). Obviously such fact patterns provide an incentive for those courts to probe and discuss limitations on the scope of application of McCarran-Ferguson, to avoid "forum shopping," but they are distinguishable from this litigation.

132.    Accordingly, the four cases cited by the Report (p. 33 and at notes 101 and 102) to guide its essential view of McCarran-Ferguson's scope are *not* mainstream cases on the subject, but cases where either the federal statute (unlike the Bankruptcy Code) was found to have express preemptive power over state insurance regulation (*Lander*), or the Court applied a test for the application of McCarran-Ferguson that is more restrictive than that announced in *Fabe* (*Ochs/First*

*Central Financial*), or the receiver of the insolvent insurer had first voluntarily waived the

protections of McCarran-Ferguson to avail himself of federal jurisdiction and then sought to reverse

that decision and avoid federal jurisdiction (*Gross* and *Tri-Valley*).

**The Report's Erroneous Application of the Three-Pronged Fabe Test**

133.    As acknowledged in the Report (p. 33), there is a generally accepted three-prong

analysis used by courts to determine whether a federal statute is reverse preempted by a state

insurance law by operation of the McCarran-Ferguson Act, expressed as follows:

> The McCarren-Ferguson Act, 15 U.S.C. §§ 1011-1015, creates an exemption to
> normal preemption rules for federal statutes not directly related to insurance.
> Specifically, the McCarren-Ferguson Act provides that "[n]o Act of Congress
> shall be construed to invalidate, impair, or supersede any law enacted by any State
> for the purpose of regulating the business of insurance . . . unless such Act
> specifically relates to the business of insurance." Id. § 1012(b). Thus, pursuant to
> the McCarren-Ferguson Act, federal law, including the Bankruptcy Code, will be
> reverse preempted by state insurance law if: (i) the federal statute does not
> specifically relate to insurance; (ii) the state law at issue was enacted to regulate
> the business of insurance; and (iii) the federal statute at issue would invalidate,
> impair, or supersede the state law. See In re Med. Care Mgmt. Co., 361 B.R. 863,
> 871 (Bankr. M.D. Tenn. 2003) [**45] (citing United States Dep't of Treasury v.
> Fabe, 508 U.S. 491, 113 S. Ct. 2202, 124 L. Ed. 2d 449 (1993)).

*In re MF Global Holdings, Ltd.,* 469 B.R. 177, 194 n.17 (Bankr. S.D.N.Y. 2012) (finding that to

the extent that Bankruptcy Code § 541 was being utilized to expand the debtors interest in an

insurance policy, it was preempted by contrary provisions of New York Insurance Law).

134.    The Report agreed with the Liquidator that the first two prongs of the three-prong

test were met, finding that the Bankruptcy Code does not specifically relate to insurance, and that

the Illinois insurance insolvency statute was enacted to regulate the business of insurance.

However, the Report erroneously concluded that the third prong of the test for the application of

McCarran-Ferguson was not met, finding that the federal court's continued exercise of

jurisdiction over this adversary proceeding would not "invalidate, impair or supersede" any

portion of the Illinois insurance insolvency statute.  This incorrect result – which is inconsistent with the rulings of multiple other bankruptcy and higher courts across the country faced with parallel situations – is grounded upon the unduly narrow view of McCarran-Ferguson expressed in the Report's preliminary statements in this section of the Report, and upon the bankruptcy court's imbalanced view of the relative importance of federal bankruptcy concerns when contrasted with the state interests expressed in the Illinois insurance insolvency statute to which McCarran-Ferguson dictates that this Court defer.

### a.  The Report Misconstrues the Second Circuit's Decision in Stephens

135.  The Report's overly narrow view of McCarran-Ferguson is demonstrated in its misconstruction of the Second Circuit's leading case on this issue, *Stephens v. American International Ins. Co.,* 66 F.3d 41 (2d Cir. 1995).  In *Stephens,* ceding insurers argued that *Fabe* required an analysis of each particular provision of the Kentucky Insurers Rehabilitation And Liquidation Law, one section of which banned arbitration against the liquidator, to determine whether that particular provision was designed to "protect policyholders" and was thus entitled to preemptive effect under McCarran-Ferguson.  The Second Circuit reversed the district court's decision enforcing the Federal Arbitration Act, and granted preemption against the application of the FAA, but refused to take the narrow, "parsing," "provision based" view that had been urged by the respondents.  Instead, the Second Circuit reviewed the purposes and scope of the entire Kentucky statutory scheme for insurance insolvency, of which the anti-arbitration provision in question was a part, to determine whether that provision was designed to "protect policyholders" (part of the *Fabe* test for determining whether a state insurance regulatory provision should be granted preemptive power).  The Second Circuit explained:

> It is clear that through its anti-arbitration provision, among others, the Kentucky Liquidation Act regulates the performance of insurance contracts once an

insurance company (or a reinsurance company) is declared insolvent and enters liquidation. It is crucial to the "relationship between [an] insurance company and [a] policyholder" that both parties know that in the case of insolvency, the insurance company will be liquidated in an organized fashion.

