**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------------- X

In re:

AMES DEPARTMENT STORES, INC., *et al.*,

*Debtors*.

----------------------------------------------------------------------- X

AMES DEPARTMENT STORES, INC.,

*Plaintiff*.

LUMBERMENS MUTUAL CASUALTY COMPANY,

*Defendant*.

----------------------------------------------------------------------- X

District Court Docket No.:

12-cv-08365 (ALC)

Chapter 11
Case No. 01-42217 (CGM)
(Jointly Administered)

Adversary Proceeding
No. 06-01890 (CGM)

# DEFENDANT'S (REVISED) OBJECTIONS TO REPORT AND RECOMMENDATION OF THE BANKRUPTCY COURT CONCERNING JURISDICTION MOTIONS

## (ORAL ARGUMENT REQUESTED)

**TORRE, LENTZ, GAMELL, GARY**
**& RITTMASTER, LLP**
*Attorneys for Defendant*
100 Jericho Quadrangle, Suite 309
Jericho, New York  11753
Tel.:  (516) 240-8900
Email: mgamell@tlggr.com
Mark S. Gamell, Esq.
Robert Beau Leonard, Esq.

# TABLE OF CONTENTS

Preliminary Statement..................................................................................................1

Section I
The Report's Recitation Of "Facts" Is Materially Erroneous ...................................4

    The Bond.............................................................................................................4

    Events During Ames' Bankruptcy .....................................................................6

    The Original Pre-Petition Letter Of Credit Was Replaced Post-Petition ...........6

    Lumbermens' Proofs Of Claim...........................................................................7

    Travelers' Demand..............................................................................................8

    The Letter Agreement ........................................................................................8

    The Adversary Proceeding And Ames Settlement With Travelers ....................11

    The December 2008 "Final Settlement" ...........................................................12

    The Second Amended Complaint ......................................................................13

    Lumbermens' Illinois Rehabilitation Proceedings............................................15

Section II
Objections To The Report's Discussion Of "Jurisdiction"......................................17

    Claims #1 and #2 – Ames Lacks Standing To Assert Breach Of Contract ........18

    Claim #3 – Unjust Enrichment .........................................................................19

    Claim #4 – Civil Contempt Sanctions For Automatic Stay Violation...............19

        Lumbermens' Right Of Subrogation ................................................21

    Claim #5 – Declaratory Judgment Re: Trust Monies .......................................22

    Claim #6 – Marshaling......................................................................................23

    Claim #10 – Equitable Subordination Of Lumbermens' Claims.......................24

Section III
The Report Mis-Construed And Mis-Applied The McCarran Ferguson Act ...............24

The Third Prong Of The Fabe Test Is Satisfied In This Case ............................................25

"Impaired" Illinois Statutory Provisions ..........................................................................25

Cases Supporting Reverse Preemption In Property Ownership Disputes ........................27

The Report's Overly Narrow Construction Of McCarran-Ferguson ...............................30

Cases Relied Upon By The Report Are Distinguishable ..................................................32

Section IV
The "First Assuming Jurisdiction Doctrine" Is Not Applicable, And Permissive Abstention
Should Be Considered As Alternative Relief ...................................................................33

Abstention As An Alternative Remedy ............................................................................35

## TABLE OF AUTHORITIES

### CASES

*APWU v. Potter*
343 F.3d 619 (2d Cir. 2003)...........................................................................................17

*Ashcroft v. Iqbal*
556 U.S. 662 (2009).................................................................................................17, 24

*Auto Glass Exp. Inc. v. Hanover Ins. Co.*
293 Conn. 218, 975 A.2d 1266 (2009) ......................................................................19

*Autry v. Northwest Premium Serv., Inc.*
144 F.3d 1037 (7th Cir. 1998) ...................................................................................33

*Celotex Corp. v. Edwards*
514 U.S. 300, 308 n.6 (1995)......................................................................................18

*Connecticut National Bank v. Douglas*
221 Conn. 530 (1992) .................................................................................................20

*Davister Corp. v. United Republic Life Ins. Co.*
152 F.3d 1277 (10th Cir. 1998) ..................................................................................30

*Dep't of Treasury v. Fabe*
508 U.S. 491 (1993).............................................................................................25, 30

*Enron Power Mktg v. Calif. Power Exchange Corp.*
*(In re Enron Corp.)*
2007 U.S. Dist. LEXIS 73638
(S.D.N.Y. September 21, 2007)(McMahon, J.) .........................................................20

*Gaynor v. Payne*
261 Conn. 585 (Conn. 2002)........................................................................................3

*Greenwich Ins. Co. v. Greenwich St. Capital Partners II*
*(In re Metro Affilaites, Inc.)*, 2008 Bankr. LEXIS 752
(Bankr. S.D.N.Y. Mar. 6, 2008)..................................................................................19

*Gross v. Weingarten*
217 F3d 208 (4th Cir. 2000) .......................................................................................31

*Gucci Am. v. Bank of China*
768 F.3d 122, 144 (2d Cir. 2014).................................................................................34

*Hassett BancOhio Nat'l. Bank, (In re CIS Corp.)*
172 B.R. 748, 757 (S.D.N.Y. 1994)................................................................23

*Humana v. Forsyth*
525 U.S. 299, 306-307  (1999) ............................................................24, 25

*In re Advanced Cellular Systems*
235 B.R. 713 (Bankr. P.R. 1999) .......................................................30, 32

*In re Borges*
184 B.R. 874 (Bankr. D. Conn. 1995) ................................................23

*In re Liquidation of Security Casualty Co.*
127 Ill.2d 434, 130 Ill.Dec. 446, 537 N.E.2d 775 (1989) ..................26

*In re Lyondell Chem. Co.*
402 B.R. 596 (Bankr. S.D.N.Y. 2009) (Gerber, J.)............................22

*In re M.J. Sales & Distrib. Co.*
25 B.R. 608 (Bankr. S.D.N.Y. 1982) .................................................20

*International Diamond Importers, Inc. v. Oriental Gemco (NY), Inc.*
2014 U. S. Dist. Lexis 164567 (S.D.N.Y. November 24, 2014) .........17

*Jordan v. Verizon Corp.*
391 Fed. App'x 10, 12 (2d Cir. 2010) ................................................17

*J.S. ex rel. N.S. v. Attica Cent. Sch.*
386 F.3d 107, 110 (2d Cir. 2004)........................................................17

*Keene Corp. v. Acstar Ins. Co. (In re Keene Corp.)*
162 B.R. 935, 942 (Bankr. S.D.N.Y. 1994)........................................20

*Lander v. Hartford Life & Annuity Ins. Co.*
251 F.3d 101 (2d Cir. 2001)................................................................31

*Lawski v. Frontier Ins. Group*
517 B.R. 496 (Bankr. S.D.N.Y. 2014).................................................33

*Logan v. Credit Gen. Ins. Co.*
*(In re PRS Ins. Group, Inc.)*
294 B.R. 609 (Bankr. D. Del. 2003)
aff'd 2005 U.S. Dist. Lexis 22611 (D.Del. 2005)........................27, 28

*MBNA Amer. Bank v. Hill*
436 F.3d 104 (2d Cir. 2006)................................................................22

*McNutt v. General Motors Acc. Corp.*
298 U.S. 178 (1936)..............................................................................................17

*McRaith v. Am. Re-Ins. Co.*
2010 U.S. Dist. LEXIS 14021 (N.D. Ill. Feb. 17, 2010) ......................................32, 33

*In re Medical Care Management Co.*
361 B.R. 863 (Bankr. M. D. Tenn. 2003) ..............................................................30

*Meyer v. United States*
375 U.S. 233 (1963)..............................................................................................24

*Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*
701 F. Supp. 2d 568, 580-81 (S.D.N.Y. 2010) ......................................................17

*Munich American Reinsurance Company v. Crawford*
141 F.3d 585 (5th Cir. 1998)
*cert den.* 142 L.Ed.2d 448, 199 S.Ct. 539 (1998) ................................................32

*New Eng. Dairies, Inc. v. Dairy Mart Convenience Stores, Inc.*
*(In re Dairy Mart Convenience Stores, Inc.)*
351 F.3d 86 (2d Cir. 2003).....................................................................................20

*Ochs v. Simon (In re First Cent. Financial Corp.)*
269 B.R. 502 (Bankr. E.D.N.Y. 2001) ...................................................................31

*O'Neil v. Fleet National Bank (In re Britton)*
300 B.R. 155 (Bankr. D. Conn. 2003) .....................................................................3

*Putnam County Sav. Bank v. Bagen (In re Bagen)*
1 85 B.R. 691, 700 (Bankr. S.D.N.Y. 1995)...........................................................18

*In re Rubin*
160 B.R. 269 (Bankr. S.D.N.Y. 1993) ...................................................................31

*Rushton v. Bank of Utah (In re C.W. Mining Co.)*
477 B.R. 176 (B.A.P. 10th Cir. 2012) ....................................................................22

*Smart World Techs., LLC v. Juno Online Servs.*
*(In re Smart World Techs., LLC)*
423 F.3d 166 (2d Cir. 2005)...............................................................................23, 24

*Spirit v. Teachers Ins. And Annuity Ass'n*
691 F.1054 (2d Cir. 1982)......................................................................................31

*Standard Investment Chartered, Inc. v. N.A.S.D.*
621 F.Supp. 2d 55 (S.D.N.Y. 2007).............................................................17

*Stephens v. American International Ins. Co.*
66 F.3d 41 (2d Cir. 1995) .............................................................................32

*TD Bank, N.A. v ARS Partners Poplar Plains, LLC,*
2010 Conn. Super. LEXIS 232
(Fairfield Superior Court, February 2, 2010).............................................20

*The Majestic Star Casino, LLC v. Barden Development, Inc.*
*(The Majestic Star Casino, LLC)*
716 F.3d 736 (3d Cir. 2013)..........................................................................18

*Tri-Valley Distributing Fin. Corp.*
350 B.R. 628 (B.A.P. 10th Cir. 2006) ..........................................................31

*Wagner v. Amwest  Ins. Group*
285 B.R. 447 (Bankr. C.D. Cal. 2002) ........................................................29

## Statutes

*McCarran-Ferguson Act*
(15 U.S.C. §§ 1011-1015).........................................................1, 2, 24, 32, 34

*Restatement 3d of Suretyship & Guaranty,* §37 (1996) ...........................21