\* \* \*

The Cedents argue that even if the Kentucky Liquidation Act is found to regulate the business of insurance, the anti-arbitration provision contained in the Act does not "protect" the policyholders. The Cedents maintain that, to the contrary, it deprives them of a bargained-for right to arbitration and thus is not preserved from preemption by McCarran-Ferguson. This argument relies on an overly narrow definition of "protecting" policyholders. [12] Fabe states that "statutes aimed at protecting <u>or</u> regulating [the relationship between policyholder and insurer], directly or indirectly, are laws regulating the 'business of insurance,'" and that any law with the "end, intention, or aim of adjusting, managing, or controlling the business of insurance" is a law "enacted for the purpose of regulating the business of insurance." *Fabe*, 113 S. Ct. at 2208, 2210 (citations and quotations omitted) (emphasis added).

\* \* \*

The Kentucky Liquidation Act has the "end, intention, or aim of adjusting, managing or controlling the business of insurance," in that it regulates the winding up of an insolvent insurance company. The Liquidation Act "protects" policyholders -- whether they are individual policyholders or ceding insurance companies -- by assuring [13] that an insolvent insurer will be liquidated in an orderly and predictable manner *and the anti-arbitration provision is simply one piece of that mechanism*.

66 F.3d at 44-45.

136.    Two other courts have interpreted the *Stephens* holding as broadly endorsing the

preemptive power to be granted to state insurance insolvency statutes as a whole. See *In Re*

*Advanced Cellular Systems,* 235 B.R. 713, 720 (Bankr. P.R. 1999) ("[I]n Stephens, [citation

omitted], the Second Circuit took a different approach and held that a statutory scheme may be

considered in its entirety."); *Munich American Reinsurance Company v. Crawford,* 141 F.3d

585, 592 (5th Cir. 1998) (observing that Stephens held that "statutory scheme may be considered

in its entirety").  While the Report does eventually conclude that certain provisions of Article

XIII of the Illinois Insurance Code satisfy the second-prong of the *Fabe* test (see Report, p. 36-37), its mis-reading of *Stephens* is emblematic of its overly narrow approach to the purpose and importance of the Illinois statute.  For example, the Report states that *Stephens* "expressly framed its analysis around the single provision of the Kentucky . . . Law at issue," and then proceeded to limit its own inquiry into the Illinois statute to a "parsing" approach, seeking particular provisions within the Illinois statutory insolvency system that the Bankruptcy Court viewed as significant in the McCarran-Ferguson analysis, and rejecting *Stephens'* approach of viewing the entire insolvency statute as an integrated "mechanism."   See Report at p. 36-37.

**b.**      **The Third Prong of the Fabe Test Is Satisfied In This Case**

137.    In determining whether the Bankruptcy Court's continued exercise of jurisdiction over this adversary proceeding would "impair" the Illinois insurance insolvency statute, the Report quotes from the U.S. Supreme Court's decision in *Humana v. Forsythe,* 525 U.S. 299, 309-310 (1999) as follows:

> The dictionary definition of "impair" is "to weaken, to make worse, to lessen in power, diminish, or relax, or otherwise affect in an injurious manner."  Black's Law Dictionary 752 (6th ed. 1990).  The following formulation seems to us to capture that meaning and to construe, most sensibly, the text of [McCarran-Ferguson Act] § 2(b): When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.

*Humana, supra,* 525 U.S. at 309-10 [*Report,* p. 38].

138.    The Report fails to properly apply this definition of "impairment" to this case, and is in error in not determining that the continued exercise of jurisdiction over this adversary proceeding would employ federal law to "invalidate and supersede" the very Illinois statutory provisions the Report had found worthy of McCarran-Ferguson consideration "sections providing the Rehabilitation Court with jurisdiction to issue injunctions against actions and

proceedings against Lumbermens or its assets or property; establishing priority of claims; and requiring claimants, even those with judgments, to bring their claims to the Rehabilitation Court for allowance, in lieu of using judgment enforcement mechanisms to collect." [*Report,* p. 36-37].

139.     With respect to the "property ownership dispute" between the Liquidator and Ames concerning the $8 million trust deposit, the Report erroneously concludes that the matter is open to the Bankruptcy Court's continuing jurisdiction despite McCarran-Ferguson because, among other things, (i) the federal court's determination of rights to that property would not invalidate, impair or supersede Illinois state insurance law; (ii) the property in dispute does not "belong" to either the Ames or Lumbermens estate until ownership is ruled upon; and (iii) until ownership is determined, the dispute is no more about property of the Lumbermens estate than it is about property of the Ames estate. [*Report,* p. 39].

140.     Setting aside for the moment the Report's errors of mixed fact and law as to the status of the competing claims of Lumbermens and Ames to the Trust Monies (discussed *supra* at p. 44-46), the Illinois statute, as a whole, undoubtedly sets forth an integrated system for the orderly, efficient and policy-holder centric liquidation of insurers, which the Report acknowledges is protected state activity under the McCarran-Ferguson Act.  However, the report does not properly evaluate the importance of the various components of the Illinois statutory system with which this Court's continued exercise of jurisdiction over the adversary proceeding would interfere.