11 U.S.C. §105(a) ........................................................................................34

11 U.S.C. §362(a) ........................................................................................34

15 U.S.C. § 1012..........................................................................................24

28 U.S.C. § 157(d) .........................................................................................1

215 ILCS 5/187............................................................................... 1, 16

215 ILCS 5/187(6) .......................................................................................26

215 ILCS 5/189...............................................................................16, 26, 32

215 ILCS 5/191............................................................................................26

215 ILCS 5/192............................................................................................33

215 ILCS 5/194...............................................................................16, 26

215 ILCS 5/205 ................................................................................................................................26

215 ILCS 5/209(8) ...........................................................................................................................26

11 U.S.C. 105(a) ..............................................................................................................................19

At the heart of this dispute is a Trust Fund established at the Bank of New York by defendant Lumbermens Mutual Casualty Company ("**Lumbermens**"), in 2003 with $8 million of its own funds.  Defendant Lumbermens, acting through the Director of Insurance of the State of Illinois (the **"Director"**) as statutory Liquidator of Lumbermens (the "**Liquidator**"),[1] objects to the Bankruptcy Court's "Report and Recommendation on Ames' Motion to Confirm Exclusive Jurisdiction" (the "**Report**") dated December 7, 2015 [ECF #18].[2]  Lumbermens is an Illinois insurance company placed in Rehabilitation on July 2, 2012 and in Liquidation as of May 10, 2013, under Article XIII of the Illinois Insurance Code ("Article XIII").[3]  Plaintiff Ames Department Stores, Inc. ("**Ames**") is a post-confirmation Chapter 11 Debtor, whose bankruptcy petition was filed August 20, 2001, and whose Chapter 11 liquidating plan was approved November 13, 2013.

The Report was issued pursuant to this Court's July 3, 2014 Opinion & Order ("**Withdrawal Opinion**") [ECF #15], which withdrew the reference from the Bankruptcy Court pursuant to 28 U.S.C. § 157(d) as the determination of the parties' cross-motions regarding jurisdiction required "substantial and material consideration" of the McCarran-Ferguson Act (15 U.S.C. §§ 1011-1015). This Court's review of the cross-motions is *de novo*.

**Preliminary Statement**. The Report is based primarily upon erroneous findings of "undisputed fact." While ignoring facts submitted by Lumbermens, the Report adopts bare assertions in Ames' pleading that are disputed or without foundation.[4]  Critical provisions of the

---

[1] Andrew Boron, who as Director of Insurance of Illinois was first appointed Rehabilitator, and later Liquidator, of Lumbermens, has been succeeded by Acting Director Anne Melissa Dowling.

[2] This revised Objection is filed pursuant to the Court's 35-page limitation order [ECF #35]; it replaces the Objection filed as part of ECF ## 28 and 29. The exhibits filed with this Objection replace those filed with the original Objection, but the Appendix filed with ECF #29 remains effective.

[3] *Rehabilitation, Liquidation, Conservation and Dissolution of Companies,* (215 ILCS 5/187 *et seq.*).

[4] The Report states, "All facts are undisputed unless otherwise noted" [*Report p.3, n.8*].

operative documents were ignored or misconstrued.  Lumbermens sought to avoid such issues

when, in a November, 2014 conference, the Liquidator's counsel expressed concern that the

Bankruptcy Court might erroneously conclude that some of Ames' allegations were

"undisputed" because the Jurisdictional Motions had been briefed on less than a complete record.

In response to that concern, the Bankruptcy Court announced a procedure for supplementation of

the record following oral argument, and for potential evidentiary hearing; however, the

procedure was not followed. [5]

The Report's analysis and application of the relevant law is also erroneous.  The Report

does not contain the jurisdictional inquiry mandated by the Withdrawal Opinion.  Despite its

vigorous exploration of the reach of the Bankruptcy Code (which the Report concedes is *not* a

statute immune from McCarran-Ferguson Preemption), the Report does not reflect a "material

and substantial" consideration of the McCarran-Ferguson Act as applied to this case.  Also,

critical concepts of law that undermine Ames' claims were ignored, including Lumbermens'

subrogation rights, as surety; the "independence principle" applicable to letters of credit; the duty

of the bond obligee ("**Travelers**") to avoid "impairment" of collateral; and the shortcomings in

Ames' pleadings.  The Report further errs by urging this Court to retain bankruptcy jurisdiction

of this dispute, and to utilize Bankruptcy Code §105(a) to create new rights for Ames that would

impinge upon Lumbermens' rights and assets.

The Trust Fund funded by Lumbermens was established to settle Travelers' claim under a

$14.35 million surety bond issued by Lumbermens on behalf of Ames, as principal (the "Bond").

The Bond provided that Ames had no rights in the Bond or its proceeds.  The Trust Agreement

provided for limited use of the Trust Monies, which were only to be drawn upon by Travelers or

---

[5] See Transcript of 11/18/14 conference [filed under seal per Order [ECF # 30], (Tr. 19:8 – 22:10; Tr.
24:20 – 25:16; Defendants' Letter Brief dated December 1, 2014, (Appx. pp. 959-961).

returned to Lumbermens.  All the operative documents and agreements provide that undrawn Trust Monies and bond proceeds are to be returned to Lumbermens.  In settling Travelers' claim, Lumbermens exercised its contractual right to resolve such claims as it deemed fit, in its binding discretion, and to consent to modifications to the Bond.  Similarly, Travelers exercised its unfettered discretion to look to the two types of collateral it held for Ames' obligations – the Bond and letters of credit – in whichever sequence Travelers wished.  Because neither the Bond, the letters of credit nor their proceeds are property of Ames' estate, the 2003 settlement did not impinge upon any rights of Ames or its bankruptcy estate.  Yet, since 2008 the Ames estate has endeavored, under various theories, to convert the Trust Monies to its benefit.  Tellingly, the Report confirmed that the Trust Monies are *not* property of the Ames bankruptcy estate [*Report*, pp. 29, 39].

By contrast, the Liquidator has a presently protectable and legally cognizable residuary interest in the Trust Monies under the operative agreements – the Bond,[6] the Trust Agreement[7] the Travelers/Ames November 1, 2000 insurance program agreement,[8] and the Letter Agreement.[9] Under Connecticut law, which governs the Bond, the Trust and Ames' agreements with Travelers [Trust, Appx. p. 352, ¶ 11; Bond, Appx. p. 322, ¶ 6], interests such as that of the Liquidator are legally cognizable as "vested remainders subject to complete defeasance," or "contingent remainders," rather than an unenforceable mere "expectancies." *Gaynor v. Payne,* 261 Conn. 585 (Conn. 2002); *O'Neil v. Fleet National Bank (In re Britton),* 300 B.R. 155 (Bankr. D. Conn. 2003).  Thus, Ames' assertion of claims with "bankruptcy" labels to effectuate

---

[6] Bond, Appx. p. 321, ¶ 2.

[7] Trust Agreement, Appx. p. 351, ¶ 9(c).

[8] November 1, 2000 Agreement, Appx. pp. 399-400 at ¶ 3(a).

[9] Letter Agreement, Appx. p. 341 at ¶ 5.

an improper taking of the Lumbermens' estate's rights and property is unfounded in the facts or

law, and under the dictate of McCarran-Ferguson should not be heard by this Court.

Accordingly, upon *de novo* review, this Court should grant Lumbermens' cross-motion.

**Section I**
**The Report's Recitation of "Facts" Is Materially Erroneous**

The Report's recitation of allegedly undisputed facts distorts both the factual context of

the jurisdiction motions and the true content of the operative documents.  For a comprehensive

review of the actual facts, we refer the Court to Lumbermens' submissions on the cross-

motions.[10]  The most significant errors in the Report's "facts" are discussed below.

**The Bond**.  The Report wrongly suggests there was a November 2000 "contract" between

Lumbermens and Ames for the issuance of a surety bond of "up to $14.35 million," called a

"Bond Agreement"; no such agreement exists.  Actually, Ames had used the term "Bond

Agreement" in its Second Amended Complaint to create the misimpression that Ames had rights

in the Bond.[11]   In fact, Lumbermens, as surety, issued a surety bond in the amount of $14.35

million on November 1, 2000 in favor of Travelers, as obligee, on behalf of Ames, as principal.[12]

In connection with the issuance of the Bond, Ames executed a General Indemnity Agreement

dated July 26, 2000 ("GIA"),[13] providing that Lumbermens had the exclusive right to determine

how claims against its bonds should be "compromised, resisted, defended, tried or appealed,"

and that Lumbermens' decision was "final and binding" on Ames.[14]  The Bond further stated that

---

[10] Lumbermens' Moving Brief, pp. 2-16, 23-26, 31-33, 33-36; Appx. 688 et seq.; Lumbermens' Reply Brief, pp. 1-5, Appx. 784-88; Supplemental Reply Brief, pp. 1-3, 6-11, Appx. 864-68, 869-74.

[11] In Ames' pleading the term "Bond Agreement" refers to the Bond itself. Appx. p. 550, p. 7, ¶ 26.

[12] Bond, Appx 81-83; Lumbermens' Moving Brief, p. 2, Appx. 697.

[13] General Indemnity Agreement, Appx. p. 327, ¶ "5", "Surety's Rights Re: Claims".

[14] Appx. pp. 327-28, ¶"2" ("Surety's Consent To Changes"), and ¶ "10" ("Indemnitors' Waiver Of Notice").

"The Principal [*i.e.*, Ames] shall not at any time have any rights or property interests in this Bond, the Bond Collateral or other proceeds of this Bond."[15]

The Bond did *not* require Lumbermens to pay within seven business days of Travelers' demand if Travelers made a non-conforming demand, which it did.[16]  It is undisputed that the Bond was drafted by Travelers, *not* by Lumbermens, and thus any ambiguity on this point would be resolved in favor of Lumbermens.[17]  The Report treats the single sentence providing for "seven-day" payment as if it were the entire content of the Bond.  In fact, paragraph "2" of the Bond set forth several conditions for a "full penal sum" demand, such as that made by Travelers, with which Travelers did not comply despite requests from Lumbermens.[18]  Bond proceeds paid in response to a paragraph "2" demand were defined as "Bond Collateral," only to be applied to Ames' obligations from time to time upon Ames' default to Travelers (which never occurred), *not* to be applied to Ames' obligations all at once.  According to the Bond, any unapplied Bond Collateral *must be returned to Lumbermens.*[19]

Rather than being a general "backstop" for all Ames' obligations to Travelers, the Bond expressly identified which existing "Obligations" of Ames to Travelers were secured by the Bond.  However, contrary to the Bond's representation that agreements existed defining those "obligations," no such agreements existed at the time the Bond was issued.[20]  The Bond's misrepresentations from Travelers (its drafter) to Lumbermens, and Travelers' non-conforming

---

[15] Bond, ¶ "2," last sentence (Appx. p. 81).