### Impaired Illinois Statutory Provisions

141.     Among the Illinois insolvency statute's provisions are those which enjoin all persons from proceeding with suits or proceedings against the liquidation estate.  215 ILCS 5/189 states, in part: "The court may also restrain all persons, companies, and entities from

bringing or further prosecuting all actions and proceedings at law or in equity or otherwise, whether in this State or elsewhere, against the company or its assets or property or the Director except insofar as those actions or proceedings arise in or are brought in the conservation, rehabilitation, or liquidation proceeding."[61]   As noted above, the entry of the Liquidation Order fixed the rights of all parties as against the Liquidation estate as of the date of that order's entry, May 10, 2013, pursuant to 215 ILCS 5/194.[62]

142.   Also pursuant to the Illinois statute, all claims that have not been liquidated prior to the date fixed by the liquidation court are to be "estimated" pursuant to the statute's procedures, under which no judgment taken after the date of entry of the Rehabilitation order is admissible to prove either liability or the amount of the claim.  Code section 215 ILCS 5/209(8) states:

> No judgment against such an insured or an insurer taken after the date of the entry of the liquidation, rehabilitation, or conservation order shall be considered in the proceedings as evidence of liability, or of the amount of damages . . ."

143.   In addition, the Illinois statute has vested in the Liquidator all right, title and interest to Lumbermens' assets (215 ILCS 5/191), which is defined in the statute to include "trust deposits" (215 ILCS 5/187(6).  And the priority of distribution regime for distribution of Lumbermens' assets (215 ILCS 5/205), which the Supreme Court of Illinois has held sets forth the exclusive remedy available for the distribution of any property of the insolvent insurer's estate, *In re Liquidation of Security Casualty Co., supra*, 537 N.E.2d 775 (Ill. 1989), would clearly place any claim by Ames, as a "creditor," several priorities beneath those accorded to policyholders and the expenses of administering the Lumbermens liquidation estate.

---

[61] See also Rehabilitation Order, Appx. pp. 622-637; Liquidation Order, Exhibit "A" to these Objections, pp. 5-6, para. F

[62] Exhibit "A" to these Objections, p. 5, para. D

144.    Each of these provisions (as well as the entire framework of which they are a part) would obviously be "impaired, invalidated or superseded" by the Report's suggested continued exercise of federal jurisdiction over this adversary proceeding.  For example, the Report's suggestion that the federal court could proceed to try all the claims in the adversary proceeding, and then Ames could take the judgment to the Liquidation court in Illinois and file the resulting judgment as a "claim," is contrary to the injunction provisions of section 5/189 and of the Rehabilitation Order, contrary to the effective date for the "fixing" of rights against the estate provided by §5/194; contrary to the estimation process for claims provided for in the statute; and contrary (at least to the extent that claims are justiciable before the Liquidation court), to the provisions of section 5/209(8) that no judgment taken against the insurer after the date of the Rehabilitation Order is admissible as evidence of the liability or amount of damages with respect to the claim.  The purpose of this system of provisions is obvious, as policyholder interests cannot be protected if estate assets can be dissipated through litigation and post-Rehabilitation litigation is permitted to secure preferences that would erode funds available to pay policyholders.

145.    Furthermore, this Court's taking of control over the purported dispute over ownership of the Trust Monies, in a situation where the Report has acknowledged that the monies are not property of the Ames estate, violates the Illinois statutory directive that the Liquidator and his estate have sole ownership and possession of Lumbermens "assets," expressly defined to include trust deposits.

**Cases Supporting Preemption On Parallel Facts**

146.    In the face of these clear, head-on conflicts between the Report's recommendations and the provisions of the Illinois statute, the definition of "impairment"

adopted in the Report should have been found to have been satisfied in this case.

147. A number of courts have taken a vastly different approach to McCarran-Ferguson preemption from that recommended in the Report, holding that federal bankruptcy jurisdiction over a property dispute between a bankrupt debtor and the receiver of an insolvent insurer is preempted by McCarran-Ferguson because it would impair the state insolvency statute's priority of distribution provisions. These cases reason that to award disputed property to the debtor – a mere creditor rather than a "policyholder" – would, in effect, provide the debtor with 100 cents on the dollar for its claim, which conflicts with the priority of distribution statutes found throughout the nation affording priority to policyholder claims in insurer insolvencies, and which prioritize the claims of "creditors" such as Ames at or near the bottom of the priority ladder. Here the invasion of the Illinois statutory scheme is even more striking, since the Liquidator has a present and legally cognizable property interest in the Trust Monies under Connecticut Law, which governs the Trust, while Ames does not – Ames has only "claims."