[16] See Lumbermens' Moving Brief, pp. 3-7, Appx. 698-702.

[17] See Lumbermens' Moving Brief, p. 5, n.8; Appx. p. 700.

[18] See Lumbermens' Moving Brief, p. 5, notes 7 and.8; Appx. p. 700.

[19] Bond, ¶ "2," (Appx. p. 81)

[20] See Lumbermens' Moving Brief, p. 5 (esp. n. 9 and 10), Appx. 700.

demand, provided Lumbermens with significant potential defenses to Travelers' demand.[21] Since Ames' position (adopted by the Report) is grounded upon the false contention that Lumbermens breached the Bond by not immediately paying $14.35 million to Travelers upon demand, the existence of these defenses undermine the Report and Ames' claims.

The Report errs in describing Lumbermens' right to be reimbursed by Ames for any loss under the Bond as unsecured in the event of a future Ames bankruptcy [Report, pp. 3-4].  From the outset, Lumbermens, as a surety, was protected by its right of equitable subrogation to all rights of Travelers, which also held letter of credit collateral from Ames. Accordingly, it is irrelevant whether Lumbermens was secured in its own name or as subrogee of Travelers.

**Events During Ames' Bankruptcy**.  The Report wrongly states that Ames provided two post-petition letters of credit for Travelers' continued "administration" of its pre-petition insurance programs.  [Report, pp. 3-4]. Actually, Ames "replaced" the $12.5 million letter of credit that Travelers had held pre-petition as collateral for insurance years 1998 – 2001, and Ames then *later* provided an *additional* letter of credit for $14.6 million pursuant to Ames' post-petition, November 2001 Agreement for an additional year of insurance and related services.[22]

**The Original Pre-Petition Letter of Credit Was Replaced Post-Petition**.  The pre-petition agreement between Ames and Travelers for the insurance year November 1, 2000 to November 1, 2001 required collateral of two kinds: the Bond and a letter of credit.[23]  The Agreement left to Travelers' discretion the sequence in which it would look to its collateral.[24]

---

[21] See Lumbermens' Moving Brief, pp. 4-7, Appx. 699-702; Oral Argument, Tr.64:1-65:8, Appx. 1029-30.

[22] Lumbermens Deposition Ex. 19, 2001-2002 Program Agreement, p.9; Exhibit "A" to these Objections.

[23] November 1, 2000 Agreement, Appx. pp. 375 – 410 at p.7, Appx. 382.

[24] November 1, 2000 Agreement, Appx. pp. 375 – 410.  This was acknowledged by the attorney for Ames' creditors committee at the November 5, 2007 hearing before the Bankruptcy Court.  Committee

The original letter of credit was issued by Bank of America ("BOA") in February 2000.[25]

Eventually, BOA issued a non-renewal notice for its letter of credit to Travelers, by which the

BOA letter of credit would expire on October 31, 2001.[26]

Following the August 20, 2001 filing of Ames' bankruptcy petition under Chapter 11, the

Bankruptcy Court issued various "first day" orders, including one authorizing the continuation of

Ames' insurance programs and agreements with Travelers.[27] On October 11, 2001, the

Bankruptcy Court approved a Stipulation between Ames and Travelers for the *replacement* of

the BOA letter of credit with a substitute issued under Ames' post-petition DIP lending facility

with GECC.[28]  Separately, on or about November 1, 2001, Ames and Travelers entered into an

agreement for an additional year of post-petition insurance and services, which recited the

collateral already held by Travelers and required an additional letter of credit in the amount of

$14.6 million (Ex. A to these Objections, p. 9, "Collateral Requirement").

Accordingly, by late 2001, Travelers held $26.85 million in letter of credit collateral, and

Travelers' position was that both letters of credit (as well as the Bond) stood for all obligations

of Ames, whether arising pre-petition or post-petition.[29] This position was later echoed by Ames

in its Second Amended Complaint.[30]

**Lumbermens' Proofs of Claim.**  The Report notes that Lumbermens' original proof of

---

counsel Hazan at 11/5/07 Tr. 18:18-20, Appx. p. 470 ("Travelers has a right to call upon whichever pot it
needed to address the responsibilities it had whether it was the letters of credit or the surety bonds.")

[25] Letter of Credit, Exhibit "B" to these Objections.

[26] Lumbermens Deposition Ex. 39, letter from Travelers to Ames dated September 13, 2001 (Exhibit "C"
to these Objections).

[27] ECF#17, Case No. 01-42217-cgm, filed 8/20/01.

[28] Exhibit "D" to these Objections, [ECF 372 and 372-1 in Ames' main bankruptcy case, 01-42217-cgm].

[29] Testimony of LaLiberte, 76:14-81:23 (esp. at 80:19-81:23), Exhibit "E" to these Objections).

[30] See Ames Second Amended Complaint, ¶29, n.6, Appx. 550.

claim was "unsecured," by way of suggesting that Lumbermens improperly attempted, in the Letter Agreement, to transform itself from an unsecured to a secured creditor. While Lumbermens' original, 2002 proof of claim (filed before Travelers' demand) was "unsecured," Lumbermens need not have filed a "secured" claim in order to assert its rights as subrogree of Travelers, including the right to draw upon the letters of credit Travelers held. Counsel for Ames admitted as much upon questioning from the Bankruptcy Court.[31]

**Travelers' Demand**. Travelers' May 3, 2003 demand on the Bond did not conform to the Bond's requirements**.** Travelers refused Lumbermens**'** requests for information that would cure the demand's defects,[32] and Travelers instead filed suit against Lumbermens. Ames and its outside counsel were aware of Travelers' suit almost immediately, and took no action to intervene or become involved in the action, and never asserted that any rights of Ames were affected.**[33]**

**The Letter Agreement**. The Report inaccurately interprets the Letter Agreement that settled the Travelers-Lumbermens suit. This includes an unfounded suggestion that it included a term intended to exhaust Ames' "cash collateral." [Report, p. 6, subp. 3(iii)].[34]

A fair description of the "essence" of the Letter Agreement is that two non-debtors, a surety (Lumbermens) and its obligee (Travelers), settled a bond claim dispute over which Ames had contractually given Lumbermens exclusive and binding discretion. Lumbermens exercised that discretion by (a) making an agreement regarding the Bond, Bond proceeds and Bond

---

[31] June 30, 2015 Oral Argument, Appx. pp. 1103-1104, Tr. 138:22–139:18. Lumbermens' Amended Proof of Claim filed thereafter claimed subrogation to Travelers rights, including Travelers' rights as a creditor of Ames and as beneficiary of the letters of credit. See Amended Proof of Claim, Exhibit "F" to these Objections.

[32] Lumbermens Moving Brief, Appx. 698–702.

[33] Lumbermens Moving Brief, Appx. 703-705.

[34] Contrary to the Report's statement (p. 5), the Bank of New York, as Trustee, was not a party to the Letter Agreement. Letter Agreement, Appx. pp. 339-342.

collateral, as well as the letters of credit and their proceeds, *none* of which were property of the principal [Ames] or its estate; (b) establishing how Travelers would exercise its discretion and decide which of its collateral it would look to first; and (c) memorializing Lumbermen's right of equitable subrogation and Travelers' duty not to impair those rights in collateral held by Travelers.  Travelers, the only party entitled to receive performance under the Bond, informed the Bankruptcy Court that in Travelers' view the Letter Agreement was a "good result."[35]

Pursuant to the Letter Agreement, the funds in the Trust were to be held as "proceeds of Collateral," meaning that the monies were *not* to be immediately applied to any outstanding obligation of Ames; they would not "pay down" any debt of Ames to Travelers, but would be held against the eventuality of an Ames default in payment.  Thus, the Trust Monies remained "Bond Collateral" as defined in paragraph "2" of the Bond – funds in which Ames had no property rights or interest.[36] Under the November 1, 2000 Agreement between Ames and Travelers, such monies had to be returned to *Lumbermens* if not applied to obligations of Ames.[37]

There is no foundation whatever for the Report's statement that the Letter Agreement provided for the exhaustion of Ames' cash collateral.  The Liquidator expressly disputed this very allegation below.  Supplemental Letter Brief, p. 1-2, Appx. 936-37. The Letter Agreement merely incorporated the very discretion Ames had ceded to Travelers to decide to look to the letters of credit first.  Paragraph "2" of the Letter Agreement provided that Travelers would not draw upon the Trust Monies unless it had first drawn upon the letters of credit and the proceeds thereof proved insufficient to satisfy Ames' obligations; at that point, Travelers could draw upon the Trust Monies "in an amount sufficient to satisfy the Obligations" (*i.e.,* not the entirety of the

---

[35] 11/5/07 transcript, Tr. 31:17 – 32:1, Appx. pp. 483-484.

[36] See Bond, Appx. 81, 321.

[37] November 1, 2000 Agreement, ¶3(a); Appx. 399-400.

Trust Monies, but only that part necessary to satisfy any deficiency).[38]  As discussed below, since neither the letters of credit nor their proceeds were property of the estate, they were not subject to the automatic stay.

The Report's footnoted description of two scenarios in which Travelers allegedly would *not* have to return the Trust Monies to Lumbermens is incorrect, confusing the paragraphs of the Letter Agreement. Contrary to the Report (n.15), Letter Agreement paragraph "5" deals only with Travelers' agreement to make interim calculations of Ames' obligations and periodically adjust collateral requirements; it was *this* obligation of which Travelers would be relieved if either of the events described in subsections "(a)" or "(b)" of the second paragraph of paragraph "5" occurred (*i.e.,* Travelers' claim against Ames was subject to challenge of any sort, or Lumbermens was the subject of an insolvency, liquidation, rehabilitation or similar proceeding).

The first paragraph of paragraph "5" of the Letter Agreement provides that once Ames' obligations are terminated or satisfied, Travelers will *first* return to Lumbermens all remaining proceeds of the letters of credit until Lumbermens has been fully reimbursed, and only then will Travelers return the balance of any letter of credit proceeds it holds to the letter of credit issuers. This does nothing more than memorialize the operation of equitable subrogation (*see* discussion *infra,* p. 21-22).  Nothing set forth in paragraph "5" affects the provisions of the Trust Agreement, the Ames/Travelers insurance agreement or the Bond, all of which require that any unused Trust Monies be returned to Lumbermens.