148. In *In Re Advanced Cellular Systems,* 235 B.R. 713 (Bankr. D.P.R. 1999), a case with several parallels to the instant matter, Advanced Cellular had provided a certificate of deposit pre-petition to an insurance company as collateral for the issuance by the insurer of a financial surety bond to the Puerto Rico Telephone Company. Advanced Cellular went into bankruptcy, and the insurer was placed in state delinquency proceedings (*i.e.*, liquidation). The debtor sought to recover the certificate of deposit by bringing a "turnover" proceeding in the bankruptcy court under Bankruptcy Code Sections 542 and 543, and the Commissioner of Insurance of Puerto Rico moved to dismiss the turnover proceeding for lack of subject matter jurisdiction due to McCarran-Ferguson preemption. The debtor made many of the same arguments that Ames has made (and that are found in the Report), including the argument that

proceedings under Bankruptcy Code Sections 542 and 543 are "core" proceedings over which the Bankruptcy Court has "exclusive" jurisdiction.

149.    In holding that its continued jurisdiction over the bankruptcy turnover proceedings would "invalidate, supersede or impair" the Insurance Code of Puerto Rico, the court rejected the debtor's arguments that it had a property right in the Certificate of Deposit, and that the Certificate of Deposit was never an asset of the insolvent insurer's estate, thus removing the dispute from the scope of the insurance delinquency proceedings in Puerto Rico's state court. Id. at 235 B.R. 723-24.  The bankruptcy court agreed with the Puerto Rico insurance commissioner that "whether Advanced Cellular has a property right over the Certificate of Deposit is a question that must be addressed within the [insurer's] liquidation proceedings" (Id. at 724); thus an "impairment" would occur, and accordingly the bankruptcy court's jurisdiction over the property dispute was reverse preempted (Id. at 724).

150.    Two further cases granting preemption in property between bankruptcy and state insurance insolvency estates focused on the potential negative impact on the funds available for distribution to policyholders from state insurance insolvencies as a trigger for McCarran-Ferguson preemption.  In *Logan v. Credit Gen. Ins. Co. (In re PRS Ins. Group, Inc.),* 294 B.R. 609 (Bankr. D. Del. 2003), aff'd 2005 U.S. Dist. Lexis 22611 (D.Del. 2005) (a case which this Court called to the bankruptcy court's attention in the Withdrawal Opinion), the debtor (PRS) was a holding company with an insurance company subsidiary (CGIC) regulated by the Ohio Department of Insurance ("ODI").  While CGIC was under a state order of "supervision" by ODI, assets of CGIC that ODI found had been improperly commingled with assets of PRS and its other subsidiaries, were transferred back to CGIC.  The debtor, PRS, commenced an adversary

proceeding seeking avoidance of those transfers and recovery of the funds as preferential and/or fraudulent transfers from the bankruptcy estate to CGIC, which by then had been placed in Ohio state liquidation. Id. at 294 B.R. 611-12.

151.    Like the Bankruptcy Court in its Report herein, the Delaware Bankruptcy Court in *Logan* observed that it had jurisdiction to decide what was property of the PRS estate, "exclusive" jurisdiction over property of the estate, and jurisdiction to hear and decide preference and fraudulent conveyance actions.  Id. at 612.  Nevertheless, the bankruptcy court found that it was reverse preempted by operation of McCarran-Ferguson.

152.    Using the same definition of "impairment" utilized in the Report of the Bankruptcy Court in this matter, the *Logan* court came to a different conclusion, finding that the application of the Bankruptcy Code in the adversary proceeding would frustrate state policy and interfere with the state's administrative regime regulating insurance.  Id. at 613.  Referencing the Ohio Insurance Code's priority for the distribution of claims against the insolvent insurer's estate, the court noted that ODI was making an "impairment" argument based upon its state distribution priority statute  - an argument also advanced by the Illinois Liquidator in the instant case:

> According to the Liquidator, a determination by this Court that some CGIC assets were improperly obtained and should be immediately transferred to PRS would violate the Ohio statute as PRS would receive payment ahead of creditors entitled to a higher priority under the state's liquidation scheme.

Id. at 613.

153.    The Bankruptcy Court concluded that the Bankruptcy Code "impairs" the Ohio insurance liquidation statute at issue because Ohio's policy of "maximizing the return to CGIC's policyholders and its administrative scheme setting forth priority of payments would be frustrated by allowing PRS to use the Bankruptcy Code to recover property from CGIC and thus be paid with funds that would otherwise be paid to creditors under the priorities set forth under the Ohio statute."

Id. at 613.

154.     On appeal, the U. S. District Court for the District of Delaware affirmed, holding

that to the extent that the adversary complaints filed by the debtor against the insolvent insurer's

liquidation estate sought affirmative relief (as opposed to being merely "defensive" to defend

against the liquidator's own claims in the PRS bankruptcy), the adversary proceeding impaired the

Ohio Liquidation Act and was reverse preempted. 2005 U.S. Dist. Lexis 22611at *7).