The Report mistakes the purpose and scope of paragraph "6" of the Letter Agreement.[39]

---

[38] Both Travelers and Ames took the position that all of Travelers' collateral, including all pre- and post-petition bonds and letters of credit, secured all of Ames' obligations to Travelers whenever those obligations had arisen.  See Ames Second Amended Complaint, ¶29, n.6, Appx. p. 550; Testimony of LaLiberte, 76:14-81:23 (esp. at 80:19-81:23), Exhibit "E" to these Objections).

[39] Report at n. 15, second full sentence.

Paragraph 6 is clearly intended to allow Travelers to comply with a court order directing the return of the letter of credit proceeds in a manner different from that set forth in paragraph "5." Critically, paragraph "5" only deals with the return of excess proceeds of *letters of credit,* not the return of the Trust Monies.  And nothing in paragraphs 5 or 6 provides any court with power to generally impair contractual rights by rewriting the agreements made by the parties.

Finally, the Report misleadingly states that "Ames' cash collateral was indeed drawn upon when the letters of credit were tapped."[40] In fact, the only time that any of the letters of credit were "tapped" was pursuant to the December 2008 "Final Settlement" order.

**The Adversary Proceeding and Ames Settlement With Travelers.**  Notably, Ames' initial adversary Complaint, filed two years after Ames' counsel received a copy of the Letter Agreement,[41] does not contain any allegation of an automatic stay violation.[42]  The Report's broad, footnoted assertion that any steps intended to or resulting in a draw on cash collateral are barred by the automatic stay [Report, p.8, n. 18] is, of course, inapplicable to letters of credit." *See* discussion, *infra,* p. 20.  There is no support for an unlimited, "butterfly effect" application of the automatic stay (*i.e.,* the stay does not reach every event or transaction that might not be beneficial, or that might be detrimental, to the estate).

While it is correct that "Lumbermens did not appeal the 2007 Decision," the 2007 Decision did "not materially prejudice" Lumbermens' interests (Report, pp. 7-8).  The Bankruptcy Court's ruling preserved Lumbermens' rights of equitable subrogation by assuring

---

[40] Report p. 6, final sentence of "in essence" discussion.

[41] Ames' outside counsel received a copy of the Letter Agreement from Travelers' outside counsel no later than August, 24, 2004. See Letter, Appx. 452; Lumbermens' Moving Brief, pp. 9-10, Appx. 452-53.

[42] Original Adversary Complaint filed November 3, 2006, Appx. 506-23. It is incorrect that Ames' Original Complaint [Report p. 7, subparagraph (iii)] sought damages against Travelers for breach of the "Bond Agreement"; it sought damages for Travelers' alleged breach of the insurance policies [Complaint, ¶77, Appx. p. 523], and the term "Bond Agreement" never appeared in that Complaint.

that Travelers would still hold letter of credit collateral in excess of Ames' total obligations to

Travelers.[43]  It is equally true that Ames did not appeal from the 2007 Decision, as part of which

the Court ruled:

> I'm not at all sure that I have jurisdiction over a
> Travelers/[Lumbermens] dispute in this regard but each side can
> have a reservation of rights as to that as well … [Lumbermens] is
> of course right that Ames has no interest in the surety Bond and
> neither the Bond nor the letters of credit are property of the Ames
> estate.  This decision assumes the correctness of those assertions.[44]

**The December 2008 "Final Settlement".**  In 2008, after five years of negotiations, Ames

and Travelers agreed on a lump sum figure, $6,511,508, that Travelers would accept in order to

accept sole responsibility for all remaining exposure under the entire Ames insurance program

(an agreement witnesses referred to as  "loss portfolio transfer").  Ames moved for an order

directing *Travelers* to pay that amount to *Ames* from the Lumbermens Trust Monies, so that

Ames could then pay it over to Travelers ("Collateral Release Motion").[45]  It was this requested

relief to which Lumbermens objected, together with any suggestion that the deal would affect the

defenses or rights of Lumbermens.[46]  So that the deal could go forward despite the dispute, an

order was negotiated and presented to the Bankruptcy Court (the "Final Settlement" referred to

in the Report), under which the buy-out amount would be drawn by Travelers from the

remaining letter of credit (the only such draw that occurred), the cash collateral supporting the

---

[43] 11/5/2007 Hearing Transcript, Tr.49:4 – 18, Appx. 135.

[44] Report pp. 7-8.

[45] See Lumbermens' Moving Brief, Appx. 726-727; Gamell Aff. Ex. HH, Appx. 655-687.

[46]  For example, under the settlement Ames' obligations to Travelers had not in fact been "fixed" – the
figure was, in effect, a negotiated buy-out and not a mathematic calculation of Ames obligations.
Lumbermens did not agree to be bound by the figure, which included contingency amounts insisted upon
by Travelers. Also, part of the Final Settlement was the settlement of Travelers' proof of claim in the
Ames bankruptcy, which included assertions by Travelers of administrative priority and other rights with
respect to the insurance programs, which Lumbermens demanded be preserved for its benefit.

rest of the letter of credit was released, and Ames and Lumbermens reserved their respective rights in great detail.[47]

Importantly for these proceedings, the 2008 Order reserved the rights of all parties as if the "Approval Events" set forth in the Order had not occurred.[48]  Thus, for purposes of this adversary proceeding, the status is as if Ames and Travelers have agreed to a "loss portfolio transfer" for approximately $6.5 million but it has not been paid; Travelers still holds one letter of credit in the amount of $13,350,000;[49] Travelers still has its administrative claim, priority and other creditors' rights against Ames' estate intact; the Letter Agreement and Trust are still in full force and effect; and Lumbermens still has all of its arguments based upon the rights of Travelers to which Lumbermens will become subrogated if it is required to sustain a loss, including Travelers' rights to draw upon the remaining letter of credit.[50]  Thus, if Lumbermens' Trust Monies were used to pay Travelers the $6.5 million buy-out, then Lumbermens, exercising its rights as subrogee of Travelers, would be reimbursed from the remaining $13.35 million letter of credit, resulting in no net benefit to the Ames estate.

**The Second Amended Complaint.**  The Report's summary of the claims originally set forth in Ames' Second Amended Complaint (of which 7 remain) is deficient and should not be

---

[47] See 12/15/08 Order, filed 12/28/08, Appx. 536-43.

[48] Report, p. 9 at n. 23; 12/15/08 Order pp. 3 et seq., Appx. 538-42.

[49] See ¶ "M" of "Stipulation Regarding The Allowance, etc.", November 25, 2008, Appx. pp. 172-187 at 176, ¶M.

[50] To the extent that the Travelers' insurance program was a post-petition agreement, then Travelers' right to be reimbursed from the estate did not rely solely upon the letters of credit; all costs of the program were post-petition administrative expenses required to be paid in full under bankruptcy law.  In that case, and upon any payment under the Bond, Lumbermens would become subrogated to Travelers' administrative claim rights to full reimbursement directly from the estate as a post-petition administrative creditor.  Accordingly, to the extent this matter is not disposed of based upon Lumbermens' equitable subrogation rights to the letters of credit, the bankruptcy claim rights Travelers possessed immediately prior to the approval of the 2008 Final Settlement are relevant.

relied upon in place of reviewing Ames' actual pleading.  For example, omitted from the Report's discussion is note 6 of that Complaint, alleging that the Bond covers past, present and future "obligations" under the Ames/Travelers insurance program, and is not limited to any one policy year.  This disputed allegation that the Bond, issued pre-petition in connection with the insurance year commencing November 1, 2000, also stands as collateral for Ames' post-petition November 1, 2001 insurance agreement with Travelers, is at the heart of the dispute regarding the "administrative" claim filed by Lumbermens and referred to elsewhere in the Report.

Regarding Lumbermens' own pleadings, the Report omits that Lumbermens' Amended Answer disputed many of the allegations of Ames' Second Amended Complaint, in many cases with quotations or citations to provisions of operative documents disproving many of Ames' allegations.[51]  The Report also leaves the misimpression that Lumbermens' Amended Counterclaim sought to independently invoke the jurisdiction of the Bankruptcy Court to effectuate an affirmative recovery from Ames.  In fact, Lumbermens' counterclaims including subrogation, setoff, recoupment, contribution and similar theories arising from the allegations in Ames' pleading, were all asserted by way of defense. *See* Amended Answer, Appx. 605-14.

Neither were Lumbermens' administrative priority claims anything other than defensive in nature.  The Report suggests that these claims, referenced in Lumbermens' Answer, were efforts to obtain independent affirmative recovery from Ames' estate, but the Report overlooked the allegation in Ames' Second Amended Complaint, note 6, discussed above.  If, as Ames alleged, the Bond stood as collateral for Ames' post-petition insurance obligations to Travelers, then Lumbermens would be entitled to administrative priority claim treatment to the extent that it paid

---

[51] Amended Answer, Appx. pp. 573-616.

for Ames' post-petition obligations or to the extent of unpaid annual premiums for the Bond.[52]  It was against this background that counsel for Lumbermens made the statement quoted at the top of p. 12 of the Report regarding the interconnection between Ames' allegations against Lumbermens and Lumbermens' administrative priority claims.  Moreover, the Report fails to mention that the Liquidator offered to remove the administrative priority claim issue from this dispute by withdrawing any such claim for affirmative recovery from the Ames estate should the adversary proceeding be transferred, dismissed or stayed.[53]

**Lumbermens' Illinois Rehabilitation Proceedings.**  The Report's description of the evolution of Lumbermens' financial difficulties and the entry of the "Rehabilitation Order" are both inaccurate [Report, pp. 12-13] and revelatory of the Bankruptcy Court's failure to seriously consider Illinois' legitimate state interests with respect to Lumbermens.  Lumbermens' financial difficulties did not first arise in 2012, as the Report suggests.  As narrated in the Rehabilitation Order,[54] a series of "agreed corrective orders" were entered beginning in February 2003 between the Illinois Department of Insurance and Lumbermens.  Pursuant to the terms of the Corrective Orders, Lumbermens commenced a voluntary run-off in 2003.[55]

From 2004 onwards, Lumbermens operated under a Run-Off plan filed and updated with the Department of Insurance, under whose oversight Lumbermens was operated. The scope of the Department's oversight was described in the Rehabilitation Order (§§ "I" through "Q"), and included the involvement of the National Association of Insurance Commissioners ("NAIC")

---

[52] The Report erroneously describes Lumbermens' two administrative proofs of claim as relating to "rights and obligations under the Bond Agreement, the Indemnity Agreement and the Customs Bond." Report p. 11.  The Customs Bond matters were settled and removed from the litigation [Adv. Pro. 06-01890 ECF # 49 filed 7/7/11].