155.     Similarly, in *Wagner v. Amwest Ins. Group,* 285 B.R. 447 (Bankr. C.D. Cal. 2002),

the bankruptcy court held that a dispute over property ownership between the bankrupt debtors'

estate and the liquidator of an insolvent insurer had to be determined in the state liquidation

proceedings due to McCarran-Ferguson preemption, despite the fact that the debtor was the party

in actual possession of the disputed funds.  The bankruptcy court found that the purpose of the

Nebraska Insurance Act, under which the liquidation was proceeding, was to "marshal assets and

pay claims of policyholders and other claimants," and due to the apparent lack of sufficient funds

to pay the full amount due policyholders, the court found that the interests of the Nebraska

insurer's policyholders were directly at stake. Id at 453-454. [63]

156.     The concerns expressed by the *Wagner* court regarding policyholder interests

being directly and adversely affected by the exercise of federal jurisdiction over contested estate

property apply strongly in the instant matter, where the Lumbermens estate has a very substantial

deficiency of assets versus liabilities. The record below reflected that Lumbermens' estate had a

$500 million deficiency as of December, 2012 [Appx. p. 711].  In the financial report for

Lumbermens' estate as of December 31, 2014 (Exhibit "N" to these Objections), it is apparent

---

[63] The court found that the risk of its interpretation of the agreement in question would be at odds with the
liquidation court's construction of a similar agreement was sufficient to show that the continued exercise
of bankruptcy court jurisdiction would "impair" the progress of an orderly liquidation in Nebraska, thus
satisfying the MFA's third prong.  Id. at 455.

that there are not now sufficient assets to pay the claims that have accrued to date through to the

policyholder priority level (in other words, there are insufficient assets to pay the claims of

policyholders at par), as the assets of the estate are $862 million while policyholder claims alone

total $1.3 billion.  To permit any "claim" by Ames to result in the confiscation of the Trust

Monies, rather than the entry of a creditors' claim in the Lumbermens insolvency (which would

probably be placed in priority category "g", below those of policyholders), would result in a

diminution of assets available to satisfy policyholder claims and be a very direct impairment of

the Illinois distribution priority system established in Illinois code section 5/205.

      157.    In a slightly different procedural context, McCarran–Ferguson was used as the basis

for granting a lift – stay motion to permit state proceedings to preempt federal bankruptcy

proceedings.  In *In Re Medical Care Management Co.,* 361 B.R. 863 (Bankr. M. D. Tenn. 2003), an

HMO management company's subsidiary, MCMC, had transferred $5.7 million from a Tennessee

state insurer under "supervision" under the Tennessee Insurers Rehabilitation and Liquidation Act

without the approval of the state appointed supervisor, and the funds were placed in a bank account

at AmSouth Bank.  The Tennessee insurance commissioner seized the insurer, procured an

injunction against AmSouth Bank disbursing the funds, and placed the insurer in liquidation.

Thereafter, the Commissioner filed a petition in Tennessee state court to recover the funds as a

preferential and fraudulent transfer.  MCMC thereafter filed for bankruptcy protection, and the state

appointed liquidator moved to lift the automatic stay to permit the state court fraudulent and

preferential transfer action to proceed.  Id. at 866-868.  The debtor and its unsecured creditors

committee raised the familiar refrain that the bankruptcy court had "exclusive and non-delegable"

jurisdiction over property of the debtor's estate, and therefore cause could not be found for granting

the lift stay motion by the Commissioner. Id at 869.

158.     The bankruptcy court ruled that the McCarran-Ferguson Act dictated the grant of the lift stay motion to permit the state court proceedings to go forward.  In determining that permitting bankruptcy court determination of the property ownership question would "impair" the Tennessee Insurers Rehabilitation and Liquidation Act, the court first noted that the Act, as whole, "embodies the requisite intent to regulate the business of insurance."  The court then focused on the grant in the Act of exclusive jurisdiction in the state court of Tennessee and the prohibition of suits against the insurer or liquidator once the liquidation has begun.  The bankruptcy court held that it was preempted from considering the contested ownership issues because to do so would impair the state act, stating:

> Whether by force of the current stay or by this Court's decision as to the alleged transfer and ownership of the funds, those portions of the Insurers Rehabilitation and Liquidation Act giving the Chancery Court of Davidson County exclusive jurisdiction over all actions under the Act would be invalidated, impaired, or superseded under the McCarran-Ferguson Act. The simple exercise of this Court's jurisdiction to decide whether the alleged transfer was valid and who owns the disputed funds or to preclude the Chancery Court from deciding these issues, without more, impinges upon and negates the obvious intent of the state legislature to consolidate all liquidation proceedings in one special court for the reasons stated previously.

Id. at 876.

159.     As in the Tennessee statute reviewed in *In Re Medical Management*, the Illinois statute uses a combination of provisions to create in the Illinois state liquidation court an exclusive jurisdiction for the hearing and determination of all claims *against* the insolvent insurer, and the Rehabilitation Order and Liquidation Order in the Lumbermens liquidation proceedings expressly invoke those injunctive powers.