[53] Lumbermens Reply Brief, Appx. p. 800; June 30, 2015 Oral Argument, Appx. p. 1089:7-13.

[54] Appx. pp. 620-637, at pp. 626-629, ¶¶ "G" through "R".

[55] Agreed Order of Rehabilitation, p. 5, ¶ G, Appx. p. 626

"Lumbermens' Working Group," composed of representatives from State Insurance Departments of Illinois, California, New York, Texas, Pennsylvania, Florida, Massachusetts and New Jersey as states comprising a large majority of the business previously written by Lumbermens and affiliates.

In 2012, the Director determined that the Lumbermens run-off was no longer in the best interests of its policyholders, claimants and creditors, and determined that a rehabilitation should commence under Article XIII.[56] The July, 2012 Rehabilitation Order affirmed the Director (and his successors) as statutory Rehabilitator of Lumbermens and its affiliates, and incorporated the broad and sweeping powers and protections set forth in Article XIII (215 ILCS 5/187, et seq.), including the power to take immediate possession of all property, accounts and assets of Lumbermens and a broad array of both mandatory and negative injunctive relief (¶14 of the Rehabilitation Order) based upon the authority provided in, *inter alia,* 215 ILCS 5/189 ("Injunction").

As of May 10, 2013 Lumbermens was placed in Liquidation and the Rehabilitation terminated.[57] The "Order of Liquidation With A Finding Of Insolvency" incorporated powers for the Liquidator and injunctions similar to those in the Rehabilitation Order, but added, among other things, the effective date of the Order as the date on which the rights of all persons against the Lumbermens estate were "fixed" (215 ILCS 5/194).[58] In addition, upon the filing of the Order of Liquidation, the responsibility of the state insurance guaranty funds of some 42 states for the payment of claims was triggered under each respective state insurance guaranty fund

---

[56] Affidavit of Andrew Boron, Appx. pp. 778-79.

[57] Lumbermens did not "convert" its proceedings from rehabilitation to liquidation under Article XIII as the Report states (Report, n.3). *See* Order of Liquidation dated May 8, 2013 (Exhibit "G" to these Objections).

[58] Order of Liquidation With A Finding Of Insolvency, Exhibit "G" to these Objections, at p. 5, ¶D.

statute.[59] This multi-year, complex involvement of Illinois and multiple state regulators and guaranty funds, was omitted from the Report.

## Section II

## Objections To The Report's Discussion of "Jurisdiction"

The Report completely failed to apply the correct standard of proof applicable to these Motions. The Liquidator made not only a facial, but also a factual challenge to jurisdiction.[60] As stated in *International Diamond Importers, Inc. v. Oriental Gemco (NY), Inc.,* 2014 U. S. Dist. Lexis 164567 (S.D.N.Y. November 24, 2014) [*(Appx. pp. 960-61)*]:

> "When . . . the defendant challenges the factual basis for the plaintiff's assertion of jurisdiction, '[j]urisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'"[48] [[48] *Jordan v. Verizon Corp.*, 391 Fed. App'x 10, 12 (2d Cir. 2010) (quoting *APWU v. Potter,* 343 F.3d 619, 623 (2d Cir. 2003)).] "In deciding the motion, the court 'may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [it] may not rely on conclusory or hearsay statements contained in the affidavits.'"[49] [[49] *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills,* 701 F. Supp. 2d 568, 580-81 (S.D.N.Y. 2010) (alteration in original) (quoting *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004)).]
>
> See*, also, McNutt v. General Motors Acc. Corp.,* 298 U.S. 178, 189 (1936), "If his allegations of jurisdictional facts are challenged by his adversary in any appropriate manner, he must support them by competent proof."

Thus, on these Jurisdiction Motions, contrary to the approach taken in the Report, this Court "should refrain from drawing inferences favorable to the party asserting jurisdiction." *Standard Investment Chartered, Inc. v. N.A.S.D.,* 621 F.Supp. 2d 55, 65 (S.D.N.Y. 2007).

The Report further failed to analyze the sufficiency of Ames' pleaded claims in light of *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), as part of its jurisdictional analysis and determination of

---

[59]  Liquidator's Supplemental Memorandum, p. 14, Appx. 877.

[60] See oral argument, 57:21 – 58:24, Appx. 1022-23; Lumbermens' Supplemental Letter Brief, p.2-3, Appx. 960-961.

McCarran-Ferguson reverse preemption.[61] The Report also ignored the Liquidator's step-by-step deconstruction of each of Ames' claims, demonstrating their lack of factual and legal merit and pleading deficiencies.[62] As a "threshold matter of justiciability," the Court must consider whether the debtor has standing to assert the causes of action alleged in its pleading. *The Majestic Star Casino, LLC v. Barden Development, Inc. (The Majestic Star Casino, LLC),* 716 F.3d 736, 747 (3d Cir. 2013). The Liquidator submits that as part of this Court's de novo review of the cross-motions, the Court should perform the proper factual inquiry, not only as a procedural matter, but in weighing the countervailing state and federal interests presented.

The Report's lengthy discussion (pp. 14-20) of the various types of federal bankruptcy jurisdiction is irrelevant, given this Court's prior withdrawal of the reference. Accordingly, the Report's discourse on core/ non-core distinctions is of no application here. The Report cited no authority suggesting that the different "types" of bankruptcy jurisdiction are accorded different treatment under McCarran-Ferguson, incorrectly attempts to reject the rule that bankruptcy jurisdiction "shrinks" once bankruptcy plan confirmation has occurred [Report, n.52].[63]

**Claims # 1 and # 2 - Ames Lacks Standing To Assert Breach of Contract**. The Report utterly ignored the unambiguous provisions of the Bond and the GIA, in upholding jurisdiction over Ames' two "contract" claims (Claim #1 and #2) alleging that Lumbermens' settlement with Travelers breached duties owed by Lumbermens to Ames under the Bond. Even absent the broad waiver of rights in the Bond, and the grant of discretionary claim settlement power in the GIA, there is no legal foundation for a principal to sue its own surety for damages under a surety

---

[61] See Lumbermens Moving Brief, Appx. pp. 734-738; Lumbermens Reply Brief, Appx. pp. 789-792.

[62] See Lumbermens' Moving Brief, Point IV, pp. 39-43, Appx. pp. 734-738.

[63] This Court should reject the Report's effort to reject *Celotex Corp. v. Edwards,* 514 U.S. 300, 308 n.6 (1995) regarding diminishing bankruptcy jurisdiction following plan confirmation. *See, e.g., Putnam County Sav. Bank v. Bagen (In re Bagen),* 1 85 B.R. 691, 700 (Bankr. S.D.N.Y. 1995).

bond based on the surety's mitigation of its loss by avoiding payment of the full penal sum.[64]

**Claim #3 – Unjust Enrichment.**  An unjust enrichment claim cannot be asserted where there is a contract governing the parties' relationship, or some other more common cause of action.[65]  Ames' relationship with Lumbermens was governed by contract – the Bond (with its waiver of rights) and GIA, both of which conclusively negate a possible unjust enrichment claim.

**Claim # 4 – Civil Contempt Sanctions for Automatic Stay Violation.**  As described in the Report, Ames' Claim # 4 for civil contempt under 11 U.S.C. 105(a) for alleged violation of the automatic stay rests on the flawed proposition that the Letter Agreement improperly affected two types of property of the Ames estate: (1) Ames' supposed "bundle of rights" in the "Bond Agreement," and (2) the cash collateral Ames pledged to support the letters of credit held by Travelers.  The Report identifies no such "bundle of rights" or their source, and the Bond itself refutes the suggestion that Ames had any such rights in the Bond.  When Ames signed the Bond, it agreed to a broad waiver of any potential rights in the Bond or its proceeds.  The Report never deals with this waiver, or explains how an undefined "bundle of rights" could survive it.  Furthermore, the particular "bundle of rights" the Report creates are directly contrary to the express rights granted to Lumbermens by Ames in the GIA, including the right to settle or compromise claims under its Bonds in its sole discretion, and the right to modify the Bond.  In light of Ames'express waiver of rights in the Bond and its proceeds, the Reports' fabrication of a "bundle of rights" in favor of Ames is patently improper, and negates rights that Ames

---

[64] *See,* Lumbermens Moving Brief, pp. 39-41, Appx. 734-36.

[65] *See, e.g., Greenwich Ins. Co. v. Greenwich St. Capital Partners II (In re Metro Affilaites, Inc.),* 2008 Bankr. LEXIS 752 (Bankr. S.D.N.Y. Mar. 6, 2008); *Auto Glass Exp. Inc. v. Hanover Ins. Co.,* 293 Conn. 218, 975 A.2d 1266 (2009); Lumbermens Moving Brief, pp. 41-42, n. 57, Appx. 736-37.

contractually granted to Lumbermens.[66]

As for the other property allegedly interfered with by the Letter Agreement – Ames' "cash collateral" supporting the letters of credit held by Travelers – the letters of credit represented the independent obligation of the issuing bank, and neither the letters of credit nor their proceeds are property of Ames bankruptcy estate.[67] *Enron Power Mktg v. Calif. Power Exchange Corp. (In re Enron Corp.),* 2007 U.S. Dist. LEXIS 73638 at *12-13 (S.D.N.Y. September 21, 2007)(McMahon, J.)(proposition that letters of credit and their proceeds are not property of the debtors' estates on whose behalf they were issued is "too well settled to warrant extended discussion"); *In re M.J. Sales & Distrib. Co.,* 25 B.R. 608, 613-615 (Bankr. S.D.N.Y. 1982).

The automatic stay does not bar a draw upon letters of credit even if they are collateralized with debtor's property.  *Keene Corp. v. Acstar Ins. Co. (In re Keene Corp.),* 162 B.R. 935, 942 (Bankr. S.D.N.Y. 1994) (letter of credit is an independent third party obligation, and the proceeds are not the debtor's property even if the letter of credit is secured by the debtor's property).