160.     See also, *Davister Corp. v. United Republic Life Ins. Co.,* 152 F.3d 1277, 1281-82 (10th Cir. 1998) (order of federal district court directing arbitration against insolvent insurer to proceed under Federal Arbitration Act would "invalidate, impair or supersede" the "blanket stay"

2234391_1                                      72

entered by the state court in which the liquidation was pending and impair the progress of the

orderly resolution of all matters involving the insolvent company, adversely impacting

policyholders because proceedings dealt with an asset of the insurance company that could be

apportioned to them).

161.    Accordingly, there is substantial authority, much of it from bankruptcy courts,

supporting the view that the continuation of a bankruptcy adversary proceeding in which affirmative

relief is sought against the liquidator of an insurer in a dispute over property rights will "impair" a

comprehensive state statutory scheme governing the insurer's liquidation, and thus trigger reverse

preemption under McCarran-Ferguson even when "core" and "exclusive" bankruptcy jurisdiction is

precedent.  These authorities were either ignored in the Report, or glossed over.

        **c.**        **<u>Cases Relied Upon By The Report Are Distinguishable</u>**

162.    The three cases primarily relied upon by the Report in ruling that no

"impairment" is created by the federal court's continued exercise of jurisdiction over this

adversary proceeding do not involve facts or circumstances remotely similar to those in the case

at bar and are easily distinguishable.

163.    The Report relies upon and quotes *Gross v. Weingarten,* 217 F.3d 208 (4th Cir.

2000) (Report, p. 33).  That case did not involve a dispute between insolvent estates. In *Gross,*

the deputy receiver of an insurer in Virginia state court rehabilitation *brought a lawsuit* in the

U.S. District Court against former officers, directors and various "control persons" for fraud.

The defendants counterclaimed for indemnification and contribution based upon a prior

shareholder's class action and settlement. The matter proceeded to trial in the U.S. District Court,

where the jury awarded the defendants dismissal of the deputy receiver's claims, whereupon the

deputy receiver moved to dismiss the defendants' counterclaims for lack of jurisdiction on

McCarran-Ferguson grounds, alleging that the state receivership court had exclusive jurisdiction over those counterclaims.  On cross-appeals by the deputy receiver and the defendants, the Fourth Circuit reversed the District Court's determination to dismiss the counterclaims of the defendants.  217 F.3d 208 at 211-212.

164.    A major distinguishing characteristic of *Gross* is that the state insurance liquidation estate availed itself voluntarily of federal court jurisdiction to prosecute its affirmative claims, and only asserted preemption over the counter-claims of the defendants after the deputy receiver's claims had been dismissed by the jury.  Furthermore, unlike the Ames/Lumbermens adversary proceeding, *Gross* did not involve an attempt to use federal court jurisdiction to secure property claimed by the insolvent insurer's estate.  The *Gross* court noted that the defendants were only asserting counterclaims for exoneration, contribution or indemnification, and if judgment were awarded to the defendants in the federal court they would still be required to present their judgments to the state liquidation court for payment in accordance with the rehabilitation plan and Virginia's priority statutes. Id. at 221-22.  While the *Gross* court does express a very narrow reading of McCarran-Ferguson and a strong preference that McCarran-Ferguson not be broadly interpreted to divest federal jurisdiction in every case, its holding was also informed by its finding that the Virginia rehabilitation court had had jurisdiction over the "res" (*i.e.*, the property of the insurer) for some years, and that the continued prosecution of the counterclaims in the case that the receiver had brought would still require the counterclaiming defendants to present their claims in the rehabilitation court. Id at 222.

165.    The Report also cites *McRaith v. Am. Re-Ins. Co.,* 2010 U.S. Dist. LEXIS 14021 (N.D. Ill. Feb. 17, 2010) for the proposition that the "Illinois priority scheme can co-exist with federal jurisdiction over the underlying action resolving a claim." Report p. 41.  However, once

again, *McRaith* did not involve a property dispute between a bankruptcy estate and an insurance liquidator; rather, the liquidator sued two reinsurers in state court for a declaratory judgment as to their liability to pay for a settlement the liquidator had entered into with a claimant, and the reinsurers removed the action to the federal court.  In denying the liquidator's motion for remand on McCarran-Ferguson grounds, the *McRaith* court noted that the action did not directly affect any policyholder since it was, in effect, a breach of contract collection action brought by the liquidator which only incidentally enhanced the liquidation estate by enlarging its coffers generally.  In addition, the *McRaith* court noted that the Illinois statute did not create an exclusive jurisdictional court for the *bringing* of actions by the liquidator – an issue not involved in the instant adversary proceeding since the Illinois statute undoubtedly establishes the liquidation court in Illinois as the exclusive jurisdiction for bringing claims *against* the Lumbermens estate. The distinction between *McRaith* and this matter is obvious, as *McRaith* involved the liquidator as plaintiff to recover assets, while this adversary proceeding involves affirmative claims against the liquidator's estate.