Furthermore, Ames' insurance program agreements gave Travelers unfettered discretion as to which of its two separate pools of collateral it would draw upon first.[68]  In the Letter Agreement, Travelers simply agreed with Lumbermens as to how it would exercise that discretion, in a manner consistent with Travelers' duty, as bond obligee, not to impair its collateral.[69]

---

[66] *New Eng. Dairies, Inc. v. Dairy Mart Convenience Stores, Inc.* (*In re Dairy Mart Convenience Stores, Inc.*), 351 F.3d 86, 91-92 (2d Cir. 2003)

[67] November 5, 2007 Hearing, Tr. 49:19-22, Appx. 135.

[68]November 1, 2000 Agreement, p. 24, ¶2 (c), Appx. 399; November 1, 2001 Agreement, p. 22, ¶2 (b) (Exhibit A hereto).

[69] *See, Connecticut National Bank v. Douglas,* 221 Conn. 530 (1992); *TD Bank, N.A. v ARS Partners Poplar Plains, LLC,* 2010 Conn. Super. LEXIS 232 (Fairfield Superior Court, February 2, 2010);

**<u>Lumbermens' Right of Subrogation.</u>** Lumbermens' right of subrogation to the rights of Travelers is well-established. *In re Wingspread Corp.,* 145 B.R. 748, 787-88 (S.D.N.Y. 1992), *aff'd* 992 F.2d 319 (2d Cir. 1993). Lumbermens' subrogation rights bring about the same result as the Letter Agreement. The Letter Agreement merely memorialized those rights and the Bond's terms, and therefore the Letter Agreement caused no damage to the Ames estate.[70] The Report suggests that the Ames' estate was damaged by Lumbermens' settlement with Travelers, because (a) Lumbermens did not pay the Bond's full penal sum to Travelers, and (b) Lumbermens agreed with Travelers that letter of credit proceeds would be used to pay for an Ames default before a draw upon the Bond or the Bond Proceeds (*i.e.,* Trust Monies), and (c) Lumbermens would be made whole from any remaining letter of credit proceeds. In fact, the exact same results would have obtained in the absence of the Letter Agreement.

Had Lumbermens paid the entirety of Travelers' 2003 "full penal sum" demand, the Bond (paragraph 2) required that the funds would still have been held by Travelers as "Bond Collateral" (*i.e.,* not immediately applied to Ames' obligations unless Ames defaulted, and then only so applied if Travelers, in its discretion, chose to do so). Under that same Bond paragraph, any unapplied proceeds would be returned to Lumbermens (not to Ames). Moreover, under the law of subrogation, Lumbermens would have become entitled to exercise Travelers' rights in the letters of credit to reimburse itself for its loss (and Travelers at all times held sufficient letters of credit to make Lumbermens whole for any loss).

The same result obtains based on the "fiction" maintained for this adversary proceeding in

---

*Restatement 3d of Suretyship & Guaranty,* §37 (1996).

[70] Lumbermens' equitable subrogation rights were emphasized in its main brief on the Motions, pp. 36-39, Appx. pp. 731-34, and again at oral argument Appx. pp. 1061-66 at Tr. 97:24-101:9, but were ignored in the Report.

the "Final Settlement."[71]  By operation of equitable subrogation (expressly recognized and preserved in the 2008 Order), if the Court were to direct that the Trust Monies be used to pay the $6.5 million settlement between Ames and Travelers, then Lumbermens would immediately become entitled to exercise Travelers' right to draw upon the remaining $13.5 million letter of credit to reimburse Lumbermens for its $6.5 million loss.  Accordingly, the Ames estate would be in exactly the same place with or without the Letter Agreement.

For the same reasons, even if the Letter Agreement constituted a technical violation of the automatic stay (which it does not), there was no resulting damage to the Ames estate, and therefore no basis for an award of civil contempt damages; the rule of "no harm, no foul" applies.[72]  The Letter Agreement merely recognized and preserved the "*status quo*" of Travelers' and Lumbermens' rights as against each other, and so does not constitute an actionable stay violation.[73]  In any event, since the Ames bankruptcy case is essentially over, bankruptcy court jurisdiction is not exclusive.[74]

**Claim # 5 – Declaratory Judgment Re: Trust Monies.**  The Report states that Claim # 5 is "essentially" requesting "a declaratory judgment determining that the Trust Monies are property of the estate under section 541" of the Bankruptcy Code [Report p.28].  If this claim does arise under §541, then the claim should have been dismissed since the Report concludes that the Trust Monies *are not* property of the Ames estate [Report, p. 29, 39].  Based on that finding, it is inappropriate for this Court to entertain federal bankruptcy jurisdiction under §541.

---

[71] *See* discussion at p. 13, *supra*.

[72] *Rushton v. Bank of Utah (In re C.W. Mining Co.),* 477 B.R. 176 (B.A.P. 10th Cir. 2012). *See also,* Lumbermens' Moving Brief, p. 27, n.44, Appx. 722.

[73] *See, In re Lyondell Chem. Co.,* 402 B.R. 596, 606-607 (Bankr. S.D.N.Y. 2009) (Gerber, J.).

[74] *See, MBNA Amer. Bank v. Hill*, 436 F.3d 104 (2d Cir. 2006) (auto-stay damage claim can be pursued outside bankruptcy court with no interference with ongoing bankruptcy case administration).

*Hassett BancOhio Nat'l. Bank, (In re CIS Corp.),* 172 B.R. 748, 757 (S.D.N.Y. 1994).

Furthermore, this claim, as pleaded, does not reference §541.  Rather, the claim erroneously

alleges that the Letter Agreement granted the court power to direct the return of the Trust Monies

in any manner the Bankruptcy Court wished, and requests that the court use its general equitable

power to direct the "release" the Trust Monies to Ames.  [Appx. 565-66, ¶¶ 177-18]. As

discussed *supra,* pp. 8-11, the Letter Agreement does not so provide.  Thus, the Report's

invocation of §541 gives this claim a bankruptcy "gloss" not found in the pleading, and to

entertain it would be contrary to the Second Circuit's admonition against utilizing general

bankruptcy powers as a "roving commission to do equity."  <u>*Smart World Techs., LLC v. Juno*</u>

<u>*Online Servs. (In re Smart World Techs., LLC),*</u> 423 F.3d 166, 183-184 (2d Cir. N.Y. 2005).[75]

**Claim #6 – Marshaling.**  The Report's discussion of Ames' "Claim #6" seeking

"marshaling" [<u>*Report, pp. 29-30*</u>] failed to consider that the requisite elements of "marshaling"

cannot be established in this adversary proceeding.[76]  Furthermore, "marshalling" is a common

law, equitable doctrine, and therefore should not be viewed as within the "exclusive" jurisdiction

of the Bankruptcy Court.  "Marshaling" applies where there are (1) two secured creditors of a

common debtor; (2) two funds belonging to the debtor; and (3) a senior creditor entitled to

satisfy its demand from both funds, in competition with a junior creditor entitled to resort to only

a single fund.  *In re Borges*, 184 B.R. 874, 879 (Bankr. D. Conn. 1995).  This dispute does not

involve these required elements.  *In re Borges, supra*, held that the "common debtor"

requirement renders marshaling unavailable in cases in which the two funds consist of an interest

---

[75] "This Court has long recognized that Section 105(a) limits the bankruptcy court's equitable powers, which must and can only be exercised within the confines of the Bankruptcy Code. It does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." 423 F.3d 166 at 185.

[76] See Lumbermens' Moving Brief, p. 43, *Appx. p. 738.*

in estate property and an interest in property of a non-debtor. *Id.* at 184 B.R. 879 n.3, (Bankr. D. Conn. 1995).[77]

**Claim # 10 – Equitable Subordination of Lumbermens' Claims.**  Ames' contention that Lumbermens' claims against the Ames estate should be equitably subordinated to the claims of other creditors due to Lumbermens' alleged "inequitable conduct" simply "piggybacks" on the allegations of Ames' earlier claims.  As the discussion above has shown, there was no inequitable conduct by Lumbermens, so this claim should fall if the merits of Ames' allegations are reviewed under the standard announced in *Ashcroft v. Iqbal.*[78]

## Section III

## The Report Mis-Construed And Mis-Applied The McCarran Ferguson Act

Section 2(b) of the McCarran-Ferguson Act "precludes application of a federal statute in face of state law 'enacted . . . for the purpose of regulating the business of insurance,' if the federal measure does not 'specifically relate to the business of insurance' and would 'invalidate, impair, or supersede' the State's law."  *Humana v. Forsyth*, 525 U.S. 299, 306-307  (1999); McCarran-Ferguson Act (15 U.S.C. §§ 1011–1015).   The McCarran-Ferguson Act states, in pertinent part, as follows, at 15 U.S.C. § 1012:

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or

---

[77] *See also Meyer v. United States,* 375 U.S. 233, 236-37 (1963), and Lumbermens Moving Brief p. 43, Appx. 738.  To the extent the Report suggests the expansion of the equitable doctrine of "marshaling" beyond its established elements and purposes, the Report improperly invokes § 105 to create new rights, power and remedies for the debtor in direct contravention of the Second Circuit's directives. *Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC),* 423 F.3d 166, 184 (2d Cir. 2005).

[78] While the Report is correct that the Ames Bankruptcy Court must rule on Lumbermens' claims against that estate, given the fact that little or no recovery is currently expected for unsecured creditors such as Lumbermens expected, and Lumbermens has already agreed to waive any affirmative recovery on its administrative claims, this claim should be stayed from proceeding under principles of abstention to avoid conflict with the Illinois insolvency proceedings.

which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance [except certain anti-trust laws].

"The primary purpose of a statute that distributes the insolvent insurer's assets to policyholders in preference to other creditors is identical to the primary purpose of the insurance company itself:  the payment of claims made against policies." *Dep't of Treasury v. Fabe*, 508 U.S. 491, 505–06 (1993).

**The Third Prong of the Fabe Test Is Satisfied In This Case.** Although utilizing the correct definition of "impairment" for purposes of applying the third prong of the *Fabe* test for McCarran-Ferguson preemption,[79] the Report improperly applied that definition to the facts of this case.