166.    The *McRaith* Court acknowledged, however, that it was applying the test for application of McCarran-Ferguson announced by the Seventh Circuit in *Autry v. Northwest Premium Serv., Inc.,* 144 F.3d 1037 (7th Cir. 1998), which requires a direct impact upon a policyholder in the capacity of holder of an insurance contract in order to satisfy the third prong of the *Fabe* test.  The Second Circuit has not adopted the *Autry* approach to *Fabe*.[64]  In any event, it is submitted that the direct dollar-for-dollar impact on policyholders resulting from this court's exercise of jurisdiction over the Trust Monies, given the substantial insolvency of the

---

[64] See discussion in *Munich American Reinsurance Company v. Crawford,* 141 F.3d 585, 592 (5th Cir. 1998), *cert den.* 142 L.Ed.2d 448, 199 S.Ct. 539 (1998), of the different approaches taken by the circuits to implementing the third prong of the *Fabe* test.

Lumbermens estate, establishes such a direct impact upon policyholders.  Furthermore, *McRaith* did not rule that the Illinois statute was *not* entitled to *any* preemptive effect; it ruled only that 215 ILCS 5/192 ("Duties Of Director As Rehabilitator, Termination"), standing alone in the circumstances of the liquidator suing to recover debts owed, was not entitled to preemptive effect over the federal court removal and jurisdictional statutes.  That holding is totally inapposite to the facts in this case.

167.    *Lawski v. Frontier Ins. Group,* 517 B.R. 496 (Bankr. S.D.N.Y. 2014), cited in the Report at p. 39, n.126, dealt with a dispute between a reorganized debtor and an insolvent insurance subsidiary of the debtor in liquidation as to ownership of various parcels of property. However, at the outset of its discussion, the *Lawski* court held it would avoid the very kind of intervention in the dispute that the Report advocates in this matter; rather, the *Lawski* court held that it would avoid determining state law contract issues (such as the existence of a right of reversion), and limit itself to the review and interpretation of the reorganized debtor's plan of reorganization and confirmation before the bankruptcy court.  The court stated:

> The Court need not step on the toes of the state court by making a determination on whether the various contracts between and among the parties grant a right of reversion to the Reorganized Debtor. The Court need only look to the plan and confirmation order to determine whether the property was included in the plan, whether the Liquidator's claim was dealt with in the plan, whether the Liquidator is enjoined from proceeding against the Debtor, whether the Reorganized Debtor is released from any liability and whether a violation of the discharge has occurred, as was alleged by the Reorganized Debtor. The Court believes that it is in a better position than the state court to make such determinations and that doing so would assist, rather than hinder, the state court. If the Court determines that this issue was not covered by the plan, it will send the matter back to state court so that the issue can be decided under state law.

Id. at 504.

168.    Having so limited its own intended role in the dispute, the bankruptcy court proceeded to discuss abstention, the McCarran-Ferguson Act, and the other matters raised by the

liquidator's position in that case.  In respect to McCarran-Ferguson issues, the court noted that "the Liquidator's only argument is that the state proceeding would be impaired because the asset would be lost."  Id. at 506.  It was in that context that the bankruptcy court made the statement quoted by the Report at note 126:

> The Liquidator's only argument is that the state proceeding would be impaired because the asset would be lost.  But if this Court finds that the assets belongs to the Reorganized Debtor, it would not have been FIC's asset to liquidate anyway.  Moreover, "<u>a federal court's ordinary determination of property rights, interpretation of contracts, or interpretation of state statutes does not "impair" state law, even when a federal court's decision has a financial impact on the insolvent insurer's estate.</u> (underlined portion was quoted in the R&R at footnote 126).

Id. at 506.

169.    In the case at bar, it is clear that far more than just the "loss of the asset" is involved; the head-on conflict between the Illinois statutory provisions and this Court's continued exercise jurisdiction over this adversary proceeding is quite evident.  The Report's recommendation that this Court proceed to dispose of *all* issues, including the interpretation of multiple contracts that are within the expertise of state insurance liquidators and their courts (including surety bonds, agreements between surety and insurer, insurance program agreements, claim litigation settlement agreements and inter-insurer trust agreements), is not supported by *Lawski,* which limited its role to interpreting its own bankruptcy orders.

### Section IV

### Liquidator's Objections To Report's Recommendations As To "First Assuming Jurisdiction Doctrine"

170.    To the extent that McCarran-Ferguson preemption is found to be applicable to any of Ames' claims, the Liquidator maintains that the "first filed jurisdiction" rule would be inapplicable to defeat such preemption in the context of insurer insolvency cases; there is no

exception in the text of McCarran-Ferguson for otherwise preempted federal statutes based upon a "first in time" exercise of jurisdiction.  If a "first filing" were sufficient to defeat McCarran-Ferguson preemption in insurer insolvency cases, then a run to the federal courthouse upon word of an insurer's financial difficulty would effectively strip the McCarran-Ferguson Act of its central purpose, seriously crippling the state and national non-federal systems for dealing with insurer insolvency.  Neither does the Liquidator agree that federal actions *in rem* that impair state insurance insolvency statutes should be excluded from McCarran-Ferguson preemption even if first filed, especially if the *in rem* action is improperly dealing with property that should be part of the insurer's insolvency estate according to state insurance law or regulations.  Because the Report does not recommend that McCarran-Ferguson preemption is available, these issues (which were framed in the Withdrawal Opinion of this Court) are not discussed in the Report.