With respect to the heart of this dispute – the disposition of Lumbermens' $9 million trust deposit – the Report erroneously concludes that the federal court can determine the ownership dispute between Ames and Lumbermens because, among other things, (i) the federal court's determination of rights in that property would not invalidate, impair or supersede Illinois state insurance law; (ii) the property in dispute does not "belong" to either the Ames or Lumbermens estate until ownership is ruled upon; and (iii) until ownership is determined, the dispute is no more about property of the Lumbermens estate than it is about property of the Ames estate. [*Report*, p. 39].   Each of these conclusions is patently in error, and the Report does not properly evaluate the Liquidator's property interest in the Trust Monies or the importance of the various components of the Illinois statutory system.

**"Impaired" Illinois Statutory Provisions.** Article XIII provides for the issuance of broad injunctions against "all persons" or "entities" from bringing or continuing actions or proceedings, at law or in equity, against Lumbermens or its property except in the Illinois

---

[79] *See Humana,* 525 U.S. at 309-310.

Liquidation proceedings, and such an injunction was issued in both the Rehabilitation Order and the Liquidation Order of Lumbermens.[80] A companion provision of the Illinois statute fixed the rights of all parties against the Liquidation estate as of the date of entry of the Liquidation Order, May 10, 2013.[81] All claims that have not been liquidated prior to the date fixed by the liquidation court are to be "estimated" pursuant to the statute's procedures, under which no judgment taken after the date of entry of the Rehabilitation order is admissible to prove either liability or the amount of the claim.[82] Article XIII has vested in the Liquidator all right, title and interest to Lumbermens' assets, defined as including "trust deposits."[83] And the priority of distribution regime for distribution of Lumbermens' assets, which the Supreme Court of Illinois has held sets forth the *exclusive* remedy available for the distribution of any property from the insolvent insurer's estate, places any claim by a "creditor" such as Ames, no matter how denominated, several priorities beneath those accorded to *policyholders* and the expenses of administering the estate.[84]

Each of these provisions (as well as the entire comprehensive framework of which they are a part) would be "impaired, invalidated or superseded" by the Report's suggested continued exercise of federal jurisdiction over this adversary proceeding, whether to determine ownership of the Trust Monies or to determine and liquidate Ames' claims against Lumbermens. The purpose of the system created by Article XIII is obvious, as policyholder interests cannot be protected if estate assets can be dissipated through litigation costs across the country, and if post-

---

[80] 215 ILCS 5/189; Rehabilitation Order, Appx. pp. 622-637; Liquidation Order, Exhibit "G" to these Objections, pp. 5-6, para. F.

[81] 215 ILCS 5/194; Exhibit "G" to these Objections, p. 5, para. D

[82] 215 ILCS 5/209(8).

[83] 215 ILCS 5/191, 215 ILCS 5/187(6).

[84] (215 ILCS 5/205); *In re Liquidation of Security Casualty Co., supra*, 537 N.E.2d 775 (Ill. 1989).

liquidation piecemeal litigation can secure what are essentially "preferences" for creditors that would trump the priority accorded in Article XIII to policyholder claims.  It is just such a preference that Ames seeks, and which the Report would enable.  Most incomprehensible is the Report's suggestion that even though it acknowledges that the Trust Monies are not property of the Ames estate, the federal court may nevertheless proceed to determine ownership of Lumbermens' Trust Monies. The conflict with Article XIII embodied in that recommendation is palpable, as it would violate the Illinois statutory directive that estate assets may only be distributed through the liquidation court and pursuant to the statutory priority schedule of Article XIII, and that the Liquidator and his estate have sole ownership and possession of Lumbermens "assets," including "trust deposits."

**Cases Supporting Reverse Preemption In Property Ownership Disputes.** The Report ignored the McCarran-Ferguson preemption cases cited by Lumbermens holding that where property ownership is disputed between a federal bankruptcy estate and a state insurance insolvency estate, McCarran-Ferguson reverse preempts the bankruptcy court's exercise of jurisdiction – even where such bankruptcy jurisdiction is "exclusive."  These cases reason that to permit the bankruptcy court to award disputed property to a debtor – a mere general creditor of the insolvent insurer rather than a "policyholder" – would "impair" the state insurance insolvency statute's priority of distribution scheme and thus adversely affect the interest of policyholders.  Here the impairment of the Illinois statutory scheme is even more striking, since the Liquidator has a present and legally cognizable property interest in the Trust Monies under the controlling Connecticut Law, while the Report concludes that Ames does not (Ames has only "claims").

In *Logan v. Credit Gen. Ins. Co. (In re PRS Ins. Group, Inc.),* 294 B.R. 609 (Bankr. D.

Del. 2003), *aff'd* 2005 U.S. Dist. Lexis 22611 (D.Del. 2005), the bankruptcy court held that its

exercise of jurisdiction over an adversary proceeding seeking return of fraudulent transfers to the

debtor was reverse preempted because it could frustrate the Ohio state insurance liquidation

statute's policy of maximizing the return to policyholders.[85] [86] In *Logan,* the Delaware

Bankruptcy Court found that it was reverse preempted even though it had "exclusive"

jurisdiction over property of the debtors' estate, jurisdiction to determine what was property of

the debtors' estate, and jurisdiction to hear and decide preference and fraudulent conveyance

actions.  *Id.* at 612.  Using the same definition of "impairment" utilized in the Report, *Logan* found

that application of bankruptcy jurisdiction would frustrate Ohio state policy and interfere with the

state's administrative regime regulating insurance by violating the Ohio statute's priority of

distribution provisions:

> According to the Liquidator, a determination by this Court that some CGIC [insurer]
> assets were improperly obtained and should be immediately transferred to PRS
> [debtor] would violate the Ohio statute as PRS would receive payment ahead of
> creditors entitled to a higher priority under the state's liquidation scheme.[87]

The *Logan* Bankruptcy Court concluded that the continuation of the adversary proceedings

would "impair" the Ohio insurance liquidation statute at issue because Ohio's policy of

"maximizing the return to CGIC's policyholders and its administrative scheme setting forth priority

of payments would be frustrated by allowing PRS to use the Bankruptcy Code to recover property

from CGIC and thus be paid with funds that would otherwise be paid to creditors under the

priorities set forth under the Ohio statute." *Id.* at 613.

On appeal, the U. S. District Court for the District of Delaware affirmed, holding that to the

---

[85] Despite *Logan* being called to the Bankruptcy Court's attention in this Court's Withdrawal Opinion, the Report only mentioned *Logan* in one footnote, merely noting that *Logan* is *contra* to the Report's conclusions. Report, n. 134.

[86] See Report, fn. 134.

[87] 294 B.R. 609 at 613.

extent that the adversary complaints filed by the debtor against the insolvent insurer's liquidation estate sought affirmative relief, the adversary proceeding impaired the Ohio Liquidation Act and was reverse preempted. 2005 U.S. Dist. Lexis 22611at *7.

Similarly, in *Wagner v. Amwest  Ins. Group,* 285 B.R. 447 (Bankr. C.D. Cal. 2002), the bankruptcy court held that a dispute over property ownership between the bankrupt debtors' estate and the liquidator of an insolvent insurer had to be determined in the state liquidation proceedings due to McCarran-Ferguson preemption, even though the debtor was the party in possession of the disputed funds.  The bankruptcy court found that the purpose of the Nebraska Insurance Act, under which the liquidation was proceeding, was to "marshal assets and pay claims of policyholders and other claimants," and due to the apparent lack of sufficient funds to pay the full amount due policyholders, the court found that the interests of the Nebraska insurer's policyholders were directly at stake. *Id* at 453-454. [88]

The concerns expressed by the *Wagner* court regarding policyholder interests are equally applicable here, where the Lumbermens estate has a very substantial deficiency of assets versus liabilities.  As of December, 2012, Lumbermens' estate had a $500 million deficiency [Appx. p. 711].  As of the Lumbermens' estate's financial report as of December 31, 2014, there are insufficient assets to pay the claims of policyholders at par, as the assets of the estate are $862 million while policyholder claims alone total $1.3 billion.[89]  To permit any "claim" by Ames to result in the appropriation of the Trust Monies, rather than the possible allowance of a general creditors' claim in the Lumbermens insolvency, would be a very direct impairment of the

---

[88] The court found that the risk of its interpretation of the agreement in question would be at odds with the liquidation court's construction of a similar agreement was sufficient to show that the continued exercise of bankruptcy court jurisdiction would "impair" the progress of an orderly liquidation in Nebraska, thus satisfying the MFA's third prong.  Id. at 455.

[89] Exhibit "H" to these Objections.

distribution priority system of Article XIII.

Other cases supporting the Liquidator's position were not discussed or explored in the Report, are: *In Re Advanced Cellular Systems,* 235 B.R. 713 (Bankr. D.P.R. 1999)(turnover proceeding in bankruptcy court by debtor to recover certificate of deposit from insolvent surety bond insurer reverse preempted, despite bankruptcy court's "core" and "exclusive" jurisdiction under Bankruptcy Code §§ 542 and 543, as dispute over whether insolvent insurer had a property right in the CD must be addressed in the state insurance insolvency proceedings to avoid an "impairment" of the insurance insolvency statute); *In Re Medical Care Management Co.,* 361 B.R. 863 (Bankr. M. D. Tenn. 2003)( bankruptcy court granted lift-stay motion on McCarran-Ferguson grounds to permit state court determination of ownership of contested bank deposit, despite its "exclusive and "non-delegable" jurisdiction over property of the debtor's estate,  as bankruptcy court determination of the property ownership question would "impair" the Tennessee Insurers Rehabilitation and Liquidation Act's grant of exclusive jurisdiction to the state court of Tennessee and its prohibition of suits against the insurer or liquidator once the liquidation has begun). *See also, Davister Corp. v. United Republic Life Ins. Co.,* 152 F.3d 1277, 1281-82 (10th Cir. 1998) (federal district court order directing arbitration against insolvent insurer under Federal Arbitration Act would "invalidate, impair or supersede" the "blanket stay" entered by the state liquidation court and impair the progress of the orderly resolution of all matters involving the insolvent company, adversely impacting policyholders because proposed arbitration dealt with an asset of the insurance company that could be apportioned to policyholders).