171.    The Liquidator agrees with the Report that the "First Assuming Jurisdiction Doctrine" applies only to claims that are *in rem* or *quasi in rem,* and that therefore the doctrine plays no role with regard to Ames' Claims ## 1, 2, 3 and 5 (Report, pp. 43, 45).  However, the Liquidator disagrees with the Report's analysis as to Ames' other claims.[65]  Once again, McCarran-Ferguson reverse preemption affects the discussion, as the Liquidator has cited authority for the proposition that even federal claims subject to "exclusive" federal bankruptcy jurisdiction are reverse preempted by McCarran-Ferguson in appropriate circumstances.  Such jurisdiction, exclusive or not, is created by federal statute - the Bankruptcy Code and its related jurisdictional statutes - and those very statutes are the target of McCarran-Ferguson preemption according to its clear terms.

---

[65] The Liquidator excepts Claim # 10 from this category, as the Liquidator agrees that if such claim for equitable subordination is not dismissed on the merits, then it must stay with the federal court overseeing Ames' bankruptcy case; it does not seek affirmative recovery from the Liquidator, and it is part of the bankruptcy court's adjustment of claims functions.

172.     The Liquidator also disagrees with the Report as to the essential nature of both Claim # 4 and Claim #6 in the context of this adversary proceeding.  Claim #4 is not an *in rem* claim; rather, it is an *in personam* claim under 11 U.S.C. §105(a) for civil contempt sanctions against the estate of Lumbermens.  The fact that it is grounded on 11 U.S.C. §362(a), which deals with property of the estate, does not render the contempt claim itself *in rem*.[66]  Claim #4 seeks the relief that can be recovered in civil contempt actions – coercion for compliance and/or compensatory damages. *Gucci Am. v. Bank of China*, 768 F.3d 122, 144 (2d Cir. 2014).   Here the relief sought is clearly damages, and thus the action is *in personam* and the first filed doctrine does not apply.  To the extent Ames' goal is to recover damages (although styled as contempt sanctions) against the estate of Lumbermens, such use of 11 U.S.C. §105(a) must be viewed as directly in conflict with the Illinois priority statute to the extent the sanction seeks to recover property of Lumbermens outside the Illinois liquidation court process.

173.     The Liquidator believes that the analysis of Claim #6, for marshaling, is much the same as the analysis above for Claim #4 in this particular instance, since Ames' goal is to find a way to seize the Trust Monies rather than to employ the equitable remedy of marshaling in its traditionally recognized form.  Therefore, despite its "marshaling" label, the claim seeks to secure an award of property that either (a) belongs to Lumbermens (under the Liquidator's analysis), or (b) belongs to no one (under the Report's analysis).  Once again, in this particular context the claim does not have an *in rem* character, and should be treated as an *in personam* claim that is also unaffected by the "first filed" doctrine.

---

[66] The Report's discussion at note 144 is unsupported and confuses the *grounds* for the contempt sanction (§362(a)) with the §105(a) contempt relief itself, which is what is sought in Ames' claim.  Whether the property is or is not still in the possession of the bankruptcy estate is irrelevant, but not for the reasons discussed in the Report's note; the property involved in the underlying alleged violation and its location does not transform the nature of the *in personam* civil contempt action into one sounding *in rem*.

**The Liquidator Objects To The Report's Rejection of**
**Discretionary/Permissive Abstention As An Alternative Remedy**

174.    While acknowledging that discretionary abstention "might still be possible," the Report declined to recommend it as an alternative to McCarran-Ferguson preemptive relief. [Report p. 42, n. 138]. The basis for the Report's reluctance is its observation that the "majority of the claims in the adversary proceeding arise from the Bankruptcy Code," and that the bankruptcy issues in the case should not be determined by non-bankruptcy courts. *Id.* However, the majority of the claims in the adversary proceeding are actually state law claims, to which Bankruptcy Code "labels" have been added; the key issues are not bankruptcy issues, but contract, insurance and common law matters such as property rights and equitable subrogation. Furthermore, several other courts in similar cases have granted abstention as either an alternative or a companion form of relief to McCarran-Ferguson Preemption, even where only bankruptcy claims were involved. Accordingly, the Liquidator does not find the reasoning of the Report on this point persuasive, and objects to the recommendation that this alternative relief not be considered. See the discussion of abstention in prior briefs on behalf of the Liquidator [Lumbermens Moving Brief, Appx. p. 0715, n41; 0718, n.42; Lumbermens Reply Brief, Appx. pp. 0794-0795].

Dated: Jericho, New York
            January 29, 2016

Respectfully Submitted,

TORRE, LENTZ, GAMELL,
GARY & RITTMASTER, LLP
Attorneys for Defendant

By:    s/Mark S. Gamell
            Mark S. Gamell
            Robert Beau Leonard
100 Jericho Quadrangle, Suite 309
Jericho, NY 11753-2702
Tel.: (516) 240-8900