**The Reports' Overly Narrow Construction of McCarran-Ferguson.** This jurisdictional dispute deals with the very type of state insurance regulatory statute granted preemptive power over the federal priority statute by the U.S. Supreme Court in *Dep't of Treasury v. Fabe,* 508 U.S. 491

(1993). This must be contrasted with the cases relied upon by the Report (p. 33, and n.101 and 102) in urging a "narrow reading" of McCarran-Ferguson.  Those cases are distinguishable, largely dealing with federal statutes that have been held to be immune to preemption rather than dealing with property disputes between estates.  For example, *Lander v. Hartford Life & Annuity Ins. Co.,* 251 F.3d 101 (2d Cir. 2001) was already distinguished in the "Withdrawal Opinion," as the federal statute in question (SLUSA) was explicit in preempting state regulatory schemes. 512 B.R. 736 at 742, n3.  As the Report concedes, the Supreme Court has held that the Bankruptcy Code is not similarly situated. [*Report, p.33- 34; n. 105*].  In *Ochs v. Simon (In re First Cent. Financial Corp.),* 269 B.R. 502 (Bankr. E.D.N.Y. 2001) relied upon an earlier bankruptcy court decision, *In re Rubin,* 160 B.R. 269 (Bankr. S.D.N.Y. 1993), which narrowly construed McCarran-Ferguson based upon decisions rejecting preemption of federal statutes immune from reverse preemption, and which adopted a "four-part" test for the application of McCarran-Ferguson preemption more restrictive than that set forth in *Fabe.*[90]

As for the other cases cited in note 102 of the Report, *Gross v. Weingarten,* 217 F.3d 208 (4th Cir. 2000) and *Tri-Valley Distributing Fin. Corp.,* 350 B.R. 628 (B.A.P. 10th Cir. 2006)(*Unpublished*), both involved the voluntary election by state insurance receivers to avail their insolvency estates of federal jurisdiction, followed by an attempted avoidance of federal jurisdiction (in *Gross,* diversity jurisdiction for an affirmative recovery action and in *Tri-Valley,* stipulated bankruptcy court jurisdiction to determine ownership of certain proceeds).  *Tri-Valley* also relied upon its finding that the state statutory scheme at issue did not create exclusive state jurisdiction for claims asserted against the receiver – that is not the case here, where Article XIII centralizes all

---

[90] *Rubin* relied upon cases such as *Spirit v. Teachers Ins. And Annuity Ass'n,* 691 F.1054 (2d Cir. 1982), a pre-*Fabe* case involving the preemptive effect of Title VII, a decision which this Court has also already deemed inapplicable to the issues presented in this matter.  [Withdrawal Opinion, 512 B.R. 736 at 742, n3.]

claims against the liquidation estate in the Illinois liquidation court. *See* 215 ILCS 5/189 and 209(8).

The Report's overly narrow view of McCarran-Ferguson, informed by its erroneous reliance upon these cases, is demonstrated in its misconstruction of the Second Circuit's leading case on this issue, *Stephens v. American International Ins. Co.,* 66 F.3d 41 (2d Cir. 1995). Contrary to the Report's description, in *Stephens* the Second Circuit reviewed the purposes and scope of the entire Kentucky statutory scheme for insurance insolvency, of which the anti-arbitration provision in question was a part, to determine whether that provision was designed to "protect policyholders," and rejected focusing on the anti-arbitration provision in isolation. *Stephens, supra,* 66 F.3d at 44-45. Two other federal courts have interpreted the *Stephens* holding as broadly endorsing the preemptive power to be granted to state insurance insolvency statutes as a whole.[91] The Report's misconstruction of *Stephens* reflects the Report's inappropriately narrow approach to the McCarran-Ferguson Act as a whole.

**Cases Relied Upon By The Report Are Distinguishable.** The cases primarily relied upon by the Report in ruling that no "impairment" is created by the federal court's continued exercise of jurisdiction over this adversary proceeding do not involve facts or circumstances remotely similar to those in the case at bar. The Report cites *McRaith v. Am. Re-Ins. Co.,* 2010 U.S. Dist. LEXIS 14021 (N.D. Ill. Feb. 17, 2010) for the proposition that the "Illinois priority scheme can co-exist with federal jurisdiction over the underlying action resolving a claim." Report p. 41. However, *McRaith* did not involve a property dispute between a bankruptcy estate and an insurance liquidator. The *McRaith* court noted that the action did not directly affect any policyholder since it was, in effect, a breach of contract collection action brought by the

---

[91] *In Re Advanced Cellular Systems,* 235 B.R. 713, 720 (Bankr. P.R. 1999) ("[I]n Stephens, [citation omitted], the Second Circuit took a different approach and held that a statutory scheme may be considered in its entirety."); *Munich American Reinsurance Company v. Crawford,* 141 F.3d 585, 592 (5th Cir. 1998) (observing that Stephens held that "statutory scheme may be considered in its entirety").

liquidator which only incidentally enhanced the liquidation estate.  In addition, the *McRaith* court noted that the Illinois statute did not create an exclusive jurisdictional court for the *bringing* of actions by the liquidator – an issue not involved here since Article XIII establishes the Illinois liquidation court as the exclusive jurisdiction for bringing claims *against* the Lumbermens estate.[92]

In *Lawski v. Frontier Ins. Group,* 517 B.R. 496 (Bankr. S.D.N.Y. 2014), cited in the Report at p. 39, n.126, the Bankruptcy Court limited its role in considering whether the bankruptcy estate had an interest in real property to a review of the debtor's confirmed plan and related orders; it expressly stated that it would avoid construing the underlying contracts at issue so as not to "step on the toes" of the state court.  *Id.* at 504.  The judicial restraint evidenced by that holding is at odds with the Report's recommendations.  Furthermore, in respect to McCarran-Ferguson issues, the *Lawski* court noted that "the Liquidator's only argument is that the state proceeding would be impaired because the asset would be lost."  Id. at 506.  It was in that context that the *Lawski* bankruptcy court made the statement quoted, out of context, by the Report at note 126.

<u>**Section IV**</u>

**The "First Assuming Jurisdiction Doctrine" Is Not Applicable,
<u>and Permissive Abstention Should Be Considered As Alternative Relief</u>**

If McCarran-Ferguson reverse preemption is applicable to Ames' claims, there is no

---

[92] The *McRaith* Court applied the Seventh Circuit's test for application of McCarran-Ferguson announced in *Autry v. Northwest Premium Serv., Inc.,* 144 F.3d 1037 (7th Cir. 1998), which requires a direct impact upon a policyholder in the capacity of holder of an insurance contract in order to satisfy the third prong of the *Fabe* test.  The Autry test has not been adopted by the Second Circuit, but that a direct impact on policyholder interests is presented in this case.  Furthermore, *McRaith* did not rule that the Illinois statute was not entitled to *any* preemptive effect; it ruled only that 215 ILCS 5/192 ("Duties Of Director As Rehabilitator, Termination"), standing alone in the circumstances of the liquidator suing to recover debts owed, was not entitled to preemptive effect over the federal court removal and jurisdictional statutes.

authority supporting its defeat based on a "first filed" rule.  Particularly in the context of insurer insolvency cases, to adopt such a rule would create a run to the federal courthouse each time an insurer's rating was seriously lowered.  Nothing more than first-filing in federal court would be needed to "gut" the national system of state insurance insolvency statutes and guaranty funds.  As the Report concludes, the "first assuming jurisdiction" doctrine applies only to *in rem* and *quasi in rem* jurisdiction.  However, there is nothing in the McCarran-Ferguson Act that creates an exemption for federal *in rem* actions that impair, invalidate or supersede state insurance insolvency statutes, even if first filed.

As the Report concedes, since the "First Assuming Jurisdiction Doctrine" applies only to claims that are *in rem* or *quasi in rem,* the doctrine plays no role with regard to Ames' Claims ## 1, 2, 3 and 5 (Report, pp. 43, 45).  However, the doctrine should have no application to Ames' other claims either, since "*in rem*" bankruptcy jurisdiction is created by the Bankruptcy Code, a statute subject to McCarran-Ferguson reverse preemption in appropriate circumstances.[93]

Furthermore, the essential nature of both Claim # 4 and Claim # 6 are *in personam* rather than *in rem*.  Claim # 4 is an *in personam* claim for civil contempt sanctions under 11 U.S.C. §105(a), for which either coercion for compliance and/or compensatory damages are the remedies. *Gucci Am. v. Bank of China*, 768 F.3d 122, 144 (2d Cir. 2014).  Here, it is clearly damages that are sought, and the fact that the claim is grounded in 11 U.S.C. §362(a), which deals with property of the estate, does not render the contempt claim itself *in rem*.[94]  The analysis

---

[93] The Liquidator excepts Claim # 10 from this category, as the Liquidator agrees that if such claim for equitable subordination is not dismissed on the merits, then it must stay with the federal court overseeing Ames' bankruptcy case; it does not seek affirmative recovery from the Liquidator, and it is part of the bankruptcy court's adjustment of claims functions.

[94] The Report's discussion at note 144 is unsupported by authority and confuses the *grounds* for the contempt sanction (§362(a)) with the §105(a) contempt relief itself.  Whether the property is or is not still in the possession of the bankruptcy estate is irrelevant, but not for the reasons discussed in the Report's

of Claim #6, for "marshaling," is much the same. Ames' goal is to find a way to seize the Trust Monies rather than to employ the equitable remedy of "marshaling" in its recognized form. Therefore, despite its label, the claim seeks to secure an award of property that does not currently belong to the Ames estate, and the claim does not have an *in rem* character.

**Abstention As An Alternative Remedy.**  While acknowledging that discretionary abstention "might still be possible," the Report declined to recommend it as an alternative to McCarran-Ferguson preemptive relief.  [Report p. 42, n. 138].  However, the majority of Ames' claims do *not* actually arise under the Bankruptcy Code; they are state law claims of little or no merit masquerading as claims arising under the Bankruptcy Code.  Several courts have granted abstention as either an alternative or a companion form of relief to McCarran-Ferguson Preemption, even where only bankruptcy claims were involved.[95]  Accordingly, if McCarran-Ferguson preemption is not found, the Court should grant the alternate relief of abstention.

Dated: Jericho, New York
      February 17, 2016

          Respectfully Submitted,

          TORRE, LENTZ, GAMELL,
          GARY & RITTMASTER, LLP
          Attorneys for Defendant

          By:   s/Mark S. Gamell
             Mark S. Gamell
             Robert Beau Leonard
          100 Jericho Quadrangle, Suite 309
          Jericho, NY 11753-2702
          Tel.:  (516) 240-8900

---

note; the property involved in the underlying alleged violation and its location does not transform the nature of the *in personam* civil contempt action into one sounding *in rem*.

[95] See cases cited in Lumbermens Moving Brief, Appx. p. 0715, n41; 0718, n.42; Lumbermens Reply Brief, Appx. pp. 0794-0795.